## Case No. 21-4058

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

v.

PLURALSIGHT, INC., AARON SKONNARD, JAMES BUDGE, GARY CRITTENDEN, SCOTT DORSEY, ARNE DUNCAN, RYAN HINKLE, LEAH JOHNSON, TIMOTHY MAUDLIN, FREDERICK ONION, BRAD RENCHER, BONITA STEWART, KARENANN TERRELL, MORGAN STANLEY & CO and JP MORGAN SECURITIES,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the District of Utah- Salt Lake City Case No. 1:19-CV-00128-JNP-DBP · Honorable Jill N. Parrish, U.S. District Judge*

# PLAINTIFFS-APPELLANTS' REPLY BRIEF

CAROL V. GILDEN, ESQ.
COHEN MILSTEIN SELLERS & TOLL
190 South Lasalle Street, Suite 1705
Chicago, Illinois 60603
(312) 357-0370 Telephone
cgilden@cohenmilstein.com

KEITH M. WOODWELL, ESQ.
CLYDE SNOW & SESSIONS
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111
(801) 322-2516 Telephone
kmw@clydesnow.com

STEVEN J. TOLL, ESQ.
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue, NW, Suite 500
Washington, District of Columbia 20005
(202) 408-4600 Telephone
stoll@cohenmilstein.com

BENJAMIN F. JACKSON, ESQ.
NORHAN BASSIOUNY, ESQ.
COHEN MILSTEIN SELLERS & TOLL
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797 Telephone
bjackson@cohenmilstein.com
nbassiouny@cohenmilstein.com

*Attorneys for Plaintiffs-Appellants Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago*



# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................iii

PRELIMINARY STATEMENT................................................................. 1

ARGUMENT .......................................................................................... 3

I.    PLAINTIFFS ADEQUATELY PLED NUMEROUS
      MATERIALLY FALSE AND MISLEADING
      STATEMENTS................................................................................ 3

      A.    A Statement-by-Statement Analysis Shows That
            the Complaint Alleges Numerous False and
            Misleading Statements ................................................ 7

            1.    January 16, 2019 Statements ("1-4")
                  (JA1_105 07 (¶173-74)) ......................................... 10

            2.    February 13, 2019 Statement ("8")
                  (JA1_108-09 (¶¶176 78)) ...................................... 12

            3.    February 21, 2019 & March 4-7, 2019
                  Statements ("11" and "17-18")
                  (JA1_69,110-11,117-18,129-31,153-55
                  (¶¶91,181-82,194-96,215,219,289-92)).................. 13

            4.    May 1, 2019 Statements ("27-30")
                  (JA1_77-78,120,122-23,125-26
                  (¶¶113-16,199-200,204-06,209-10)) ..................... 14

            5.    Risk Factors ("12-15, 19-23, 25")
                  (JA1_112 16,119,122,155-58
                  (¶¶184 92,198,202 03,293-302))........................... 16

            6.    Regulation S-K Items 105 & 303
                  (JA1_127 31,170-73 (¶¶212 23,330-342)) ............ 17

      B.    The PSLRA Safe Harbor Does Not Apply ................... 18

II. THE COMPLAINT ALLEGES A STRONG AND MORE COMPELLING INFERENCE OF SCIENTER ........ 23

    A. Defendants' Admissions Support a Strong Inference of Scienter ................................................... 24

    B. Defendants' Insider Sales Support a Strong Inference of Scienter ................................................... 28

III. PLAINTIFFS ADEQUATELY PLED CLAIMS UNDER SECURITIES ACT §§ 11 & 12(A)(2) ................................... 33

IV. PLAINTIFFS ADEQUATELY PLED CLAIMS UNDER EXCHANGE ACT §§ 20(A) & 20A AND SECURITIES ACT § 15 ................................................................................ 34

CONCLUSION ................................................................................ 35

CERTIFICATE OF COMPLIANCE ........................................ 37

STATEMENT OF RELATED CASES ...................................... 38

CERTIFICATE OF SERVICE.................................................. 39

ii

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Spirit Aerosys. Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) .............................................. 14, 27

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...................................................... 1, 7

*Brooks v. Mentor Worldwide LLC*,
985 F.3d 1272 (10th Cir. 2021) ...................................................11

*CalPERS v. ANZ Secs., Inc.*,
137 S. Ct. 2042 (2021) ....................................................... 7

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ............................................. 17, 20

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ...................................................28

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .........................................................32

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ........................................................24

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...........................................29

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) .............................................. 4, 8

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021)...................................................... 16, 27

*In re Apple Comput., Inc.*,
127 F. App'x 296 (9th Cir. 2005) ...................................................15

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  No. 16 CIV 7840 (RJS), 2018 WL 2081859
  (S.D.N.Y. Mar. 30, 2018) ............................................................... 15

*In re K-tel Int'l Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) ........................................................... 4

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ............................. 15, 24, 27, 31, 32

*In re Myriad Genetics, Inc.*,
  No. 2:19-cv-00707, 2021 WL 977770 (D. Utah Mar. 16, 2021) ...... 11

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ........................................................ 18

*In re Qwest Commc'ns Int'l, Inc.*,
  396 F. Supp. 2d 1178 (D. Colo. 2004) ............................................ 31

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................. 31

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) .......................................................... 19

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  No. 15-cv-7658, 2017 WL 1658822 (D.N.J. Apr. 28, 2017) ............ 27

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................. 8

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ....................................................... 6

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  6 F.4th 123 (1st Cir. 2021) ............................................. 15, 16, 17

*Levy v. Gutierrez*,
  No. 14-cv-443, 2017 WL 2191592 (D.N.H. May 4, 2017) ............... 31

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ........................................... 17, 22, 23

iv

*Makor Issues & Rts., Ltd. v. Tellabs Inc.* (*Tellabs II*),
  513 F.3d 702 (7th Cir. 2008) .......................................................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ....................................................................... 3, 11

*McDonald v. Kinder-Morgan, Inc.*,
  287 F.3d 992 (10th Cir. 2002) ......................................................... 14

*Meyer v. Jinksolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................ 7, 8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*
  *Pension Fund*,
  575 U.S. 175 (2015) ........................................................................ 29

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) ............................................................. 7

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ........................................................... 28

*SEC v. Merchant Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ......................................................... 16

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ............................................................ 6, 16

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
  707 F.3d 95 (1st Cir. 2013) .............................................................. 18

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ......................................................... 21, 22

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) .......................................................... 18

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ............................................................... 18

*TSC Indus., Inc v. Northway, Inc.*,
  426 U.S. 438 (1976) .......................................................................... 7

*United States v. Gordon,*
    710 F.3d 1124 (10th Cir. 2013) ........................................................ 3

*Van Dongen v. CNinsure Inc.,*
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) ............................................ 31

*Wochos v. Tesla,*
    985 F.3d 1180 (9th Cir, 2021) ........................................................ 15

## STATUTES

15 U.S.C. § 78u-5(c)(1)(A)(i) ........................................................ 21

Exchange Act § 20(a) ...................................................................... 34

Securities Act § 11 .......................................................................... 34

Securities Act § 12(a)(12) .............................................................. 34

Securities Act § 15 .......................................................................... 34

## OTHER AUTHORITIES

65 Fed. Reg. 51716, 51727 (Aug. 24, 2000) .............................. 29

## PRELIMINARY STATEMENT

Defendants' brief attempts a sleight of hand, repeatedly suggesting that during the first half of 2019, Defendants did not have to tell investors the truth about the most important aspect of Pluralsight's business—its sales force—because Pluralsight's billings continued to grow and the company "exceeded its public revenue and earnings forecasts." Defs.Answer.Br.1.[1] But this is not how the federal securities laws work. The "fundamental purpose" of the federal securities laws is to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor*," because "[t]here cannot be honest markets without honest publicity," and "[m]anipulation and dishonest practices of the market thrive upon mystery and secrecy." *Basic Inc. v. Levinson*, 485 U.S. 224, 230, 234 (1988). Accordingly, federal law requires corporate spokespeople to be forthright and speak honestly to investors ***all the time—and not engage in misleading half-truths and omissions***. Defendants' barrage of knowing and reckless misstatements about the

---

[1] "Pls.Opening.Br.__" refers to Plaintiffs' opening brief and "Defs.Answer.Br.__" refers to Defendants' answer brief. All citations and capitalized terms herein have the same meaning as in the prior briefing. *See* Pls.Opening.Br.2-3 nn.1-2; Defs.Answer.Br. at xv-xvi.

state of Pluralsight's sales force propped up Pluralsight's share price and enabled Defendants to profit handsomely from lucrative insider sales before Pluralsight's 2Q19 earnings were announced. This is precisely the type of conduct the federal securities laws are designed to deter, and Defendants do not get a free pass simply because Pluralsight purportedly reported financial success on certain metrics in other financial periods, or because its revenues—derived from marketing efforts undertaken in previous quarters—continued to grow despite major undisclosed issues.

There is nothing "unusual" about Plaintiffs' straightforward federal securities claims, contrary to Defendants. What makes this case unusual is that Pluralsight has ***never turned a profit*** and suffered ***mounting losses*** from its inception as a public company in May 2018 through year-end 2019. JA1_38,58 (¶¶5,64). Pluralsight attracted investors by ***consistently reporting high billings growth***. Defendants made clear the key driver of Pluralsight's sustained billings growth was its sales force's size and effectiveness. And because Pluralsight did not provide billings growth projections, investors relied on Defendants' statements about the sales force's expansion and

2

performance as an important proxy for whether the company's financial performance was on track. This is why Defendants' misrepresentations about the sales force fueled a **58% increase** in Pluralsight's stock price between December 2018 and February 2019, JA1_42 (¶15), and why when the truth about Pluralsight's sales force was revealed during the 2Q19 earnings call on July 31, 2019, the **massive** artificial inflation of Pluralsight's share price introduced by Defendants' misrepresentations dissipated and the share price **dropped 39.52%**—a drop for which Defendants offer **no plausible alternative explanation**.

For these reasons, and as discussed more fully in Plaintiffs' Opening Brief, the Complaint properly pleads numerous federal securities claims against Defendants, and this Court should reverse.

## ARGUMENT

**I.    PLAINTIFFS ADEQUATELY PLED NUMEROUS MATERIALLY FALSE AND MISLEADING STATEMENTS.**

A cardinal principle of federal securities law is that once a party chooses to speak on a subject, they must speak "fully and truthfully, and provide complete and non-misleading information." *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (disclosure

required to make "statements made, in the light of the circumstances under which they were made, not misleading"). "[I]f a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir. 1997). This duty is created, ***but not extinguished***, at the time the statement is made—if after speaking a party learns information on a "closely linked" subject matter that "color[s]" the "underlying assumptions" of their statement, yet does not disclose that information to investors, the statement is misleading. *See In re K-tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 899 (8th Cir. 2002).

The Complaint clearly alleges Defendants contemporaneously misled investors about Pluralsight's sales force's ability to generate billings. Everyone involved with Pluralsight—from analysts to investors to the Defendant executives, Aaron Skonnard (Pluralsight's CEO) and James Budge (its CFO)—viewed Pluralsight's sales force as ***the key driver*** of the company's future profits. Defendants cultivated this view, touting Pluralsight's 40-50% year-over-year billings growth for eight straight quarters leading up to 2Q19 and telling investors this level of

4

growth was built into Pluralsight's long-term business model. JA1_38-39 (¶5). But in 1Q19, Pluralsight had 25% fewer sales representatives and a less structurally efficient sales force than needed to sustain the growth rate Defendants led investors to expect. Defendants hid this reality from Pluralsight's investors during 1Q19 and 2Q19 by repeatedly misrepresenting and speaking positively about the size, supporting infrastructure, and effectiveness of Pluralsight's sales force, providing investors with ***no indication whatsoever*** its growth and performance were off-track. These statements were individually and collectively materially false or misleading due most importantly to Defendants' omission about the true condition of Pluralsight's sales force, which was revealed on July 31, 2019 when Pluralsight announced a huge drop in billings growth, as demonstrated by the charts below:

| | Q2 2018 | Q3 2018 | Q4 2018 | FE 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| B2B Billings | 52% | 53% | 51% | 52% | 48% | 27% |
| Total Billings | 42% | 44% | 42% | 43% | 41% | 23% |
| Revenue | 38% | 42% | 42% | 42% | 40% | 42% |



JA1_80 (¶119). This announcement trigged a ***massive 39.52% drop*** in

Pluralsight's share price by market-close the following day,

demonstrating the omissions' materiality. JA1_45,84 (¶¶23,129).

Defendants' repeated claim that the alleged misrepresentations

were "literally true," *see, e.g.*, Defs.Answer.Br.1, is both wrong, *see infra*

§ I.A, and a red herring, because "the law is well settled that so-called

'half-truths'—literally true statements that create a materially

misleading impression—will support claims for securities fraud," *Set*

*Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021);

*accord Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000)

("Statements which are technically true may be so incomplete as to be misleading (e.g., half-truths or distortions)."), *abrogated on other grounds by CalPERS v. ANZ Secs., Inc.*, 137 S. Ct. 2042 (2021). Thus, "the proper inquiry requires an examination of defendants' representations, **taken together and in context**." *Meyer v. Jinksolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (emphasis added) (quotation omitted).

## A.  <u>A Statement-by-Statement Analysis Shows That the Complaint Alleges Numerous False and Misleading Statements</u>.

Both Defendants and the district court erred by engaging in a myopic statement-by-statement analysis that fails to account for how Defendants' misrepresentations reinforced each other and worked together to mislead investors. For decades, the Supreme Court has "repeatedly cautioned that allegedly fraudulent corporate statements must be examined in context and in light of the 'total mix' of information made available to investors." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) (citing *Basic*, 485 U.S. at 231-32; *TSC Indus., Inc v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The correct test for whether a statement is materially misleading under Section 10(b) is

7

"whether the defendants' representations*, taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis added). "The literal truth of an isolated statement" does not determine whether it was materially misleading. *Meyer*, 761 F.3d at 250; *see also Grossman*, 120 F.3d at 1121 (court must consider "the context in which the statements were made"). The non-binding cases Defendants cite to the contrary, *see* Defs.Answer.Br.16 n.4, merely state the Court cannot lump all the alleged misstatements together into a singular "pattern" of misstatements and analyze whether the "pattern" was misleading. The Court cannot ignore each alleged misrepresentation's relationship with others, even when conducting a statement-by-statement analysis.

Defendants attempt to distract the Court by repeatedly pointing out Pluralsight's year-over-year billings growth for 1Q19 was above 40%, the growth rate required to sustain Pluralsight's business model. That is a complete non sequitur because the Complaint alleges any sales force issues would not affect Pluralsight's financials until at least 5-6 months later, so of course this huge shortfall in the sales force in early 2019 would not affect billings growth reported in 1Q19. *See, e.g.*,

8

JA1_60-61,63,81-82,144-45 (¶¶70,76,122,264-65). Pluralsight's purported financial success in 1Q19—based on deals generated two quarters prior—does not imply Defendants could not have materially misrepresented the contemporaneous state of Pluralsight's sales force *during* 1Q19. Skonnard admitted the issues existed as Pluralsight "entered the year [2019]," JA1_88 (¶139), and Budge admitted the sales force lacked "ramped capacity" since the "end of last year [2018]," preventing Pluralsight "beginning into this year [2019]" from generating the deals required to sustain its billings growth, JA1_82 (¶124). Budge also admitted in January 2020 that Pluralsight "came into the year (meaning 2019) with fewer sales reps than we had planned," specifically "about 200 quota-bearing sales reps," which was 50 less than what Pluralsight had said publicly JA1_86-87 (¶136). Thus, the sales force issues, as alleged, surfaced early enough to affect Pluralsight's 2Q19 financials.

9

Because Plaintiffs have properly pled the alleged misrepresentations are materially misleading, whether analyzed independently in context or collectively, this Court should reverse.[2]

### 1.    January 16, 2019 Statements ("1-4") (JA1_105-07 (¶173-74)).

At the January 16, 2019 Needham Growth Conference, Budge stated:

1.    "today, we have about 250" quota-bearing representatives ("Statement 1"[3]);

2.    Pluralsight's growth plan is "why you're seeing some of the efficiencies in the model";

3.    Pluralsight was "starting to see some of the efficiencies" of its sales model ("Statement 3") and "built out some of the infrastructure around sales to scale"; and

---

[2] Contrary to Defendants, Defs.Answer.Br.7 n.2, the district court's decision to divide the alleged misrepresentations into 36 separately analyzable statements is not traceable to charts filed by Plaintiffs, which identified only 22 statements. *See* JA3_543-54; JA3_637.

[3] For ease of reference, Plaintiffs refer to the statement numbers listed in Defendants' answering brief; however, they should nonetheless be analyzed in context, as separating the statements this way erroneously alters their meaning. *See* Pls.Opening.Br.30 n.9.  Moreover, Defendants (and the district court) have substituted a non-challenged statement and called it "Statement 2" instead of the statement actually challenged. *See* Pls.Opening.Br.8 n.4.

4.    Pluralsight had "a lot of great sales reps" who were "killing it" based on "a lot of great infrastructure around them" and "we're now at scale" ("Statement 4").

JA1_105-07 (¶¶173-74). These statements misled investors by suggesting Pluralsight's purportedly 250-strong sales force had no material problems when, in fact, its size, infrastructure, and effectiveness were materially deficient and threatened Pluralsight's billings growth. JA1_106-07 (¶174); Pls.Opening.Br.30-35. As discussed below, Skonnard and Budge also later admitted Statement 1 was false. *See infra* § I.A.2; JA1_80-82,86-87 (¶¶119-24,136). Statements 1-4 are therefore actionable under § 10(b). *See Matrixx*, 563 U.S. at 37.

Defendants' proffered alternative interpretations are irrelevant on a motion to dismiss, where the Court must "draw all reasonable inferences from the facts in favor of Plaintiffs," *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021); *see also In re Myriad Genetics, Inc.*, No. 2:19-cv-00707, 2021 WL 977770, at *9-11 (D. Utah Mar. 16, 2021) (defendants' alternative interpretations do not support motion to dismiss). Defendants' argument that Pluralsight in fact had 250 sales representatives in January 2019 and around 240 in mid-February 2019 is predicated on the truth of statements alleged to

11

be false, and therefore fails for the same reason. *See* Defs.Answer.Br.24

(citing JA1_67,82,105-06 (¶¶87,123,173)).

### 2.    February 13, 2019 Statement ("8") (JA1_108-09 (¶¶176-78)).

On a February 13, 2019 earnings call, in response to a securities

analyst's question about "hiring trends for the sales force," Budge stated

Pluralsight was "closing in at around 240" quota-bearing sales

representatives and would "probably" have "over 300" representatives

by year-end. JA1_108 (¶¶176-78). Defendants argue the Complaint

"contains no particularized allegation" this was misleading.

Defs.Answer.Br.28. But the Complaint alleges on July 31, 2019,

Skonnard and Budge admitted (1) until "early to mid second quarter"

(*i.e.*, after April 1, 2019), the company was "dozens of reps" behind

where it needed to be; (2) the company now had "250 quota-bearing

reps"; and (3) this was "the number . . . we wanted to have at this time

in the year, but they didn't come into the year early enough." JA1_80-82

(¶¶119-24,178). Defendants therefore admitted Statement 8 is false

because Pluralsight had "dozens" fewer than 250 reps in 1Q19.

Defendants do not now deny Pluralsight was ***not*** "closing in at around

240" on that date, despite having access to those facts. Additionally,

12

Statement 8 is actionable under § 10(b) because it falsely assured investors Pluralsight was on track to achieve its sales ramp capacity plan. *See infra* § I.A.4; Pls.Opening.Br.36-39; JA1_81-83,109 (¶¶121-25,178).

### 3. February 21, 2019 & March 4-7, 2019 Statements ("11" and "17-18") (JA1_69,110-11,117-18,129-31,153-55 (¶¶91,181-82,194-96,215,219,289-92)).

In Statements 11 and 17-18, Defendants stated in Pluralsight's 2018 Form 10-K and Offering Documents that Pluralsight had "drive[n] substantial increases in the productivity and effectiveness" of its "large direct sales force," which the company had "significantly expanded," leading investors to believe there were no problems with either the sales force's current size, infrastructure or performance. JA1_69,110-11,117-18,129-31,153-55 (¶¶91,181-82,194-96,215,219,289-92). But at the time, Pluralsight was substantially behind its 2019 ramp plan and billings growth had slowed substantially, rendering these statements false and materially misleading by omission. Pls.OpeningBr.40-43. The cases Defendants cite, *see* Defs.Answer.Br.29-30, are inapposite because the reason the "accurate reporting of historic successes" does not create a duty to disclose is that it "would be unreasonable for someone to take

13

a report ***strictly concerned with the past*** as a representation about the future," *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (emphasis added). Here, Statements 11 and 17-18 were not meant to report on past financial performance, but rather meant to assure investors the sales force ***was now more productive***.

4.     **May 1, 2019 Statements ("27-30") (JA1_77-78,120,122-23,125-26 (¶¶113-16,199-200,204-06,209-10)).**

Statements 27-28 concern a May 1, 2019 earnings call during which, in response to questions from analysts about the sales force, Budge claimed Pluralsight was "on pace" and saw a "clear path" to grow the sales force to over 300 quota-bearing representatives by year-end. JA1_77-78,120,122-23,125-26 (¶¶113-16,199-200,204-06,209-10). In Statements 29-30, Defendants touted in a press release Pluralsight's "strong" revenue and billings growth of "over 40% year over year," the "efficiency" of its model, and its sales team's "strong focus" according to various metrics. JA1_77-78,120 (¶¶113,116,199). These statements were false and misleading because, *inter alia*, at the time, Pluralsight was not on track with its 2019 ramp capacity plan, and regardless of Pluralsight's 1Q19 financial success based on sales efforts six months or

14

more prior, **on May 1, 2019**, the company was **not** enjoying continued

billings growth over 40%. JA1_120,123 (¶¶200,206,210). Contrary to

Defendants, the phrase "on pace" is not forward-looking, because as this

Court has repeatedly held, phrases like "on track," "on plan," and

"ahead of plan" are "objectively verifiable each quarter" insofar as they

concern specific internal measurements or plans. *Anderson v. Spirit*

*Aerosys. Holdings, Inc.*, 827 F.3d 1229, 1254-55 (10th Cir. 2016); *In re*

*Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012);

*see also In re Apple Comput., Inc.*, 127 F. App'x 296, 300 (9th Cir. 2005)

(unpublished) (statement that sales force transition was "progressing

nicely" not forward-looking).[4]

Defendants' reliance on *Karth v. Keryx Biopharmaceuticals, Inc.*, 6

F.4th 123 (1st Cir. 2021), is also misplaced. There, the plaintiff failed to

allege a risk disclosure relating to production issues was misleading

---

[4] *Wochos v. Tesla*, 985 F.3d 1180, 1192 (9th Cir, 2021), and *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 CIV 7840 (RJS), 2018 WL 2081859, at \*13 (S.D.N.Y. Mar. 30, 2018), cited by Defendants, are inapposite because they clearly conflict with the cited binding Tenth Circuit precedent. Further, even under *Wochos*' logic, Statements 27-30 are actionable because they were not simply "unadorned" statements that Pluralsight believed it was on track to achieve its goal, but rather incorporated claims about "specific, concrete circumstances *that have already occurred*" (*i.e.*, the touted metrics). *Wochos*, 985 F.3d at 1192.

because at the time the disclosure was made, "it seemed [the company] had solved any production problem," as shown by a contemporaneous supply forecast that later proved accurate. *See id.* at 139-40. Here, Plaintiffs allege Pluralsight's sales force issues were ***ongoing*** at the time of the alleged misstatements.

Lastly, the fact that ***by January 2020*** Pluralsight purportedly got its sales force back on track does not imply Defendants told investors the truth ***in May 2019***.

### 5. <u>Risk Factors ("12-15, 19-23, 25") (JA1_112-16,119, 122,155-58 (¶¶184-92,198,202-03,293-302)).</u>

Under Defendants' logic, a company can deceive investors about current facts so long as it warns investors those facts ***might*** materialize in the future. But that is not the law—for good reason. Contrary to the non-precedential Sixth Circuit decision cited by Defendants, *see* Defs.Answer.Br.33, it is well-established that risk factors can mislead investors if they characterize risks as "possible" when they have in fact already begun to materialize, *see, e.g., In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021); *Set Cap. LLC*, 996 F.3d at 85; *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 769 (11th Cir. 2007). Complete materialization is not required, as even authority cited by Defendants

16

acknowledges. *See Karth*, 6 F.4th at 137-38 ("A company must also disclose a relevant risk if that risk had already begun to materialize."); *see also Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 247 (5th Cir. 2009) (risk disclosures misled investors about "certain dangers that had already begun to materialize"). Nor is known certainty of financial loss required—it is ***sufficient***, but not ***necessary***, to show a risk factor misled investors by describing such a loss as merely "possible." *See Karth*, 6 F.4th at 137-38. Statements 12-15, 19-23, and 25 in the 2018 10-K, Offering Documents and 1Q19 10-Q misled investors by stating Pluralsight ***might*** have trouble hiring and ramping sales representatives, while omitting the company ***was already*** months and dozens of representatives behind, severely threatening billings growth.

6. **Regulation S-K Items 105 & 303 (JA1_127-31,170-73 (¶¶212-23,330-342)).**

Defendants' arguments regarding Plaintiffs' Item 105 claim fail for the reasons discussed in § I.B.5, *supra*. Defendants' arguments about Plaintiffs' Item 303 claim likewise fail. The cases Defendants cite, Defs.Answer.Br.36, state only that because "Item 303 imposes a more sweeping disclosure obligation than Rule 10b-5," a "violation of the former does not *ipso facto* indicate a violation of the latter," *Carvelli v.*

17

*Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019). But an Item 303 violation is actionable under § 10(b) if the omitted information was material, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102-03 (2d Cir. 2015), as here because the negative sales-force growth trend was already occurring and likely to significantly impact Pluralsight's financials, Pls.Opening.Br.53-55. Further, Skonnard and Budge knew about the trend. *See infra* § II. Regardless, Plaintiffs' Item 303 claim is also separately actionable under the Securities Act. *See Stratte-McClure*, 776 F.3d at 104; *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 102-03 (1st Cir. 2013); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

### B.   <u>The PSLRA Safe Harbor Does Not Apply.</u>

Defendants argue Statements 8, 11-12, 18, and 27-28 are protected by the PSLRA safe harbor. But the safe harbor is not "designed to protect companies and their officials . . . when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) (collecting cases from multiple circuits). And each of these statements

18

either made materially false or misleading representations about current or past facts, or the portion of the statements Plaintiffs alleged to be misleading is not forward-looking.

These statements were materially misleading insofar as Pluralsight omitted disclosure of its then-ongoing major issues with sustaining the growth of its sales force and corresponding threats to billings growth, which were clearly important to investors and capable of objective verification.[5] Even assuming *arguendo* some portions of these statements were forward-looking, they nevertheless also contained separable non-forward-looking misrepresentations not protected by the safe harbor:[6]

---

[5] Defendants contend the risk of Pluralsight's falling behind its plan to grow its sales force cannot have materialized in early 2019 because the company continued to grow and invest in its sales force. *See* Defs.Answer.Br.19-20. But those two things are not mutually exclusive, and Budge later admitted the risk had already materialized, stating it was "well documented we had a capacity gap in the first half of 2019." JA1_89,172 (¶¶140, 336).

[6] *Cf. Makor Issues & Rts., Ltd. v. Tellabs Inc.* (*Tellabs II*), 513 F.3d 702, 705 (7th Cir. 2008) (statement that sales were "still going strong," which said "both that current sales were strong and that they would continue to be so," would be misleading if company "knew its sales were about to collapse"); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 207, 213 (1st Cir. 2005) (statement that company "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs"

19

- **January 16, 2019—Statement 2**[7]: Budge stated he was now "seeing some of the efficiencies in the model." JA1_105-06 (¶173).

- **February 13, 2019—Statement 8**: Budge said the total number of quota-bearing representatives was "closing in at around 240." JA1_66, 105-08 (¶¶87,177).

- **February 21 and March 4-7, 2019—Statements 11 and 18**: Pluralsight's 2018 10-K and the SPO Offering Documents, which were signed by Skonnard and Budge, stated Pluralsight currently had a "large direct sales force" and described Pluralsight's purported past success in "driv[ing] substantial increases in the productivity and effectiveness of our sales personnel." JA1_110 (¶181); JA1_72-73, 117 (¶¶103,195).

- **2018 10-K Risk Factors—Statement 12**: The 2018 10-K stated Pluralsight made "no guarantee" its investments in sales and marketing would "succeed and contribute to additional customer acquisition and revenue growth." JA1_70,112,155 (¶¶93,185,294). This refusal to guarantee success is not a forward-looking statement, because it is not a specific "prediction, projection, or plan." *Carvelli*, 934 F.3d at 1325.

- **May 1, 2019—Statement 27**: Budge stated "we like where we are with our sales reps," and Pluralsight's plan to grow its sales force "continues on the really outstanding progressions we've had over the last few years"; current sales representative retention was "excellent"; and the sales force had previously "experienced" some "churn" and "turnover in sales," but nevertheless Pluralsight was

---

not protected under safe harbor because even though statement referred to future financial needs, the company claimed "access to ample cash at a time when [it] was suffering a dire cash shortage").

[7] *See* note 3, *supra.*

20

currently "on pace" to hit its target of "having 300-plus reps by the time we exit the year." JA1_77-78 (¶114).

- **May 1, 2019—Statement 28**: Budge described Pluralsight's recent sales growth rates as "greater than 40% and near 50% on B2B," described them as "sufficient for us over time" to "grow a long and sustainable business model," and represented Pluralsight was currently going in a good "direction . . . on both a top and bottom line." JA1_78, 125 (¶¶115,209).

Further, to receive protection under the safe harbor, a forward-looking statement must be "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). However, "cautionary language that is misleading in light of historical fact cannot be meaningful," *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010), nor can cautionary language that is "nothing more than a front for present problems," *Carvelli*, 934 F.3d at 1327. To provide safe harbor protection, a "cautionary statement[] must be substantive and tailored to the specific future projections, estimates or opinions" alleged to be misleading. *Slayton*, 604 F.3d at 772.

Most of the purportedly "cautionary" language Defendants cite consists of boilerplate references to the safe harbor at the outset of investor presentations and earnings calls, in press releases and SEC submissions, and on Pluralsight's investor relations websites. *See*

21

Defs.Answer.Br.18-19. Courts have repeatedly held such generic language is not meaningfully cautionary. *See, e.g., Slayton*, 640 F.3d at 772 ("if our portfolio deteriorates, then there will be losses in our portfolio," was not meaningfully cautionary and "verge[d] on . . . boilerplate" because it was "vague" and did not concern "the exact risk that materialized"); *Lormand*, 565 F.3d at 244-47 (disclaimer that statements were "not guarantees of future performance . . . and involve known and unknown risks and other factors" was "boilerplate" and not "meaningful"). Accepting Defendants' argument would allow corporate officers to immunize statements from liability under § 10(b) by making a generic nod at the safe harbor at the outset of any presentation or written disclosure—giving them free license to mislead investors without consequence. This is not, and should not, be the law of this Circuit. To the extent Defendants cite specific risk disclosures in Pluralsight's 2018 10-K, *see* Defs.Answer.Br.19 (citing JA1_237-42), these disclosures were false and misleading, *see supra* § I.A.5, and therefore not meaningfully cautionary.

Defendants thus cannot avail themselves of the safe harbor because their "misrepresentations and omissions were not accompanied

22

by specific, concrete explanations that clearly identified and quantified the clearly present financial dangers" and "disastrous effects" posed by the sales force capacity and infrastructure issues.[8] *Lormand*, 565 F.3d at 247-48.

## II.  THE COMPLAINT ALLEGES A STRONG AND MORE COMPELLING INFERENCE OF SCIENTER.

The Complaint adequately alleges Defendants—including Pluralsight's CEO Skonnard and CFO Budge—knew they were misleading investors, or recklessly disregarded the substantial likelihood of doing so, regarding major issues plaguing Pluralsight's sales force, which was the most important driver of the company's valuation, profits, and ability to raise capital. Under a properly holistic analysis, the Complaint pleads a strong inference of scienter that is more compelling than Defendants' *post hoc* attempts to exonerate themselves. *See* Pls.Opening.Br.56-67.

---

[8] The safe harbor is also inapplicable because Skonnard and Budge knew the alleged misrepresentations were false. *See infra* § II.

A.     **Defendants' Admissions Support a Strong Inference of Scienter.**

Defendants attempt to recast Skonnard's and Budge's repeated admissions they were aware of the sales capacity issues as "*post hoc* assessment[s]" of "sales execution challenges," which merely related what they "subsequently 'learned,'" not what they knew at the time of the misrepresentations. Defs.Answer.Br.2,39-40. But "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *see also Level 3*, 667 F.3d at 1345 ("conflict between internal reports and public statements would be evidence of scienter"). And the Complaint alleges Skonnard and Budge effectively admitted they ***knew*** of the sales force issues ***when*** they made the alleged misrepresentations:

1.    In August 2018, Budge admitted he and Skonnard carefully tracked Pluralsight's deal "pipeline," through which deals typically took 5-6 months to progress, and closely monitored Pluralsight's sales representatives' quota performance. JA1_61-63 (¶¶71,76-77).

24

2.    During the 2Q19 earnings call, Skonnard stated he and Budge "regularly" monitored the sales force's performance against industry "benchmarks." JA1_83 (¶127).

3.    During the 2Q19 earnings call, Budge admitted he hadn't revealed the sales force capacity gap during the 1Q19 earnings call because "we were still hitting our numbers" and "we were seeing kind of an accelerated productivity" out of the existing representatives. JA1_82-83 (¶124-126).

4.    During the 2Q19 earnings call, Budge also admitted he and other executives had been monitoring the "metrics around how quickly a sales rep [was] ramped," and Skonnard told investors he and Budge were "regularly" monitoring key "benchmarks . . . regarding the retention of sales representatives." JA1_102 (¶164(i)-(j)).

5.    In January 2020, Budge admitted it was "well documented" Pluralsight entered 2019 with about 200 quota-bearing representatives, and not 250 as claimed in January 2019. JA1_86-87 (¶136).

Together, these statements lead to the plausible inference that

Defendants *knew* Pluralsight's sales force was not performing as

expected, because they had been carefully monitoring its performance

all long, and they *knew* the performance issues would impact billings in

2Q19, because they were aware any issues with the deal pipeline would

take 5-6 months to affect billings. Yet they *chose* not to reveal this to

25

investors.[9] Bolstering this inference are the Complaint's allegations that securities analysts and media coverage reached the ***same inference***, interpreting Budge's and Skonnard's statements during the 2Q19 call as admissions they knew about the sales force issues as they were occurring. For instance, a J.P. Morgan report noted the "hiring issue was known earlier," and a *Seeking Alpha* article repeatedly called out management's "lack of transparency in information sharing," JA1_44-45,85-86 (¶¶19-22,131-35). Further bolstering this inference is the principle that when corporate insiders speak on a particular topic, they have facts to justify their statements given their superior access to company information. *Cf.* O*mnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191-92 (2015) (statement of opinion implies speaker has facts to support it).

That the Complaint does not cite confidential witnesses or internal Pluralsight documents to demonstrate such knowledge is irrelevant. As the district court correctly concluded, JA3_659, the "mere lack of citations to confidential informants and internal documents does

---

[9] Defendants assert it is *possible* Budge simply "misremembered or misspoke in January 2020," but the much more plausible explanation is that Budge spoke truthfully. *See supra* § I.A.1.

not preclude the Court from finding sufficient allegations of scienter based on its holistic review of the Complaint," *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-cv-7658, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 707 (lack of confidential witnesses not a "*sine qua non* for raising" scienter inference).

In response, Defendants rely on *Level 3*, 667 F.3d at 1344, and *Anderson*, 827 F.3d at 1246, but both cases are inapposite. In *Level 3* the Court found the purported post–class period "admission" was merely a "hindsight review" detailing corporate performance issues without conceding the defendants knew about them during the class period. See 667 F.3d at 1347. Similarly, in *Anderson*, the airline Spirit's CEO acknowledged Spirit "mistakenly projected Spirit's ability to improve efficiency and that Spirit ultimately learned that it could not meet projections," but he "did not suggest that Spirit executives had knowingly or recklessly misevaluated earlier data." 827 F.3d at 1249. Here, Defendants' admissions as to their knowledge occurred both ***before and during*** the Class Period.

27

Moreover, Defendants' misrepresentations concerned undisclosed issues with the very engine of the company's business—its sales force—and "it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). At the very least, Defendants' misrepresentations about Pluralsight's sales force were reckless because they presented a danger of misleading investors "so obvious that the [defendants] must have been aware of it." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001). Defendants' admissions thus support a strong and more compelling inference of scienter.

**B.**   **Defendants' Insider Sales Support a Strong Inference of Scienter**.

Defendants have no valid argument why their clearly suspiciously timed and massive insider trades do not support a strong inference of scienter. This is precisely why they took the extraordinary step of attempting to exclude from this Court's consideration an *amicus* brief offered by a distinguished group of academics and former SEC officials—including former SEC Commissioners Robert J. Jackson Jr. and Luis A. Aguilar and former SEC Chief Accountant Lynn E. Turner—explaining why Rule 10b5-1 trading plans may be highly

probative of scienter, even if entered into before the class period, and urging reversal of the district court.[10]

As the distinguished *amici* explain, the SEC's purpose in enacting Rule 10b5-1 was to provide an affirmative defense to a claim of trading on the basis of material nonpublic information, not to allegations of making false and misleading statements. In adopting the rule, the SEC explicitly noted it "does not change" the scienter requirement under § 10(b). 65 Fed. Reg. 51716, 51727 (Aug. 24, 2000). A finding that insider trades have no bearing on scienter simply because they were made pursuant to a Rule 10b5-1 plan would be "inconsistent with the text and history of Rule 10b5-1," Amici Br. at 6-7, and courts have recognized that trading pursuant to Rule 10b5-1 plans may "give rise to an inference of scienter because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan," *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010). These judicial findings are supported by empirical data, which has shown "automatic trading plans may be highly probative of

---

[10] ECF Nos. 10856897, 10858756, 10860044.

scienter."[11] Amici Br. at 7-8. Even plans created before a class period can reveal a motive for personal gain through misrepresentations designed to inflate a company's stock price, particularly if the plans contain share-price triggers or various other red-flag features. *Id.* at 10-14.

All the reasons why sales pursuant to Rule 10b5-1 plans support an inference of scienter are present here. First, Defendants made a substantial profit from their sales. Pls.Opening.Br.65. Second, on a per-month basis, Skonnard and Budge sold ***over seven times*** the number of shares during the Class Period than they did in the ten months after. Amici Br. at 16; JA1_90,94 (¶¶143,150). Third, Skonnard and Budge's sales were suspiciously timed—Skonnard sold in April 2019 right around Pluralsight's highest share price of the Class Period and also ***just five days before the 2Q19 earnings call*** on July 31, 2019, and Budge's trades all executed ***less than a week after the February***

---

[11] Defendants cite various outdated cases to argue that entering a plan before a class period rebuts an inference of scienter. Defs.Answer.Br.47. But subsequent studies have shown Rule 10b5-1 plans can reveal a motive for financial gain when they include short cooling-off periods, like Budge's plan, or when trades are made close to earnings announcements, like Skonnard's. Amici Br. 11-17.

*13, 2019 earnings call*. JA1_91-96 (¶¶144-45,152-53). Fourth,

Defendants sold a substantial amount of their holdings.[12] JA1_93,97

(¶¶148-49,156). The district court erred in failing to consider *all* these

factors, each of which is independently relevant to inferring scienter.

*See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001) (no

per se rule on stock sales; each case is "decided on its own facts"); *Van

Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013)

(stock sales that "were relatively small in amount" did not preclude

finding scienter given their "unusual" timing); *In re Qwest Commc'ns

Int'l, Inc.*, 396 F. Supp. 2d 1178, 1195 (D. Colo. 2004) (listing factors).

In addressing Plaintiffs' insider trading allegations, both the

district court and Defendants erroneously relied on *Level 3*, ignoring

---

[12] Defendants incorrectly claim Budge only sold 11% of his stock. Defs.Answer.Br. 47-48. They reach this calculation by excluding sales made pursuant to the 10b5-1 trading plan and a miniscule amount of shares Budge sold to cover tax liability, and adding in 204,324 shares that vested in mid-to-late May 2019. JA1_222-23. These mathematical gymnastics should be rejected. First, the shares that vested toward the end of the Class Period and should not be considered. *See Levy v. Gutierrez*, No. 14-cv-443, 2017 WL 2191592, at *14-15 (D.N.H. May 4, 2017) ("stark contrast" in stock sales activity before and during class period negates inferences in increases in shareholder holdings because of vesting). Second, as explained above, sales made pursuant to the trading plan are relevant. The correct percentage of shares that Budge sold was 40%, as alleged.

that its holding applies only to plans set up *solely* to pay withholding taxes as they became due, 667 F.3d at 1346-47, which is not the case here.[13] Similarly, Defendants attempt to distinguish *Employees' Retirement System of the Government of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015), on the grounds that the plans there were entered into during the class period, Defs.Answer.Br.47, but this is a distinction without a difference. As the *amici* explain, Amici Br. 14-17, the relevant consideration is that during the Class Period, Defendants misrepresented the state of Pluralsight's sales force and propped up the company's share price, knowing they had scheduled a large volume of imminent stock sales that could occur before July 31, 2019, when Pluralsight reported its 2Q19 results and the truth would come out.

In addition to selling substantial shares through their Rule 10b5-1 plans—which are not publicly available so the provisions are currently hidden—Skonnard and Budge also sold over *$18.7 million in stock* in

---

[13] Only an immaterial percentage of the shares Budge sold (1.6%) and a minority of the shares Skonnard sold (22%) were used to cover their tax liabilities. *See* JA1_222 n.10, JA2_435-40. Regardless, Defendants cannot dispute the payment of these tax liabilities provided material financial benefits.

the March 6, 2019 SPO during the Class Period, JA1_75 (¶108), further

demonstrating their motive to inflate Pluralsight's share price through

misrepresentations.

### III.   PLAINTIFFS ADEQUATELY PLED CLAIMS UNDER SECURITIES ACT §§ 11 & 12(A)(2).

As the district court correctly held, Plaintiffs' Securities Act claims

"are only subject to Rule 8's pleading requirements," and thus Rule 9(b)

does not apply to them, as Defendants contend. JA3_627-631; JA3_537.

Plaintiffs have ***clearly separated*** their negligence and strict liability-

based Securities Act claims from their fraud-based Exchange Act

claims. Plaintiffs have also ***explicitly*** stated their Exchange Act claims

"are independent of all other claims asserted in this complaint" and "the

allegations of fraud pertaining to the [Exchange Act] claims . . . do not

apply in any way to the other claims for relief," and have expressly

disclaimed any "allegations of fraud, scienter, or recklessness in

connection with these non-fraud claims, which are pleaded separately in

this Amended Complaint from Lead Plaintiffs' Exchange Act claims."

JA1_136,140 (¶¶235,254). Defendants cite no authority supporting their

argument that "rely[ing] heavily" on an Exchange Act narrative, or a

stray reference in the Exchange Act section of the Complaint to

Defendants' knowledge, requires the application of Rule 9(b) to non-fraud claims. *See* Defs.Answer.Br. 51-52. Accepting Defendants' argument would effectively, and absurdly, prevent plaintiffs from asserting claims under both acts. *See* JA3_514-514, 537. Because Defendants made false and misleading statements in their Registration Statement and Prospectus, *see supra* §§ I.A.3 & I.A.5, Plaintiffs have adequately pleaded claims under Securities Act § 11.

As to Plaintiffs' Securities Act § 12(a)(2) claims, regardless of whether Pluralsight is liable as a "seller" or "solicitor," Plaintiffs have adequately pled the Underwriter Defendants are liable as solicitors given their role and financial interest in the sales. JA1_56-57 (¶¶58-61).

## IV. PLAINTIFFS ADEQUATELY PLED CLAIMS UNDER EXCHANGE ACT §§ 20(A) & 20A AND SECURITIES ACT § 15.

Because Plaintiffs adequately alleged primary violations of the Exchange Act and the Securities Act, Plaintiffs have also adequately alleged control-person liability under Exchange Act § 20(a) and Securities Act § 15, and violations of Exchange Act § 20A against Skonnard and Budge. JA1_138-140 (¶¶245-53).

34

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted this 8th day of December, 2021.


/s/ Carol V. Gilden
Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
190 S. LaSalle St. Ste. 1705
Chicago, IL 60603
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

Steven J. Toll
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com

Benjamin F. Jackson
Norhan Bassiouny
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
bjackson@cohenmilstein.com
nbassiouny@cohenmilstein.com

Keith M. Woodwell (#7353)
CLYDE SNOW & SESSIONS, P.C.
201 S. Main Street, 13th Floor
Salt Lake City, UT 84111
Telephone: (801) 322-2516
kmw@clydesnow.com

*Counsel for Lead Plaintiffs-Appellants*
*Indiana Public Retirement System and*
*Public School Teachers' Pension and*
*Retirement Fund of Chicago and Lead*
*Counsel for the Class*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief – in both its text and its footnotes – has been prepared in 14-point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Carol V. Gilden*
Carol V. Gilden

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify the foregoing:

1. All required privacy redactions have been made per 10th Cir. R. 25.5;

2. All hard copies of any pleading required to be submitted to the Court will be an exact copy of the version submitted electronically (the ECF digital submission);

3. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, (Vipre software version 12.2.8079; Definitions version 97512 – 7.90460 [Vipre engine version 5.6.7.7 – 3.0] last updated on December 8, 2021, and according to the program, the submission is virus-free

*/s/ Carol V. Gilden*
Carol V. Gilden

38

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2021, I caused to be filed a true and correct copy of the Appellant's Reply Brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

*/s/ Carol V. Gilden*
Carol V. Gilden