## Case No. 21-4058

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

---

INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated
and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

v.

PLURALSIGHT, INC., AARON SKONNARD, JAMES BUDGE, GARY CRITTENDEN,
SCOTT DORSEY, ARNE DUNCAN, RYAN HINKLE, LEAH JOHNSON,
TIMOTHY MAUDLIN, FREDERICK ONION, BRAD RENCHER, BONITA STEWART,
KARENANN TERRELL, MORGAN STANLEY & CO and JP MORGAN SECURITIES,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the District of Utah- Salt Lake City
Case No. 1:19-CV-00128-JNP-DBP · Honorable Jill N. Parrish, U.S. District Judge*

# APPELLANTS' OPENING BRIEF
## [*Oral Argument Requested*]

---

CAROL V. GILDEN, ESQ.
COHEN MILSTEIN SELLERS & TOLL
190 South Lasalle Street, Suite 1705
Chicago, Illinois 60603
(312) 357-0370 Telephone
cgilden@cohenmilstein.com

KEITH M. WOODWELL, ESQ.
CLYDE SNOW & SESSIONS
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111
(801) 322-2516 Telephone
kmw@clydesnow.com

JOEL P. LAITMAN, ESQ.
COHEN MILSTEIN SELLERS & TOLL
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797 Telephone
jlaitman@cohenmilstein.com

STEVEN J. TOLL, ESQ.
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue, NW, Suite 500
Washington, District of Columbia 20005
(202) 408-4600 Telephone
stoll@cohenmilstein.com

*Attorneys for Appellants Indiana Public Retirement System and
Public School Teachers' Pension and Retirement Fund of Chicago*

---

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

## Corporate Disclosure Statement

The Indiana Public Retirement System does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

The Public School Teachers' Pension and Retirement Fund of Chicago does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# Table of Contents

Corporate Disclosure Statement...............................................................i

Table of Contents ...................................................................................i

Table of Authorities.............................................................................vi

Disclosure of Prior or Related Appeals ...................................................x

Jurisdictional Statement.........................................................................1

Statement of the Issues...........................................................................2

Statement of the Case .............................................................................5

    I.     Summary of Argument .................................................5

    II.    Statement of Facts .....................................................11

    III.   Procedural History .....................................................20

Argument.............................................................................................22

    I.     Standard of Review ....................................................22

    II.    The District Court Erred in Finding That the Alleged Misrepresentations and Omissions Were Not Actionable.................................................................22

        A.   Legal Standards Applicable to the Exchange Act Claims.............................................................23

        B.   The District Court's Dismissal on Materiality Grounds Was Erroneous. ...........................................26

            1.   The District Court Disregarded Well-Pled Factual Allegations Demonstrating Materiality. ........................................................26

            2.   The District Court Erroneously Found the Alleged Omissions Were Immaterial.................28

C.    The District Court's Specific Findings Were
Erroneous. ................................................................... 30

    1.    Budge's January 16, 2019 Statements
(¶¶173,  174); JA1_100-101 ................................ 30

        (a)    Erroneous Misrepresentation Findings .... 30

        (b)    Erroneous Omission Findings ................... 33

    2.    Budge's February 13, 2019 Statement
(¶¶177, 178; JA1_108-109) ................................ 36

        (a)    Erroneous  Misrepresentation
Findings ..................................................... 36

        (b)    Erroneous Omission Findings ................... 38

    3.    Defendants' February 21, 2019 Form 10-K
Statements and March 4-7, 2019 Offering
Documents (¶¶180-82,194-96; JA1_110-111,
JA1_117-118) ...................................................... 40

        (a)    Erroneous Misrepresentation Findings .... 40

        (b)    Erroneous  Omission Findings ................. 43

    4.    Defendants' May 1, 2019 Statements
(¶¶199-200, 205-06, 209-10; JA1_120,
JA1_123, JA1_125-126) ...................................... 44

        (a)    Erroneous Misrepresentation Findings .... 44

        (b)    Erroneous Omission Findings ................... 46

D.    The District Court Erred in Finding Defendants'
"Risk Factors" Unactionable (¶¶184-93, 198, 202-
203; JA1_112-16, JA1_119, JA1_122)........................... 48

    1.    The Risk Factors Were Materially
Misleading. ......................................................... 48

2.    The District Court Erred in Finding that Risks Had Not Transpired. ................................ 51

E.    The District Court Erred in Dismissing Plaintiffs' Claims Under Items 303 and 105 of Regulation S-K. ................................................................ 53

1.    Item 303 (¶¶212-220; JA1_127-131) ................. 53

2.    Item 105 (¶¶213, 217, 219, 221-23; JA1_128-131) ..................................................... 55

III.    The Complaint Alleges a Compelling Inference of Scienter .................................................................. 56

A.    The District Court Misconstrued Defendants' Admissions as Innocuous "Hindsight Expressions." .............................................................. 58

1.    Defendants' Words Did Not Reflect "Hindsight Expressions." .................................. 58

2.    The District Court Disregarded that Analysts Confirmed Defendants' Made Admissions. ....................................................... 60

3.    The District Court Erroneously Found That Billings Growth in the First Quarter of 2019 Precluded an Inference of Scienter .................... 61

B.    Defendants Knew Concealment of Sales Force Under-capacity Would Likely Mislead Investors. ....... 63

C.    The District Court Erroneously Discounted Defendants' Insider Sales. ........................................... 65

IV.    The District Court Erred in Dismissing INPRS's Securities Act Claims. ........................................................ 67

Conclusion ............................................................................. 69

iv

Statement Regarding Oral Argument ...................................................71

Certificate of Compliance.......................................................................72

Addendum: Memorandum Decision and Order Granting
the Pluralsight Defendants' Motion to Dismiss,
Filed March 31, 2021 ..................................................... Add.1

Certificate of Digital Submission

Certificate of Service

# Table of Authorities

**Page(s)**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ................................... 24, 25, 42, 43, 47

*In re Alphabet, Inc. Sec. Litig.*,
  No. 20-15638, 2021 WL 2448223 (9th Cir. June 16, 2021) ........ *passim*

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................. 24, 33, 49

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) (unpublished) ............................... 51

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) ....................................................... 32, 32

*City of Philadelphia v. Fleming Cos., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) ........................................................ 57

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) .................................................... 45

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP
  Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................ 25

*Emps. Ret. Sys. of Govt. of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................................ 67

*Garcia v. Cordova*,
  930 F.2d 826 (10th Cir. 1991) ..................................................... 25, 26

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ................................................ *passim*

*In re K-tel Int'l, Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) .................................................. 29, 30, 38

vi

*In re Level 3 Commc'ns, Inc.*,
   667 F.3d 1331 (10th Cir. 2012) .................................................. 36, 45

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) .............................................................. 63

*Matrixx Initiatives Inc. v. Siracusano*,
   563 U.S. 27, 49 (2011) ................................................................ 10, 64

*Meyer v. Jinksolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d. Cir. 2014) ............................................................. 50

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) ................................................. *passim*

*Nat. Res. Def. Council v. McCarthy*,
   993 F.3d 1243 (10th Cir. 2021) .......................................................... 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................ 37, 61

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   838 F. Supp. 2d 1148 (D. Colo. 2012) ................................................ 38

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ................................................ 32, 37, 62

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................ 34, 56

*Scheller v. Nutanix, Inc.*
   No. 19-cv-01651-WHO, 2020 WL 5500422 (N.D. Cal. Sept.
   11, 2020) (unpublished) ..................................................................... 46

*Set Cap. LLC, v. Credit Suisse Group AG*,
   996 F.3d 64 (2nd Cir. 2021) ........................................................ 42, 48

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) .............. 10, 63

*Slater v. A.G. Edwards & Sons, Inc.,*
  719 F.3d 1190 (10th Cir. 2013)....................................................54, 55

*Smallen v. The Western Union Co.,*
  950 F.3d 1297 (10th Cir. 2020)..........................................................65

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007)..........................................................22, 28, 56, 64

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976)......................................................................25, 39

*U.S. v. Gordon,*
  710 F.3d 1124 (10th Cir. 2013)......................................................29, 30

*Voulgaris v. Array Biopharma Inc.,*
  No. 17-cv-02789-KLM, 2020 WL 8367829
  (D. Colo. Nov. 24, 2020) ...........................................................39, 40, 63

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.,*
  426 F. Supp. 3d 864 (D. Kan. 2019)....................................................55

## STATUTES

15 U.S.C. § 78u-4(b)(1)-(2)...................................................................24

28 U.S.C. § 1291 .................................................................................1

Securities Exchange Act of 1934, 15 U.S.C. §§78aa,
  78t(a) and 78t-1........................................................................*passim*

Private Securities Litigation Reform Act of 1995...................................24

Securities Act of 1933, 15 U.S.C. §§77k, 77l and 77o ...................*passim*

**OTHER AUTHORITIES**

17 C.F.R. § 229.105 ................................................................... 55

17 C.F.R. § 229.303 ................................................................... 24

17 C.F.R. §240.10b-5 ................................................................ 1

Federal Rules of Civil Procedure .................................... *passim*

## Disclosure of Prior or Related Appeals

There are no prior or related appeals in this matter.

x

## Jurisdictional Statement

This is an appeal from the dismissal of a securities class action alleging violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78aa, 78t(a) and 78t-1, and SEC Rule 10b-5 (17 C.F.R. §240.10b-5), and violations of Sections 11, 12(2) and 15 of Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k, 77l and 77o.

The United States District Court for the District of Utah had federal question jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §78aa, Section 22 of the Securities Act, 15 U.S.C. §77, and 28 U.S.C. §1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court entered a final judgment dismissing all claims of Lead Plaintiffs Indiana Public Retirement System ("INPRS") and the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") (collectively, "Plaintiffs") on March 31, 2021 (the "Order").

JA3_611-67.[1] Appellants filed a timely notice of appeal on April 28, 2021.
JA3_668.

## Statement of the Issues

1.  Where dismissal of Exchange Act and Securities Act claims on the grounds that the alleged misstatements were not "material" requires a determination that the misstatements were "obviously unimportant", did the district court err in dismissing all but one of the alleged misstatements touting the size, infrastructure, and effectiveness of Pluralsight's sale force as insufficiently "material" when the Complaint contained numerous factual allegations demonstrating their obvious importance including:

(a) Defendants[2] repeatedly told analysts that the size and effectiveness of the sales force was critical to Pluralsight being able to sustain it rate of financial growth;

---

[1] Citations to the Joint Appendix are abbreviated "JA" and include the volume number of the Appendix (for example, "JA1" refers to the first volume). Citations to the district court's docket in this case are abbreviated "Dkt." Citations to "¶__" refer to paragraphs in the Corrected Amended Complaint filed by Plaintiffs (the "Complaint," Dkt. 94, JA1_31-189).

[2] The term "Defendants" refers to the Complaint's Exchange Act Defendants: Pluralsight, Inc. ("Pluralsight"), and its Chief Executive Officer, Aaron Skonnard ("Skonnard"), and Chief Financial Officer, James Budge ("Budge"). Capitalized terms used and not defined herein have the same meanings as in the Complaint. Unless otherwise noted,

b) Defendants repeatedly reported on the salesforce's size, effectiveness and supporting sales infrastructure;

(c) analysts repeatedly asked Defendants about the adequacy of the sales force;

(d) Defendants' admission at the end of the class period that the sales force had, in fact, been under-capacity by 25%, triggered a 39.52% collapse in Pluralsight's common stock price in a single day; and

(e) analysts expressed shock at Defendants' failure disclose the true under-capacity of the sales force during the Class Period when it was known to Defendants.

2) Where both the Exchange Act and the Securities Act recognize a duty to disclose material adverse facts and the existence of actionable omissions when a defendant chooses to speak on the same subject as omitted material adverse facts but fails to disclose them, did the district err in finding that Defendants had *no* duty to disclose the 25% under-capacity of the sales force even though Defendants repeatedly chose to

---

all emphasis is added, and all internal quotations and citations are omitted.

speak positively about the sales force's size, infrastructure and effectiveness?

3) Where the district court was required to analyze whether the alleged misrepresentations and omissions were actionable under the Exchange Act and Securities Act by analyzing them in the context in which they were made and as pled, did the district court err by assessing their actionability only after first dividing them into thirty-six purportedly independent "statements" thereby altering the context in which they were made and disregarding the reasons they were alleged to be misleading?

4. Did the district court err in finding that Plaintiffs failed to allege a strong inference of scienter by construing Defendants' admissions that they *knew* of the sales force's material under-capacity problem throughout the class period (even though they were plainly expressed as admissions and understood as such by analysts who reported on them), as mere "hindsight expressions" and by minimizing the significance of the senior officer defendants' clearly suspicious and massive insider sales?

5.      Did the district court err in dismissing Plaintiffs' Section 20(a) control person claim?

6.      Did the district court err in dismissing Plaintiff INPRS's Sections 11 and 12(2) claims because it relied on the erroneous analyses applied to the Exchange Act claims?

7.      Did the district court err in dismissing Plaintiff INPRS's Section 15 control person claim?

## Statement of the Case

## I.     Summary of Argument

The facts alleged in the Complaint set forth egregious violations of both the Securities Exchange Act and the Securities Act. In promoting Pluralsight to investors, Defendants repeatedly emphasized the importance of Pluralsight's sales force. They explained that the size and effectiveness of the sales force was critically important to the Company sustaining its high rate of financial growth (measured in billings). Throughout the six-month Class Period, Defendants then emphasized that every aspect of Pluralsight's sales force performance was positive. Defendants touted the sales force's "size", "growth", "infrastructure", "retention", "productivity", and "effectiveness". Unfortunately for investors however, all of these statements were materially misleading

5

because, as Skonnard and Budge, the two most senior officer defendants, knew, but would only admit at the end of the Class Period, the sales force was in fact drastically under-capacity. There were simply *too few* representatives to sustain the Company's rate of billings growth.

By not disclosing these material adverse facts, Defendants fueled a dramatic rise in Pluralsight's common stock price from $19.01, shortly before the Class Period began, to over $29.00 early in the Class Period. Skonnard and Budge then engaged in massive insider sales totaling $37 million at peak prices. These sales occurred in the open market and in a $456 million secondary public offering ("SPO") that Defendants orchestrated.

The materiality of Defendants' misstatements and omissions and deception of investors resounded clearly on the final day of the Class Period. When Defendants revealed the truth to the market and disclosed that they knew throughout the Class Period the sales force had been under-capacity by 25% and suffered from infrastructure inefficiencies, Pluralsight's stock price collapsed by 39.52% in a single day—from $30.69 per share to $18.56 per share. The disclosure shocked securities analysts who had been reporting Defendants' false positive picture of the sales

force's condition.  Analysts openly questioned why this material adverse condition had not been disclosed earlier and criticized Pluralsight for its flagrant lack of "transparency".

Despite these clearly alleged material misrepresentations and omissions regarding the *current* condition of the salesforce, Defendants' admitted knowledge of their falsity, and the substantial economic harm to investors, the district court dismissed the Exchange Act claims, as well as the Securities Act claims on the ground that the statements in Pluralsight's SPO Offering Documents were not actionable for the same reasons as under the Exchange Act. The court held there was one material misstatement under the Exchange Act only, no material omissions under either Act and with respect to the Exchange Act, that the allegations did not plead a strong inference of scienter. However, the dismissal was the result of serious legal errors in both methodology and in the application of black letter law.

*First*, on its own initiative and contrary to the pleading and the law, the district court arbitrarily altered the context and meaning of the alleged misrepresentations and omissions by dividing them into thirty-six *independent* "Statements" contrary to how they were spoken and pled**.**

JA3_629-634[3]. The court also flatly ignored the specific reasons identified in the CAC explaining why each misrepresentation and omissions was false and misleading, *see, e.g.,* ¶¶174-5,179,182-3,186,188,190,192-3,196-7,200-1,203,206-7,210-11,276,279,288, resulting in erroneous rulings that found statements "unactionable" that had never been alleged to be false or misleading.[4]

Second, the district court repeatedly found alleged misrepresentations regarding the sales force to be mere puffery, which

---

[3] For example, the court arbitrarily divided a single presentation by defendant Budge into four separate "statements" (opinion pp. 19-20) and then proceeded to assess whether each was *independently* actionable -- directly contrary to the context and as pled. See ¶¶173-4. The court also found descriptions of the sales force's performance ("Statement 4") to be "immaterial puffery" without considering that they were describing the specific performance of the dramatically expanded sales force of 250 representatives in Statement 1, which the Court found to be materially false.

[4] For example, the Court ruled that: "Statement 2 was non-actionable puffery (Op. pp.22-3; JA3_640-641) even though it was never alleged to have been false, see ¶174(a)-e. Further, even though the Complaint made clear Plaintiffs were not challenging the accuracy of Pluralsight's historical reporting of billings growth. It was never mentioned in any of the paragraphs explaining why each misstatement was false (*i.e.* ¶174,175,179,182-3,186,188,190,192-3,196-7,200-1,203,206-7,210-11) - the court simply disregarded all these allegations and found the historical billing growth in Statement 3 was unactionable because it was "accurate". Op. 23; JA3_641.

required them to be "obviously unimportant". However, these rulings ignored multiple layers of well-pled factual allegations demonstrating the obvious importance of the sales force statements: (i) Defendants told investors that the size and performance of the sales force was critical to continued billings growth, a key measure of Pluralsight's performance to investors and analysts given that the Company had yet to turn a profit; (ii) analysts specifically questioned Defendants about and reported on the sales force's size, infrastructure and performance; (iii) analysts were shocked when the sales force's under-capacity and Defendants' deceit were ultimately revealed; and (iv) Pluralsight's stock price declined close to 40% on these disclosures to investors. *See, e.g.* ¶¶62-137,256-342.

*Third*, the district court found the Complaint contained no material omissions and there was no duty to disclose the under-capacity of the sales force. JA3_623-48,659-62. These rulings were directly contrary to black letter law that once Defendants chose to speak on a specific material subject, they had a duty to be complete and non-misleading. *See Nakkhumpun v. Taylor*, 782 F.3d 1142, 1152-53 (10th Cir. 2015). That duty extended to Defendants' risk disclosures, where problems with the sales force were described as hypothetical when, in fact, the risks had

transpired. ¶¶184-93,198,202-203,293-301; JA1_1011-116, JA1_119, JA1_122, JA1_155-158; *see Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).

*Fourth*, in finding that the Complaint did not allege a compelling inference of scienter , the district court repeatedly interpreted facts in *favor of defendants* and gave greater weight to Defendants' less compelling non-culpable inferences. This included the district court: i) interpreting Defendants' admissions that they knew of the 25% under-capacity of the sales force and infrastructure inefficiencies throughout the Class Period, as nonculpable "hindsight expressions" even though the words Defendants used indicated that they were admissions and securities analysts reported them as such at the time; ii) inferring that the absence of a shortfall in billings growth in the first quarter of 2019 meant Defendants did *not know* that the then-existing under-capacity was a material fact even though such an inference was contrary to Defendants' admissions and statements regarding the deal pipeline reflecting that they did; and inferring that Skonnard's and Budge's clearly suspicious $37.2 million of insider selling was only "minimally" supportive of an inference of fraud. JA3_648-59. Additionally, the district

court analyzed and rejected each set of scienter allegations separately, instead of collectively, while claiming it conducted a holistic analysis. Properly construed and viewed collectively, the Complaint's allegations support a strong inference of scienter.

For these and the reasons that follow, the dismissal should be reversed in all respects.

## II.    Statement of Facts

Pluralsight is a software company that provides technology education courses, primarily to business customers, through a cloud-based platform. ¶¶62-65; JA1_57-58. From its inception as a public company in May 2018 through the end of the Class Period on July 31, 2019), Pluralsight garnered investor interest not by its profitability—which it never achieved—but rather by consistently reporting sales ("billings") growth. *See, e.g.* ¶¶64-76,78,81,85,88,97,105,109-12,118,258-262,267-268,273,277-8,284-8;    JA1_58-63,    JA1_64-65,    JA1_67-68, JA1_71,  JA1_74-76,  JA1_79,  JA1_142-143,  JA1_145-146,  JA1_147, JA1_149, JA1_151-153.

Defendants repeatedly told investors that achieving billings growth was directly tied to Pluralsight's ability to expand its sales force with

"quota-bearing" sales representatives capable of meeting their assigned sales quotas.[5] Defendants carefully tracked the sales force's expansion through Pluralsight's "annual ramp capacity plan," which measured the actual number of ramped sales representatives against the number needed for sustained billings growth. *See, e.g.* ¶¶ 70-74,76-77,80,114-15,120-28,136,258-262,277-8,284-8; JA1_60-63, JA1_65, JA1_77-78, JA1_81-84, JA1_86, JA1_142-143, JA1_149, JA1_151-153. Defendants told investors that it took at least six months for sales representatives to become quota bearing, which meant any shortfalls in the expansion of the sales force would not be felt immediately but rather at least six months later. *See, e.g.* ¶¶70,264; JA1_60, JA1_144. Since deals typically took approximately six months to progress through the pipeline, Defendants had visibility into billings growth approximately six months in advance of the close of a quarter. *See, e.g.* ¶76; JA1_63.

Given the importance Defendants placed on the sales force as the lynchpin for continued billings growth, the sales force's size became a

---

[5] According to Defendants, it took six or more months for sales representatives to become "ramped" to their full quotas. *See, e.g.* ¶¶ 7,69,70-71,73,77,87,124,164(i),263-5; JA1_39, JA1_60-64, JA1_67, JA1_82, JA1_100, JA1_143-145.

focal point of Defendants' presentations to investors and analysts' inquiries. *See, e.g.* ¶¶ 72-76,78-81,82-84,87-88,90-91,97,109-24,258-262,277-8,284-8; JA1_56-69, JA1_71, JA1_75-82, JA1_142-143, JA1_149, JA1_151-153. These representations were especially significant because Defendants did not provide billings growth projections to the public; therefore, the sales force's expansion and performance were how securities analysts assessed whether Pluralsight's financial performance was on track. *See id.*

Unbeknownst to investors, however, from January 16, 2019 through July 31, 2019 (the "Class Period"), Pluralsight's sales force had 25% fewer quota-bearing sales representatives—or "dozens" less—than it needed for sustained billings growth. ¶¶ 120-28,136,284-8; JA1_81-84, JA1_86, JA1_151-153; JA2_418. Rather than disclose this reality or stay silent regarding the sales force, Defendants did the opposite. At every opportunity in the seven-month Class Period, Defendants touted the size, infrastructure, and effectiveness of the sales force—concealing from investors  that the sales force's size, capacity, and infrastructure was materially deficient for sustained billings growth. ¶¶9,84,173; JA1_40, 66, 105.

13

At an investor conference on January 16, 2019, the start of the Class Period, Budge stated that the sales force had grown dramatically from "80 quota-bearing reps" to a total of "about 250"; that it had "a lot of great [supporting] infrastructure" that improved retention "massively" resulting in " efficiencies"; that the sales force was "at scale" and was, simply, "killing it". ¶173; JA1_105.

Budge perpetuated the rosy picture of the sales force on February 13, 2019, when on an earnings call, a securities analyst asked about "hiring trends for the sales force" in 2019. ¶¶176-77; JA1_108. Budge gave no hint that Pluralsight was 25% behind on its ramp capacity plan, stating instead: "Total quota-bearing reps" was "around 240, and expected to "grow to probably over 300 as we roll through 2019. . . . *So more reps to come, more on quota on the Street and more goodness from them."* ¶177; JA1_108. These positive statements immediately translated into analysts issuing buy ratings and increasing the target prices for Pluralsight stock. ¶88; JA1_68.

One week later, when Pluralsight filed its 2018 Form 10-K, signed by Skonnard and Budge, on February 21, 2019, Defendants were even

more overtly positive about the sales force's size, "productivity" and "effectiveness" stating:

> We have a ***large direct sales force*** to focus on business sales … [and] ***have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time ...***

¶181; JA1_110.

These positive statements along with the concealment of the sales force existing severe under-capacity and infrastructure inefficiencies helped fuel a meteoric 56% rise in Pluralsight's stock price, from $19.01 per share on December 24, 2018, to $29.65 per share on February 20, 2019. ¶¶97,98; JA1_71. Defendants Skonnard and Budge capitalized on this stock price inflation through massive insider sales. ¶¶98-102,143-45,151-53; JA1_71-72, JA1_90-92, JA1_94-96. In the span of three days in February 2019 alone, for example, Budge reaped nearly $10 million through open market sales, in connection with a trading plan adopted only shortly before the rapid price inflation driven by Defendants' misleading sales force statements. ¶¶151,152; JA1_94-95.

In the following month Skonnard and Budge arranged for a $456 million SPO composed entirely of insider shares (including their own) at

$29.25 per share (a 95% increase over Pluralsight's $15 per share initial public offering ten months earlier). *See, e.g.* ¶¶103-08,284; JA1_72-75, JA1_151. Skonnard and Budge sold an additional $13.6 million and $5.05 million, respectively, through the SPO.

The SPO Offering Documents once again reiterated that Pluralsight had a "large" and "significantly expanded" sales force which had shown "substantial increases in the productivity and effectiveness". ¶¶106,107,194-95,289; JA1_74, JA1_117, JA1_153. Nowhere did Defendants disclose that there were 25% fewer sales representatives than required under their 2019 ramp capacity plan for sustained billings growth or infrastructure inefficiencies. *See id*; ¶¶290-2; JA1_154-155. Even the "risk factors" section of Pluralsight's 2018 Form 10-K, 2019 First Quarter 10-Q and Offering Documents (all signed by Skonnard and Budge) reinforced the impression that the sales force capacity was unimpaired, describing the adverse financial impact of insufficient sales force hires as merely a *hypothetical* circumstance. ¶¶92-96,112,184-93,198,293-301; JA1_68-70, JA1_76, JA1_112-116, JA1_119, JA1_155-158.

16

Defendants' misleading positive statements about the sales force continued in the second quarter of 2019. On a May 1, 2019 earnings call, when asked "how are you doing in terms of the hiring to your targeted sales headcount by the end of the year," Budge responded in unequivocally positive terms, stating he "loved" the growth in sales representatives, that the retention of sales representatives was "excellent" and the 2019 sales ramp capacity plan was "on pace". ¶¶204-05; JA1_122-123. When an analyst pressed for more details on "the sales headcount," he responded that the company had a "pace" that it was happy with and planned to "continue to drive [billings] growth of greater than 40% and near 50% on B2B [billings to businesses]." ¶¶208-09; JA1_125.

These false statements and omissions enabled Skonnard to sell an additional $2.57 million in shares at $30.47, just five days before the disclosure of the sales force's under-capacity would collapse the stock price to $18.56. ¶¶129-30,143-44,151; JA1_84-85, JA1_90-91, JA1_94.

On an July 31, 2019 earnings call, Defendants revealed the severe sales force under-capacity and infrastructure inefficiencies that had plagued Pluralsight since at least the end of 2018, causing a major

decline in year-over-year billings growth. ¶¶119-28,136,139,306-11; JA1_80-84, JA1_86, JA1_88, JA1_160-162. Skonnard admitted that there had not been "enough capacity in the system to sustain our high-growth expectations as we entered the year [2019]." ¶139; JA1_88. Budge admitted that the Company "just didn't have enough ramped [sales force] capacity in our system in really the first and second quarter":

> *Simply put, there was dozen—there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.*

*Id*; ¶309; JA1_161.

When an analyst asked Budge why Defendants had not previously disclosed that the Company had been behind on its sales-representative ramping. Budge responded that the Company was "still hitting" its numbers in the first quarter of the year, but then reiterated that the problem arose much earlier: "[the sales representatives] didn't come into the year early enough in the year. So the ramp time to get them trained up and ready to go, be effective with salaries, we're a few months behind

18

there, that's been the big impact." ¶¶123,126,139,308; JA1_82-83, JA1_88, JA1_161.

In response to the July 31, 2019 disclosures, Pluralsight's common stock plummeted immediately by almost 40 percent, from $30.69 on July 31, 2019 to $18.56 by the market close on August 1, 2019 on unusually high trading volume of 22 million shares. ¶129,324-325; JA1_84, JA168-169. The crash entirely erased the stock's year-to-date gains and amounted to a loss in market capitalization of about $902 million. *Id*.

Securities analysts were shocked and made it clear they had been fundamentally misled, describing the earnings call as the worst they had ever attended. ¶121; JA1_81. The day after the disclosure, SunTrust issued an analyst report titled, "Where Did That Come From?", pointing out "shocking sales execution issues." ¶¶20,326; JA1_44, JA1_169. A report issued by J.P. Morgan stated that the hiring issue "was known earlier," and "management pointed out *that it saw it was behind on sales hiring coming into the year*." ¶20,131,326; JA1_44, JA1_85, JA1_169. A *Seeking Alpha* article expressed "greater concern around management's lack of transparency in information sharing." ¶¶131-33,134-35,329; JA1_85-86, JA1_170.

At the annual Needham conference in January 2020, Budge again admitted that Defendants had known of the sales force's under-capacity as early as the beginning of 2019. Budge stated: *"I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned – than we had hoped for,"* and he explained that "we feel much better focused from our sales leaders going into 2020 than we had going into 2019." ¶¶140,336; JA1_89, JA1_172.

## III.   Procedural History

This case was filed on August 13, 2019 in the United States District Court for the Southern District of New York (Dkt. 1), and transferred to the District of Utah on October 31, 2019. *See* Dkt. 26. INPRS and CTPF were appointed as Co-Lead Plaintiffs on behalf of the putative class on March 25, 2020, Dkt. 87, and filed the operative complaint on June 9, 2020. Dkt. 94.

The Complaint alleged violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Pluralsight, Skonnard and Budge, and of Sections 20A and 20(a) against Skonnard and Budge. ¶¶62-253; JA1_57-140. It also alleged, on behalf of INPRS, violations of Section 11

of the Securities Act against Pluralsight and the Signer and Underwriter Defendants (defined at ¶¶46-60; JA1_53-56); violations of Section 12(a)(2) against Pluralsight and the Underwriter Defendants; and violations of Section 15 against the Signer Defendants. ¶¶254-369; JA1_140-179. Additionally, the CAC alleged violations of Items 303 and 105 of Regulation S-K against all defendants under the Exchange and/or Securities Acts. ¶¶212-223,330-342; JA1_127-131, JA1_170-173.

The Pluralsight Defendants (defined in their motion) filed a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), which the Underwriter Defendants joined. JA1_195. The district court granted the motion in full on March 31, 2021, dismissing all claims in the Complaint without prejudice (the "Order"). JA3_611. On July 6, 2021, the parties filed a joint stipulation notifying the district court that it had not entered a separate judgment dismissing the action and stipulating that the parties agreed that the Order was final. JA3_671. In response, the district court asked the parties to file a motion for an indicative ruling (Dkt. 147), which they did on July 27, 2021 (Dkt. 148). JA3_678, JA3_680. On July 29, 2021, the district court entered an order stating it would dismiss the CAC with prejudice if this Court were to remand for that

purpose. JA3_692-93. On August 2, 2021, this Court remanded this case for that purpose and abated the briefing; the district court dismissed the action with prejudice and entered judgment; and this Court then abated the appeal.

## Argument

### I.  Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1250 (10th Cir. 2021); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). In determining whether Plaintiffs have pled claims on which relief could be granted, the Court must consider the Complaint in its entirety, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309-310 (2007), and "accept all the well pleaded allegations of the complaint as true," construing them "in the light most favorable to the plaintiff." *See McCarthy*, 993 F.3d at 1250; *Grossman*, 120 F. 3d at 118.

### II.  The District Court Erred in Finding That the Alleged Misrepresentations and Omissions Were Not Actionable.

The district court dismissed the Exchange Act claims on the grounds that all but one of the alleged misrepresentations and omissions

were immaterial as a matter of law, and, as to the lone false statement that remained, found that the Complaint insufficiently alleged a strong inference of scienter.[6] JA3_648, JA3_659. As explained below, the district court correctly ruled that Plaintiffs sufficiently alleged that Defendants' January 16, 2019 representation that Pluralsight had ***250 quota bearing sales reps*** was false and misleading; however, its rulings on the sufficiency of the allegations regarding the remaining misrepresentations and omissions were in error, as were its holdings regarding the adequacy of the Complaint's scienter allegations as to all the misrepresentations and omissions Plaintiffs alleged.

## A.    Legal Standards Applicable to the Exchange Act Claims

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not

---

[6] Defendants also sought dismissal under Rule 8, arguing that the Complaint's length and inclusion of Exchange Act claims and Securities Act claims, with some overlapping factual allegations, violated the "short and plain statement" requirement. *See* JA3_619. The district court appropriately found that the Complaint adequately put Defendants on notice of the claims against them and that its length did not necessitate its dismissal. *See* JA3_617-618, JA3_620-621; *see also* JA3_508.

> misleading; (2) the statement complained of was
> made in connection with the purchase or sale of
> securities; (3) the defendant acted with scienter,
> that is, with intent to defraud or recklessness; (4)
> the plaintiff relied on the misleading statements;
> and (5) the plaintiff suffered damages as a result
> of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).[7]

A misrepresented or omitted fact is material if there is "a substantial likelihood that the disclosure of the misrepresented or omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotations omitted); *see also Grossman*, 120 F.3d at 1119 (a statement or omission is material if a reasonable investor would consider it important in deciding whether to buy or sell stock).

---

[7] Defendants challenged only elements (1) (false or misleading statement or omission of a material fact) and (3) (scienter). *See* JA1_210-211. Those two elements are subject to a heightened pleading standard under the Private Securities Litigation Reform Act of 1995, which requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and provide particular facts giving rise to a strong inference that Defendants acted knowingly or with reckless disregard with respect to each act or omission. 15 U.S.C. § 78u-4(b)(1)-(2). As explained herein, the Complaint amply satisfies these elements as to all the misrepresentations and omissions, as alleged by Plaintiffs.

Materiality is a "mixed question of law and fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Accordingly, dismissal of claims on materiality grounds ***as a matter of law***, as the district court did here, is only permissible "where the information is so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality." *Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir. 1991) (quoting *Northway*, 426 U.S. at 450); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citations omitted).

Further, a complaint's allegations are to be analyzed in their proper and full context, not in isolation, in determining whether, taken as a whole," the facts alleged in a complaint "support a reasonable belief that the defendant's statements . . . were false or misleading,". Finally, this Court requires that the factual detail and sources for the alleged omitted and misrepresented facts be scrutinized to support an inference that they were materially misleading. *Kinder-Morgan*, 340 F.3d at 1099, *as amended on denial of reh'g* (Aug. 29, 2003).

**B.    The District Court's Dismissal on Materiality Grounds Was Erroneous.**

### 1.    The District Court Disregarded Well-Pled Factual Allegations Demonstrating Materiality.

As noted, to dismiss alleged misrepresentations as immaterial as a matter of law requires a finding that they were so obviously unimportant to a reasonable investor, that reasonable minds could not differ on the question of their importance. *Garcia*, 930 F.2d at 829. Here, the CAC's well-pled factual allegations leave no doubt that the sales force statements were highly important to investors and as a result dismissal on materiality grounds was erroneous.

First, the alleged misrepresentations were not vague, forward-looking positive statements about the general performance of Pluralsight but rather were statements touting the ***current*** size, performance, and infrastructure of the sales force while concealing that the sales force was ***currently*** under-capacity by 25%. *See, e.g.,* ¶¶173-223; JA1_115-131.

*Second*, Defendants repeatedly told investors that sales force growth was critically important to Pluralsight being able to sustain its rate of billings growth, the most important measure of its financial

performance. ¶¶68,70-84,91,106-07,164-65; JA1_59-66, JA1_69, JA1_74, JA1_100-102.[8]

*Third*, Defendants assured investors that they closely monitored the hiring and productivity of its sales force in generating billings. ¶¶72-74,76-77,80; JA1_61-63, JA1_65.

*Fourth*, investment analysts repeatedly asked Defendants specific questions, and sought quarterly updates, ***about the current capacity, including hiring and ramping of the sales force*** to gage Pluralsight's financial prospects. ¶166; JA1_103 (collecting questions).

*Fifth*, analysts recognized the importance of Defendants' sales force statements by integrating Defendants' exact phraseology into their reports, buy recommendations, and target prices. ¶¶75,81,88,97,109-11,117-18; JA1_62, JA1_65, JA1_68, JA1_67, JA1_75-76, JA1_79.

---

[8] The district court's dismissal is also inconsistent with the very facts it accepted as true. These facts  included the recognition of the importance of the sales force to Pluralsight's performance, including that: "***billings growth was dependent upon the capacity—including headcount, experience, efficiency, and productivity—of its sales force***"; "the productivity and effectiveness of the sales force had a substantial effect on Pluralsight's billings, and because billings were how Pluralsight attracted investors, ***the sales force's effectiveness was relevant to investors***"; and that Defendants "made ***numerous positive statements about [Pluralsight's] sales force and infrastructure*** during the Class Period." JA3_612-613.

*Sixth*, in reaction to the disclosure of the sales force's severe under-capacity Pluralsight's stock price collapsed nearly 40% in a single day and analysts expressed shock at Defendants' concealment of the sales force's under-capacity. ¶¶129-35; JA1_84-86.

When all of these well-pled factual allegations are accepted as true and viewed in Plaintiffs' favor, as they must, *see Tellabs*, 551 U.S. at 322, dismissal of Pluralsight's sales force misrepresentations as "obviously unimportant" must be reversed. *See also Grossman*, 120 F.3d at 1123-24 (analyst responses and market reaction are probative of materiality and falsity).

### 2. The District Court Erroneously Found the Alleged Omissions Were Immaterial.

The district court also incorrectly ruled that even though Defendants chose to speak positively about Pluralsight's sales force's capacity, Defendants did not incur a duty to disclose the known material adverse facts about the sales force's under-capacity. *See* JA3_632-636, JA3_642-648;     ¶¶173,174(e),177,178(b),181,182(c),194,195,196(c),205, 206(b),209,210(d); JA1_105-111, JA1_117, JA1_119-126.

This ruling contradicted black letter law that where defendants chose to speak about a specific material subject, Defendants can "not ...

mislead investors " on that subject. *Nakkhumpun*, 782 F.3d at 1152. They must "speak fully and truthfully, and provide complete and non-misleading information." *U.S. v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) correcting any "misleading impression". *Grossman*, 120 F.3d at 1125; *see also Gordon*, 710 F.3d at 1142. In choosing to speak positively about the size, infrastructure, and effectiveness of Pluralsight's sales force, Defendants could not omit the material adverse facts that the sales force was severely under-capacity by as much as 25% and infrastructure inefficiencies existed.

¶¶120-26,188,190,192,196,203,206,210,219,263,276,280,283,288,290-1,297,301,314-6,319; JA1_81-83, 114-5, 117, 122-3, 125, 130, 143, 148, 150-1, 143-4; JA2_418.

Even the legal authority the district court purported to rely upon does not support dismissal. *See* Order at 25, 33 (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002)); *see also id.* at 23. JA3_633, JA3_635, JA3_643. In *K-tel*, the Eight Circuit held that because the defendants did *not* speak on the subject of the company's financial condition (but rather, only on an unrelated subject), there was no duty to disclose. Here, of course, it is undisputed that Defendants repeatedly *did*

speak on the same subject as the material omissions; thus *K-tel* as well as this Court's precedent, clearly preclude dismissal of each alleged omission. *See Gordon*, 710 F.3d at 1142.

## C. The District Court's Specific Findings Were Erroneous.

### 1. Budge's January 16, 2019 Statements (¶¶173, 174); JA1_100-101[9]

#### (a) Erroneous Misrepresentation Findings

At the January 16, 2019 analyst conference, Budge traced the dramatic growth in the sales force over the prior year from 80 to "250" sales representatives, explained how the infrastructure for the sales force had been built out, and then concluded by touting the size, performance infrastructure and retention of the sales force. ¶¶173; JA1_105 (setting forth statements); 174; JA1_106 (explaining which statements were false and why).

The district court correctly found that Budge falsely stated that Pluralsight had "about 250" quota-bearing sales representatives and that

---

[9] Plaintiffs will refer to the alleged misstatements by citing specific paragraphs in the Complaint as opposed to the "Statements" referred to in the district court opinion because, as noted, the court's methodology incorrectly altered the context and meaning of the alleged misrepresentations and omissions. *See infra.*

this statement was material "in light of how central Pluralsight's sales force numbers were to its billings growth." JA3_631. But the district court then divorced the sentence describing the 250-person sales force from the sentences in the same paragraph that touted the performance of and infrastructure surrounding the 250 sales force (*e.g.*, the sales force was "killing it", with a "great infrastructure around them that has improved our retention massively" and "we're now at scale"). This made the later statements appear as untethered "generalized statements of optimism that are not capable of objective verification." JA3_634 (citing *Grossman*, 120 F.3d at 1119) when in fact they specifically described the performance of the 250 sales representatives, which was subject to verification as the court already found.

This was reversible error. In considering materiality, courts "must consider the context in which the statements were made." *Grossman,* 120 F.3d at 1121; *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("Statements made in the course of an oral presentation 'cannot be considered in isolation,' but must be viewed 'in the context of the total presentation.')

*Second,* the district court found that the positive statements about the size, growth and performance of the sales force *were* not "objectively verifiable"; this was also in error. As alleged, Defendants told investors that through Pluralsight's annual sales ramp capacity plan and billings pipeline, they determined if the current size of the sales force was sufficient for continued billings growth. ¶¶76-77,122,124,127,164-65; JA1_63, JA1_81-83, JA1_100-102; JA2_418. Indeed, it was these internal systems that allowed Budge to know that the sales force was missing "dozens" of representatives from the end of 2018. ¶124; JA1_82.

Taken together, these positive statements (including *e.g.*, the sales force was "killing it", with a "great infrastructure around them that has improved our retention massively" and "we're now at scale") also were actionable because they "create[d] a plausibly misleading impression of a 'state of affairs [regarding the sales force] that differed in a material way from the one that actually existed.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017)); *see also Casella*, 883 F.2d at 807-08 (what is puffery in isolation "may be actionable as an integral part of a

representation of material fact when used to emphasize and induce reliance upon such a representation").

### (b)    Erroneous Omission Findings

The complaint also alleged that the facts omitted from Budge's January statements were material. ¶174(c),(d),(e); JA1_106-107. Once again, because Defendants chose to speak in detail about the sales force's existing size, growth, productivity and infrastructure, they could not omit disclosure of the adverse facts on those subjects: i.e. Pluralsight's then-existing capacity gap (which placed it months behind and dozens of sales representatives off its 2019 plan); that Pluralsight was off its "long-term growth trajectory" (then, as Defendants boasted, running at six consecutive quarters of greater than 50% growth in B2B billings); and that there were significant inefficiencies in its sales infrastructure. *Id.*; *see also* ¶¶78,120-28,136; JA1_64, JA1_81-84, JA1_86. There is a substantial likelihood that this omitted information would have been viewed by investors "as having significantly altered the total mix of information made available particularly given the stock price collapse that occurred once it was disclosed. *See Basic*, 485 U.S. at 231-32; *see also Alphabet*, 1 F.4th at *703 (finding that "market reaction" and "media

33

coverage" after disclosure "support the materiality of the misleading omission"); ¶¶126,129-35; JA1_88-91.

The district court also erroneously ruled, purportedly relying on *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) that Budge's supposed confidence in Pluralsight's 2019 growth plan justified him speaking about the plan to grow the number of sales representatives without disclosing that Pluralsight was, in fact, currently months behind the plan. *See* JA3_633. On its face, the court erroneously interpreted allegations in favor of Defendants, without any factual basis and before any discovery. Moreover, Rombach is completely unsupportive because unlike the plaintiffs in *Rombach*, 355 F.3d at 174, Plaintiffs have alleged with specificity why Budge's discussion of the 2019 annual ramp capacity plan was materially incomplete. *See* ¶174(c),(d),(e); JA1_105-106. As Defendants themselves explained being behind in Pluralsight's plan was critically important because it threatened billings growth. *See* ¶¶6-7,68-77; JA1_39, JA1_59-63.

The district court also incorrectly isolated "Budge's touting of Pluralsight's efficiencies[10] and found it gave rise to no duty to disclose. *See* JA3_633. However, Budge's statements about efficiency were not alleged to be misleading in isolation but rather, as specifically alleged in ¶174(c),(d); JA1_106-107, combined with other specific positive statements about sales force performance and infrastructure. Taken together these statements gave the false impression that the sales force had no material problems *at all* when, in fact, its capacity, size, and infrastructure were materially deficient. *See, e.g.,* ¶¶9,84,173,174-75; JA1_40, 66, 105, 106-107.[11]

---

[10] The term "efficiency," as Budge used it in the context of his January 16, 2019 statements, was objectively verifiable. Budge described efficiencies as growing sales headcount (expenses) more slowly than B2B billings growth. *See* ¶¶72,79,173; JA1_61, JA1_64, JA1_105-106.

[11] The district court also incorrectly isolated another statement from Budge's statements in Paragraph 173 regarding the plan to "grow the sales force to 300" ("Statement 2") as being literally correct and thus non-actionable, JA3_633, even though this statement was never alleged to be false.

2.  **Budge's February 13, 2019 Statement (¶¶177, 178; JA1_108-109)**

(a)  **Erroneous  Misrepresentation Findings**

The district court ruled Budge's comments about how Pluralsight's sales force had 240 quota-bearing sales representatives and expected it to grow to over 300 in 2019, meaning "more reps to come, more on quota on the Street and more goodness from them" were "forward-looking optimism and puffery" on which no reasonable investor would rely.[12] *See* JA3_634-635. This ruling was incorrect.

*First*, Budge's comments were not "broad claims" or "general, forward-looking expressions of confidence" in the future but rather were objective and verifiable by reference to Pluralsight's 2019 sales ramp capacity plan, sales quotas, billing targets, and the deal pipeline. *See In re Level 3 Commc'ns, Inc.,* 667 F.3d 1331, 1340 (10th Cir. 2012); ¶¶76-77,120-128,136; JA1_63, JA1_81-84, JA1_86. And as of February 13, 2019, as Defendants later admitted, there was significant doubt that there was "more goodness to come" because Pluralsight was significantly

---

[12]  Statements  considered  corporate  optimism  or  mere  puffing  are typically forward-looking statements, or "are generalized statements of optimism that are not capable of objective verification," are not actionable because reasonable investors do not rely on them. *Grossman,* 120 F.3d at 1119.

off its sales ramp capacity plan and Defendants were "suffer[ing]" and trying to get "caught up." ¶¶120-127,136,178(a); JA1_79-83, JA1_86, JA1_109. Budge's February 13, 2019 statements were actionable because they completely contradicted this known reality. *See In re Quality Sys.*, 865 F.3d at 1143 ("[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" when contrary was true was actionable).

*Second*, the district court disregarded factual allegations demonstrating that the February statements *were* important to investors.  For example, Budge was responding to an analyst's question on that subject: "[O]n the hiring trends for the sales force." ¶87; JA1_67. Moreover, after Budge's comments, SunTrust issued a report noting that Pluralsight's "growth investments" were "driving top-line growth acceleration"—drawing directly upon what Budge had told investors about the sales force's status on January 16, 2019. ¶¶88,173; JA1_68,

JA1_105. Budge's failure to correct that impression was actionable. *See Grossman*, 120 F.3d 1112.

### (b)    Erroneous Omission Findings

Rather than stay silent, Budge once again chose to speak "about how Pluralsight's sales force was positioned at the end of 2018 and the company's hiring plans for 2019." JA3_635; CAC ¶¶177,178(b); JA1_108-109. Having done so, as noted the law does not sanction Budge's selective omission of the severe under-capacity of the sales force yet that is precisely what the district court did when it again, citing *K-tel*, incorrectly ruled that Budge's statements on the subject of the sales force triggered no duty to disclose. *See* JA3_635. *K-Tel*, 300 F.3d at 898; *Nakkhumpun*, 782 F.3d at 1152-53.

Further, failing to tell investors that as of February 2019, there were "dozens of reps" that the Company "***needed*** to bring on board . . . so that they would ramp and become fully productive in the second quarter," *see* ¶¶123-25; JA1_82-83, "went beyond the vague or aspirational to describe an essential feature of [Pluralsight's sales force] that reasonable investors would consider important, material information." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148,

1160 (D. Colo. 2012).[13] Indeed, Pluralsight's hiring and status of sales representatives were topics of paramount importance for investors, and as such, when Budge answered the analyst, he "could not give an explanation that would mislead investors" and had to give complete information. *See Nakkhumpun*, 782 F.3d at 1152-53.

Finally, the district court incorrectly found that omitting the disclosure of the current sales force's under-capacity did not "alter the meaning of the positive future projections that Budge made for 2019." *See* JA3_635. At the very least, reasonable minds could differ as to whether investors would have viewed Pluralsight's "positive" plan to grow to 300 sales representatives in 2019 differently had they known that Pluralsight was months behind and dozens of sales representatives behind plan; therefore, the claim should not have been dismissed at this stage.[14] *See Northway*, 426 U.S. at 450.

---

[13] As noted above, the court's ruling on this point is also at odds with its own findings that Defendants told investors that the sales force's size was highly important. See footnote 8 *supra* and JA3_612, JA3_631.

[14] To the extent that the district court ruled on the basis that one segment of Budge's whole statement was arguably forward-looking, that was also error. "[C]ourts hold that statements that are rendered misleading due to omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor provision." *Voulgaris v.*

### 3. Defendants' February 21, 2019 Form 10-K Statements and March 4-7, 2019 Offering Documents (¶¶180-82,194-96; JA1_110-111, JA1_117-118)

#### (a) Erroneous Misrepresentation Findings

In both the Form 10-K for 2018 (filed February 21, 2019) and March 2019 SPO Offering Documents, Defendants continued to perpetuate that false impression that there were *no* problems with either the current size, infrastructure, or performance of sales force.

Defendants touted the sales force as "large" and "significantly expanded" and claimed there were "substantial increases in the productivity and effectiveness". The district court also found these statements unactionable expressions of "corporate optimism and puffery." *See* Order at 26, 32; JA3_636, JA3_643.

This finding was erroneous because, whether the sales force was sufficiently "large" to be "effective" and "productive"[15] was, as noted,

---

*Array Biopharma Inc.*, No. 17-cv-02789-KLM, 2020 WL 8367829, at *20 (D. Colo. Nov. 24, 2020).

[15] Plaintiffs do not challenge the literal accuracy of the words "large," "significantly expanded," "productivity," or "effectiveness," but in context, as used by Defendants, that they created a false and misleading picture of Pluralsight's sales force ("hyper-growth," in an analyst's words). *See* ¶¶97,182(a),(b),196(a),(b); JA1_71, JA1_110-111, JA1_117-118.

objectively verifiable in the ramp capacity plan, billings pipeline records, and sales quota records. ¶¶120-28,136; JA1_81-84, JA1_86-87. Those records informed Defendants that the number of Pluralsight's sales representatives was inadequate *as of the first quarter of 2019*, when these statements were made and why it needed to get "caught up". ¶¶121-25; JA1_81-83.

Moreover, these statements were highly material because they reinforced the prior positive quantification of the adequacy of the 250 sales representatives made earlier in January and February 2019. ¶¶83,87,173,177; JA1_66-67, 105-106, 108. Also, Defendants previously explained "productivity and effectiveness" in verifiable terms that meant that sales representatives were "ramped to scale." ¶¶72,77,79,173; JA1_61, JA1_63-64, JA1_105-106.

These alleged misrepresentations were also *not* "obviously unimportant" because analysts relied on Defendants' February 21, 2019 and March 4-7, 2019 statements and tied them back to Defendants' earlier statements on the same topics. ¶¶97,109; JA1_71, JA1_75.

This Court's decisions also do not support dismissal of these statements. In *Grossman*, this Court found that similar statements *were*

41

material but affirmed dismissal of the plaintiffs' claims on the ground that the complaint failed to show they were false." 120 F.3d at 1124. Here, that is not the case. Defendants clearly created a false and misleading picture of Pluralsight's sales force's capacity ("hyper-growth," in an analyst's words). *See* ¶¶97,182(a),(b),196(a),(b); JA1_71, JA1_110-111, JA1_117-1138 *Set Cap. LLC, v. Credit Suisse Group AG*, 996 F.3d 64, 85 (2nd Cir. 2021) ("[T]he law is well settled that so-called 'half-truths'— literally true statements that create a materially misleading impression—will support claims for securities fraud.").

Further, the alleged under-capacity of the sales force are not conclusory allegations under *Kinder Morgan* because they come from admissions by the two most senior officers of the Company. *See, e.g.*, ¶¶62-81,120-37; JA1_57-65, JA1_81-87; *Kinder-Morgan,* 340 F.3d at 1099,

Finally, unlike in *Grossman*, Plaintiffs have alleged that the market "discovered these assertions to be untrue" (angrily and publicly so) and "that such discoveries had an adverse impact on [Pluralsight's] stock price." *See* 120 F.3d at 1124; ¶¶126, 129-35; JA1_83-86.

42

**(b)    Erroneous  Omission Findings**

The district court incorrectly held that Defendants' discussion of Pluralsight's sales force in the Form 10-K and SPO Offering Documents was too "general[]" to be actionable. *See* JA3_636, JA3_643. However, again having chosen to speak on the specific subject of the sales force's "large" size and increased "productivity" and "effectiveness",  Defendants were compelled to be complete and not omit the material adverse facts regarding the sales force's severe under-capacity and infrastructure, *see K-Tel*, 300 F.3d at 898; *Grossman*, 120 F.3d at 1125, which they did not do. *See* ¶¶182,196; JA1_110-111, JA1_117-118.

Finally, because these statements in February and March, as well as the prior statements about the sales force, had been uniformly positive, there is little question, that disclosure of the material sales for under-capacity would "have altered the total mix of information" alerting investors that Pluralsight's billings might well face billings head winds. *See Kinder-Morgan*, 340 F.3d at 1103-04

### 4. Defendants' May 1, 2019 Statements (¶¶199-200, 205-06, 209-10; JA1_120, JA1_123, JA1_125-126)

### (a) Erroneous Misrepresentation Findings

On May 1, 2019, Budge, in response to direct questions from analysts about the sales force's status, stated that Pluralsight's hiring and ramping of sales representatives was on pace with its plan. ¶¶205,209; JA1_123, JA1_125. The district court, however, carved out individual phrases and held that, on their own, they were unactionable "optimism and puffery."[16] *See* JA3_644-648. Both holdings are grounds for reversal.

---

[16] The district court also held that portions of the statements (whether Pluralsight had 80 sales representatives two years earlier and whether Pluralsight experienced "a turnover in sales" in the first quarter of 2019) were unactionable statements of historic fact, but again Plaintiffs never challenged the literal accuracy of those fragments of Budge's statements. *Compare* Order at 35, 36 n.17; JA3_645-646 *with* ¶¶206,210; JA1_123-124, JA1_125-126. The district court was also wrong that Plaintiffs did not challenge Budge's statement about turnover as misleading. *See* Order at 36 n.17; JA3_646. Plaintiffs argued that Budge's description of the sales ramp capacity plan as proceeding as "normal" turnover that "we planned for" was materially misleading because it created a misleading impression that Pluralsight was on track with its 2019 sales ramp capacity plan. *See* JA3_517. Finally, the district court erred in finding that Defendants' May 1, 2019 statement about Pluralsight's continued billings growth success was not misleading. JA3_647-648. At the time, Defendants were not enjoying continued billings growth over 40%. ¶¶200-01; JA1_120-121; JA3_514 (n.14).

The district court's holding on the immateriality of Budge's May 1, 2019 statements is contrary to this Court's holding in *Level 3* (which the district court cited as support) that statements about how a specific aspect of a company's business was mostly "complete," "ahead of plan, and under budget" were actionable. *Level 3,* 667 F.3dat 1340; JA3_645. Viewed with all the well-pled allegations in the CAC, Budge's detailed remarks on how Pluralsight's 2019 sales ramp capacity plan was continuing "on the really outstanding progression . . . where we've massively expanded our sales force," and how Pluralsight had "planned for" "normal" "turnover" and saw "a clear path to having 300-plus reps" by the end of 2019 (¶¶ 205-06; JA1_123), were not the "rosy affirmations" that this Court has struck down as puffery and optimism. *See Level 3*, 667 F.3d at 1340; *see also Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017).

Furthermore, Budge's May 1 statements were not obviously unimportant to investors. In fact, on June 24, 2019, Sun Trust issued a report, ¶¶117-18; JA1_79, that listed among its "key points" that the company's "***expanded [] sales capacity***" and "***overall ramp in increased sales capacity***" which "***bodes very well for B2B billings***

*activity this year*," ¶118; JA1_79, the precise issue Budge misleadingly presented on May 1, 2019. ¶¶205,209; JA1_123, JA1_125. The misleading impression of Pluralsight's sales force capacity expanding smoothly was therefore clearly actionable. *See Alphabet*, 1 F.4th , at 8; *Scheller v. Nutanix, Inc.* No. 19-cv-01651-WHO, 2020 WL 5500422, at *8 (N.D. Cal. Sept. 11, 2020) (unpublished).

### (b)    Erroneous Omission Findings

The district court also erroneously ruled that because these May 1 statements were so obviously vague as a matter of law, they could not form the basis for material omissions either. *See* JA3_644-648. The district court did not analyze Plaintiffs' allegations regarding the actionable omissions in Budge's statements at all. *See* JA3_644-647; ¶¶206(b),210(d); JA1_123, JA1_125-126. This was error because analysts asked Budge to speak about the precise topic of the alleged omissions, ¶¶204-210; JA1_122-126, asking:

- "[H]ow are you doing in terms of the hiring to your targeted sales headcount by the year?" (¶204; JA1_122); and

- "What is the limiting factor on the pace of sales headcount growth?" (¶208; JA1_125)

Budge could have declined to answer but once he "made that choice, he could not give an explanation that would mislead investors." *Nakkhumpun*, 782 F.3d at 1152. But he did.

Budge reaffirmed his and Defendants' previous positive statements, using quantifiable metrics, and specifically referenced Pluralsight's sales hiring plan, which he described as "on pace." ¶205; JA1_123. In truth, it was anything but. ¶¶120-28,136; JA1_81-84, JA1_86. When asked what the "limiting factor" on that "pace" was, he responded, "it is a combination of both of those [sales management's capacity and wanting to operate around break-even or even better free cash flow]" and elaborated, discussing the successful "pace" (referring back to his previous answer cited in Paragraph 205) of the plan to continue to grow B2B billings at its historic rate. ¶209; JA1_125. This response omitted crucial facts that would have altered the total mix of information available. *See, e.g.*, ¶¶64-91,97,109-18,210-11; JA1_58-69, JA1_71, JA1_75-79;*See Kinder-Morgan*, 340 F.3d at 1103-04.

47

**D.    The District Court Erred in Finding Defendants' "Risk Factors" Unactionable (¶¶184-93, 198, 202-203; JA1_112-16, JA1_119, JA1_122).**

### 1.    The Risk Factors Were Materially Misleading.

The district court erred in finding that, as a matter of law, Defendants' risk disclosures in the Form 10-K, SPO Offering Documents, and Form 10-Q were too "generic" to be actionable.[17] *See* JA3_636-43. But the risk disclosures that Plaintiffs challenge were not boilerplate; they were specific to the critical element of Defendants' success: its sales force. *See* ¶¶184-93,198,202-203; JA1_112-16, JA1_119, JA1_122. According to Defendants: "billings were fueled by two factors: first, the number of sales representatives, and second, by the productivity of those sales representatives." JA3_641. The crux of the at-issue risk statements was an if/then scenario that involved those three elements (headcount plus productivity equals billings). For example, Defendants repeatedly warned investors that *IF* they were unable to hire and ramp sales

---

[17] The district court's suggestion that courts only rarely, if ever, find that risk disclosures are independently actionable is incorrect. *See* Order at 28-29; JA3_638-639. Recent decisions from the Second Circuit and the Ninth Circuit affirm the well-established principle that risk disclosures are independently actionable when they omit material information. *See Alphabet*, 1 F.4th at 10-11; *Set Cap. LLC*, 996 F.3d at 86; *see also* Opp. at 20-22; JA3_519-521 (citing additional cases).

personnel to their desired productivity levels in a reasonable amount of time, **THEN** their business might be harmed. ¶¶187,198,202; JA1_113, JA1_119, JA1_122. At the same time, they painted an unblemished picture of the hiring and ramping of sales representatives. ¶¶88,97,109,111,117-18,173,177,181,199,205,209;   JA1_68,   JA1_71, JA1_75-76,   JA1_79,   JA1_105-106,   JA1_108,   JA1_110,   JA1_120, JA1_123, JA1_125.

As the district court acknowledged in finding that the PSLRA safe harbor did not protect Defendants' statements, Plaintiffs alleged sufficient facts to show that both the "*IF*" and the "*THEN*" in Defendants' warnings had transpired: as of February 21, 2019, Pluralsight "was behind in its sales representative ramping capacity and was experiencing sales execution failures." JA3_637; *see also id.* at 640-41 (accepting as true that Pluralsight's sales capacity gap existed during the first quarter of 2019). A reasonable investor would have viewed those facts as significantly altering the total mix of information regarding risks associated with Pluralsight's sales force. *See Basic*, 485 U.S. at 231-32.

Moreover, it is plausible that investors would have been misled. Even "[a] generic warning of a risk will not suffice when undisclosed facts

49

on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d. Cir. 2014). "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Id.*; *see also Alphabet*, 1 F.4th at 11. That is exactly what Defendants did here: they told investors that they might have trouble hiring and ramping to productivity but that they were progressing smoothly on their plan to hire and ramp new sales representatives, while omitting the fact that they were several months and dozens of people behind (which translated into a risk to billings). ¶¶120-28,136; JA1_81-84, 86; JA2_418.

The district court's decision to disregard those allegations and find that as a matter of law, "[a] reasonable investor would be unlikely to read" the risk disclosures and be misled was therefore erroneous. *See* JA3_639.

### 2. The District Court Erred in Finding that Risks Had Not Transpired.

Courts that have declined to find liability for risk disclosures have generally done so where the plaintiffs had not sufficiently alleged that a disclosed risk had in fact transpired as of the statement's date. *See, e.g.*, *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (unpublished); *cf. Alphabet*, 1 F.4th at 704 n.6 (declining to follow *Bondali*). Here, the district court held that it was "not evident" that a risk to billings growth had materialized by February, March, or April 2019. *See* JA3_640-643. In doing so, the district court failed to construe Plaintiffs' well-pled factual allegations as a whole, in Plaintiffs' favor.

*First*, the district court overlooked that the core of Plaintiffs' allegations regarding the risk disclosure omissions was that the risk that Defendants might not be able to hire and properly ramp sales representatives had already transpired. ¶¶186,188,190,192; JA1_113-115; JA3_519-521. This error was also incongruous with the court's recognition that the risk regarding which Defendants omitted material information was that of a failure to hire and ramp sales representatives to productivity, and that this risk had already transpired. *See* JA3_637. The risk to billings growth – the "*THEN*" of the if/then risk disclosure –

51

was a consequence of the risks associated with the sales force itself (failure to hire, ramp, etc.) transpiring. ¶¶67-81,120-36; JA1_59-65, 81-87.

Ignoring these allegations, the Court focused on Pluralsight's May 1, 2019 announcement that its first quarter results (January through March) remained strong and reasoned (wrongly) that this meant that "[t]he effect of the company's sales capacity gap did not materialize until the second quarter of 2019 . . . on July 31, 2019." JA3_640-641; *see also id.* at 643. This conflated the public announcement of the billings drop with when the threat to billings growth transpired. The billings growth announced on May 1, 2019, by Defendants' own admission, was driven by deals generated approximately ***six months earlier – before the sales capacity gap began – by Pluralsight's pre-Class Period sales force***. ¶¶124-26,165; JA1_82-83, 102-103. As Budge acknowledged, the pre-Class Period sales representatives' productivity ***stayed at its historical level*** throughout the Class Period. CAC ¶124; JA1_82.[18] Logic dictates

---

[18] On the July 31, 2019 call, Budge said that "[t]he productivity we're seeing on the tenured reps is the same where it historically has been." Complaint ¶124; JA1_82. Then, an analyst asked Budge why he had not told investors about the sales capacity gap as of at least May 1, 2019. *Id.* ¶126; JA1_83. Budge responded, in part: "we were seeing kind of an

that if Pluralsight's existing sales force was operating at its historical level in the first half of 2019, it would not be able to drive exponential billings growth during that time. Those deals had to come from new sales representatives – and they were missing until at least April 2019. ¶¶124-26; JA1_82-83; JA2_418. The threat to billings growth, therefore, transpired in January 2019, when the dozens of sales representatives that Defendants needed to continue to grow billings growth were nowhere to be found. The district court therefore misconstrued Plaintiffs' allegations in agreeing with Defendants that their first quarter results absolved them of liability for misleading investors.

## E. The District Court Erred in Dismissing Plaintiffs' Claims Under Items 303 and 105 of Regulation S-K.

### 1. Item 303 (¶¶212-220; JA1_127-131)

The district court inappropriately embraced Defendants' self-serving interpretation of Plaintiffs' factual allegations when it dismissed Plaintiffs' claims under Item 303 of Regulation S-K (which required Defendants to describe known trends or uncertainties reasonably likely

---

accelerated productivity out of reps that was not sustainable in the second quarter." *Id*. "The existence of multiple explanations" about the productivity of the sales force further supports Plaintiffs' claim that there is an issue of fact as to the misleading nature of Budge's statements. *See Nakkhumpun*, 782 F.3d at 1149.

to materially affect Pluralsight's revenue in Pluralsight's 10-K, 10-Q and Registration Filings). *See* JA3_660-661; ¶212; JA1_127; 17 C.F.R. § 229.303(a)(3)(ii). The district court premised its holding on the incorrect notion that the "sales capacity gap did not render it reasonably likely" that billings growth would be materially impacted. Order at 51, 56; JA3_661-666 (also dismissing Securities Act claims premised on violation of Item 303 (¶¶330-39; JA1_170-173) on same grounds). As explained *supra*, that is incorrect. *See also* JA3_522, n.24 (Plaintiffs alleged that Defendants had a reasonable estimate of what billings growth would be six months in advance and how Pluralsight's first quarter sales growth was driven by pre-Class Period activity). Furthermore, Budge himself admitted that the gap created "a good 4 to 5 months of impact from a sizable amount of reps [50]." JA2_418; *see also* ¶124; JA1_82 (admitting that Defendants needed "dozens of reps" at the end of 2018 "so they would ramp and become fully productive in the second quarter"). This supports a reasonable inference that the adverse trend and uncertainties caused by the sales capacity gap were specific to Pluralsight, not uncontrolled outside factors; were known to Defendants; and were reasonably likely to affect billings. They are therefore actionable. *See Slater v. A.G. Edwards*

& *Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013); *see also Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 872 (D. Kan. 2019).

## 2.    Item 105 (¶¶213, 217, 219, 221-23; JA1_128-131)

Item 105 of Regulation S-K required Defendants, in the Offering Documents, to adequately disclose the risks associated with investment in Pluralsight so that potential buyers could make an informed decision. *See* 17 C.F.R. § 229.105; JA3_522-523. The district court, yet again, discredited Plaintiffs' allegations and found that Defendants lacked reason to believe that the risks disclosed in the SPO—for instance, that an inability to hire and develop (ramp) sales representatives might affect business operations—had materialized. JA3_661-662, 666 (also dismissing Securities Act claims premised on violation of Item 105 (¶¶340-342; JA1_173) on same ground)). As discussed *supra,* Plaintiffs' detailed allegations regarding how Pluralsight's billings pipeline worked and Defendants' admissions about the sales capacity gap and its impact demonstrate that the risks had materialized. Having spoken on these important risks, Defendants had a duty to speak the whole truth, and

could not avoid that duty by describing as hypothetical risks that had already come to pass. *See Rombach*, 355 F.3d at 173.

## III. The Complaint Alleges a Compelling Inference of Scienter.

In a securities fraud case, scienter is established by demonstrating an intent to deceive, manipulate, or defraud, or with a "reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun*, 782 F.3d at 1150. A court must consider the complaint as a whole in determining whether the allegations give rise to a strong inference of scienter; it must not scrutinize individual allegations in isolation. *Tellabs*, 551 U.S. at 322-24, 326. Further, as the Supreme Court instructs, the inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Id.* at 324. Rather, at the pleading stage, a securities fraud complaint "must plead facts rendering an inference of scienter ***at least as likely as*** any plausible opposing inference." *Id.* at 328 (emphasis in original). Furthermore, the only competing inferences to be considered are those "rationally drawn from the facts alleged." *Id.* at 314.

Where, as here, Defendants failed to disclose potentially material facts, Plaintiffs need to show that (i) Defendants knew or recklessly

disregarded a potentially material fact and (ii) knew or recklessly disregarded that failure to reveal that fact would likely mislead investors. *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001).

The CAC adequately alleged both elements. Defendants admitted that they knew, but did not disclose, the sales force's 25% under-capacity and infrastructure inefficiencies. These were "potentially material facts" because Defendants told investors that sales force growth was critical to financial performance (¶¶129-35; JA1_84-86) and it was "likely to mislead" because Defendants were simultaneously touting the sales force's size, infrastructure, and performance. ¶¶120-36,138-40,163-70; JA1_81-89, 100-105. Besides this admitted knowledge, scienter is bolstered by Budge and Skonnard's massive $37.3 million in insider sales in a concentrated six-month period. These sales were made on the $456 million SPO, immediately after the stock price rose to over $29 per share, and before it collapsed in a single day back to $18 per share. ¶¶98-102,141-62; JA1_71-72, 89-100. This is sufficient to plead a compelling inference of scienter.

The district court's finding that scienter was insufficiently alleged resulted from several blatant errors and the improper weighing of inferences in Defendants' favor.

## A.  The District Court Misconstrued Defendants' Admissions as Innocuous "Hindsight Expressions."

### 1.  Defendants' Words Did Not Reflect "Hindsight Expressions."

Rather than assuming the truth of Defendants' words that they had known about the 25% sales force capacity gap since the beginning of 2019—the potential material fact—the district court concluded that Defendants' statements were more likely "nonculpable, hindsight expressions of what caused the company's second quarter billings to drop." JA3_652.

But that interpretation was not more or even equally plausible to Plaintiffs' competing inference (with a "tie" going to Plaintiffs regardless), because it is belied by the facts. Defendants repeatedly admitted that they had known there was a material gap at the beginning of 2019. ¶¶120-28,136,139-40; JA1_81-84, JA1_85-89. For instance, Budge stated that in January 2019 *"we wanted to have"* 250 sales representatives but because of "delays" *"they didn't come into the year*

***early enough***"[19] so "dozens" of sales representatives had not been "brought on board" ¶124; JA1_82. Even at the end of the Class Period, Defendants still needed to get "caught up" with the "annual sales ramp capacity plan" (¶¶120,125; JA1_81, JA1_83), indicating that throughout the Class Period the capacity gap was not only known but also documented. ¶¶122,124-25; JA1_81-83; *see also* JA2_418 (explaining that "50 or more reps . . . should have been with us in the December-January time frame" and that created "a good 4 to 5 months of impact").

While these admissions indicated Defendants had knowledge in early 2019, there is *no* support for the district court's interpretation that Defendants only learned or realized the 25% capacity gap existed at the end of the Class Period. *See* JA3_652. As a result, this interpretation was not more plausible than the Complaint's competing inferences.

---

[19] The reference to "delays" in early 2019 and having "suffered from [taking too long to hire and place sales representatives] through the first half," (¶121; JA1_81) indicates Defendants were aware of specific events ("delays") in early 2019 that caused the capacity gap, making it illogical to assume that Defendants only learned of the sales capacity gap at the end of the Class Period.

### 2. The District Court Disregarded that Analysts Confirmed Defendants' Made Admissions.

In finding mere "hindsight expressions" the district court also disregarded corroborating factual allegations that multiple analysts contemporaneously reported that Defendants admitted that they knew of the capacity gap from the beginning of 2019. ¶¶126,130-35; JA1_83, JA1_85-86. One analyst asked: "Why didn't we hear this on last quarter's call?" reflecting the reality that Defendants just admitted having known about the sales force under-capacity problem earlier. ¶126; JA1_83. Similarly, a J.P. Morgan analyst reported not only that "the hiring issue was known earlier" but also that "management . . . saw it was behind on sales hiring coming into the year." ¶131; JA1_85. Finally, a *Seeking Alpha* article also understood the Defendants to be saying that they knew of the capacity gap in the Class Period. ¶¶134-35; JA1_86. In light of these factual allegations, the court's inference in favor of Defendants *not* knowing about the sales capacity gap entering 2019 was in error. *See* JA3_652.

### 3. The District Court Erroneously Found That Billings Growth in the First Quarter of 2019 Precluded an Inference of Scienter.

The district court also improperly accepted Defendants' alternative explanation that because Pluralsight was "still hitting [its billings growth] numbers" in the first quarter of 2019, they had "no reason to believe that they lacked sufficient sales capacity and productivity to achieve their billings growth in the second quarter of 2019." *See* JA3_652-654, JA3_658-659; ¶126; JA1_83. This holding was wrong.

*First*, as Defendants explained, it took minimally six months for sales representatives to become fully seasoned or "quota bearing" (¶70; JA1_60-61) such that it was completely plausible the impact of a shortfall in quota-bearing representatives would only be realized in the second quarter and not the first quarter. ¶124; JA1_82. As a result, the absence of a shortfall in billings in the first quarter of 2019 in no way precludes an inference of scienter because Defendants themselves explained that the shortfall of requisite sales representatives at the end of 2018 would not be felt until six months thereafter.[20]

---

[20] A failure to "review or check information that [Defendants] had a duty to monitor" is also grounds for an inference of recklessness. *Novak*, 216 F.3d at 308. Defendants told investors that they reviewed specific data

*Second*, the district court's finding that the first quarter results precluded scienter is also wholly inconsistent with Defendants' admissions that they knew they were missing "50 reps", *see* JA2_418; CAC ¶¶124,128; JA1_82-84, and were behind in their ramp capacity plan and "suffer[ing]" in trying to get "caught up" through the Class Period. CAC ¶¶121,125; JA1_81-83.

*Third*, Defendants' irrational hope[21] that they could continue to keep "hitting [their billings] numbers" does not protect Defendants from concealing existing material adverse facts. *See* ¶¶126, 131, 135; JA1_83, JA1_85-86; JA2_418.[22] Hope is not a defense to well-pled scienter

---

regarding Pluralsight's sales force and deal pipeline when they spoke about the sales force. *See* Opp. at 26; JA3_525. In repeatedly describing the state of the sales force, Defendants were at a minimum reckless in not checking to make sure that they were not painting a falsely positive picture and overstating the headcount. *See In re Quality Sys.*, 865 F.3d at 1145-46.

[21] As explained *supra*, p. 50, according to Budge, Pluralsight's already-ramped sales representatives were producing at their historical levels during the Class Period, meaning that Pluralsight could not achieve exponential growth in the second quarter without growing its sales force.

[22] Budge's explanation for why Defendants did not tell investors about the sales force gap when they knew about it ("we were seeing kind of an ***accelerated productivity out of reps*** that was not sustainable in the second quarter") makes no sense in light of the fact that a ***few minutes earlier***, he had said that "[t]he ***productivity we're seeing on the tenured reps is the same where it historically has been***." *See*

allegations. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 710 (7th Cir. 2008) "*Tellabs II*"; *Voulgaris*, 2020 WL 8367829, at *24 (finding that defendants' hope that the FDA would approve a drug "does not . . . explain why they failed to disclose the negative data that a reasonable investor would find significant.").

## B.    Defendants Knew Concealment of Sales Force Under-capacity Would Likely Mislead Investors.

The district court also erred in finding Plaintiffs did not adequately allege that Skonnard and Budge knew that the failure to disclose the sales force capacity gap would "mislead investors." *See* JA3_653; *see also id.* at 654, 658-659. However, the factual allegations of Defendants' massive $37.2 million in insider trading at peak prices combined with their admissions of sales force under-capacity and infrastructure inefficiencies gives rise to the opposite "cogent and compelling inference": Defendants failed to disclose the adverse sales force facts not because "they were meaningless" but because they understood  the  likely "effect on the market" given that the disclosure of these facts would destroy the

---

¶¶124,126;  JA1_82-83;  JA3_516  (n.16).  Both  cannot  be  true.  This supports a compelling inference that Budge was not telling the truth about why Defendants did not tell the truth when they knew it.

uniformly rosy and misleading picture of the sales force. *See Matrixx Initiatives Inc. v. Siracusano,* 563 U.S. 27, 49 (2011)*; see also Nakkhumpun*, 782 F.3d at 1151-52.

An inference that Defendants were aware that they were misleading investors is also particularly plausible here because it was Defendants who told investors about the sales force's importance to billings growth (¶¶68-91; JA1_59-69) and answered analysts repeated questions on the subject (CAC ¶166; JA1_103) with those responses then appearing in analyst reports (¶¶75,81,88,97,109-11,118; JA1_62-63, 65, 68, 71, 75-76, 79). Given this direct involvement, it was "at least just as compelling" to infer that Defendants understood that by failing to tell investors of Pluralsight's severe sales force under-capacity from the beginning of 2019, they would be likely to mislead investors. *See id. See Tellabs*, 551 U.S. at 324.[23]

---

[23] Because Plaintiffs adequately alleged primary violations of the Exchange Act, Plaintiffs adequately alleged control-person liability under Section 20(a) against Skonnard and Budge and violations of 20A (insider trading in the SPO) against Skonnard and Budge. ¶¶245-53; JA1_138-140. The district court's dismissal of these claims should be reversed. JA3_662-663.

### C.    The District Court Erroneously Discounted Defendants' Insider Sales.

Insider trading is deemed suspicious and may weigh heavily in favor of a scienter inference based on several factors, including the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *See Smallen v. The Western Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020).

These factors support an inference of scienter here given: (i) Skonnard and Budge's profits on these sales was enormous: Skonnard and Budge sold at prices 78% and 74% higher than the price 90 days after the close of the class period (¶¶147,153; JA1_92, JA1_96); (ii) Budge sold nearly 40% of his holdings in a concentrated six month period (¶156; JA1_97) while Skonnard sold all but 3.6% of the shares he needed to maintain majority control (¶149; JA1_93-94); (iii) the volume of their selling in the Class Period skyrocketed, with Skonnard selling $22.2 million of shares versus $4.5 million after (¶144; JA1_91-92) while Budge sold $519,000 of shares during the Class Period as opposed to $19,300 after the Class Period (¶151; JA1_94-95); and (iv) here both officer defendants sold. ¶¶157-62; JA1_98-100.

Despite these facts, the court erroneously found that Skonnard and Budge's insider trading only provided "minimal support" for an inference of scienter. JA3_654-656. This was based on erroneous factual findings. *First*, the court concluded the trades were "primarily" executed pursuant to 10b5-1 plans and "automatic transactions" to pay withholding taxes. *Id.* at 46; JA3_656. However, *none* of the SPO insider sales ($13.67 million for Skonnard and $5.046 million for Budge) were made pursuant to the 10b5-1 plans or automatic transactions. ¶¶143,151; JA1_90, JA1_94; JA3_663-66. Moreover, it was improper to make such a finding at the motion to dismiss stage, absent discovery into the terms, purpose and creation of the 10b5-1 plans, which were entered into shortly before the start of the class period, and which plans are not public or part of the record.

*Second*, it was simply incorrect that these defendants' sales were made "primarily" through 10b5-1 plans and automatic transactions. Over 61% of Skonnard's Class Period sales ($13.67 million of $22.19 million) were sold in the SPO. CAC ¶143; JA1_90.

Finally, even as to the open market sales made through 10b5-1 plans, those plans are not and should not be get-out-of-jail free cards with

respect to Section 10(b) claims. *See* JA3_527-529. That is especially true here, where Skonnard and Budge adopted plans close to the start of the fraud and have not made their plans public. *See Emps. Ret. Sys. of Govt. of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (finding that trades pursuant 10b5-1 trading plans were suspicious because defendants "knew the dates of their scheduled sales were imminent when they made allegedly misleading statements to investors").

## IV. The District Court Erred in Dismissing INPRS's Securities Act Claims.

As the district court correctly held, Plaintiff INPRS' Securities Act claims under Sections 11, 12(a)(2)[24], and 15 were not subject to the heightened pleading standards of Rule 9(b) because they did not sound in fraud. JA3_620; JA3_531-533; ¶¶61,302,305,313,315,318,338-39,342, 344,349-51,359,367; JA1_57, 158-165, 172-176, 179. But after recognizing that the Section 11 and 12(2) claims sounded in negligence and strict liability, the district court dismissed these claims on the

---

[24] The district court declined to rule on whether Plaintiff INPRS had standing to sue Pluralsight under Section 12(a)(2), which Defendants argued. *See* JA3_666. However, because Pluralsight was substantially involved in the SPO process, it had liability under Section 12(a)(2). *See* JA3_531-532.

ground that the statements in Pluralsight's Offering documents are not actionable for the same reasons as under the Exchange Act.

As discussed supra, Defendants' statements regarding Pluralsight's large, substantially expanded sales force (¶289; JA1_153) were not forward looking or puffery or unactionable opinions, as they were clearly material assertions of present and historical fact that created an inaccurate picture of the adequacy of Pluralsight's sales force and its growth strategy (¶¶290-292; JA1_154-155). Further, the risk factors described in Paragraphs 294, 296, 298 and 300 (JA1_155-158), were materially false and misleading because they created an impression that the risks were merely hypothetical when in fact, Defendants were then suffering from and struggling to address the problems described therein (¶295,297,299,301; JA1_155-158), as discussed *supra* at § II(D).

Accordingly, INPRS has sufficiently pled misrepresentations and omissions in Pluralsight's Offering documents, and the district court's dismissal of these claims was error and requires reversal.

Additionally, the district court ruled for the Signer Defendants on INPRS's control person claims under Section 15 on the ground that INPRS failed to plead a predicate violation of the Securities Act [Sections

11 and 12(2)]. Because INPRS has sufficiently pled a primary violation of Sections 11 and 12(2), the CAC properly pleads control person liability under Section 15 of the Securities Act, and the dismissal of these claims should be reversed.

## Conclusion

For the foregoing reasons, the judgment of dismissal should be reversed in its entirety.

Respectfully submitted this 3rd day of September, 2021.

COHEN MILSTEIN SELLERS
& TOLL PLLC


By: /s/ *Carol V. Gilden*

Carol V. Gilden, Esq.
190 South Lasalle Street, Suite 1705
Chicago, Illinois 60603
(312) 357-0370 Telephone
cgilden@cohenmilstein.com

Joel P. Laitman, Esq.
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797 Telephone
jlaitman@cohenmilstein.com

Steven J. Toll, Esq.
1100 New York Avenue, NW, Suite 500
(202) 408-4600 Telephone
stoll@cohenmilstein.com

CLYDE SNOW & SESSIONS

Keith M. Woodwell, Esq.
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111
(801) 322-2516 Telephone
<u>kmw@clydesnow.com</u>

*Attorneys for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested. Plaintiffs believe that oral argument is appropriate in this case as it will likely assist the Court in this complex securities action with numerous and highly nuanced issues. Given the Court's de novo review of the complaint, oral argument will allow the parties to address  questions that may arise from the briefing and assist the Court in resolving this appeal.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,950 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief – in both its text and its footnotes – has been prepared in 14-point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.

*s/ Carol V. Gilden*
Carol V. Gilden

# ADDENDUM

FILED
2021 MAR 31 PM 2:17
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, *et al.*, | **MEMORANDUM DECISION AND ORDER GRANTING THE PLURALSIGHT DEFENDANTS' MOTION TO DISMISS** |
| Plaintiffs, | |
| v. | |
| PLURALSIGHT, INC., *et al.*, | Case No. 1:19-cv-00128-JNP-DBP |
| Defendants. | District Judge Jill N. Parrish |

Before the court is a Motion to Dismiss Corrected Amended Complaint ("CAC") filed by Defendants Pluralsight, Inc. ("Pluralsight"), Aaron Skonnard ("Skonnard"), James Budge ("Budge"), Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell (collectively, the "Pluralsight Defendants"). ECF No. 111. Defendants Morgan Stanley & Co., LLC and J.P. Morgan Securities, LLC (collectively, the "Underwriter Defendants") joined the Pluralsight Defendants' Motion to Dismiss and Reply in Support of Motion to Dismiss. ECF Nos. 114, 124. The court entertained oral argument on the Motion to Dismiss on March 22, 2021. Having reviewed the memoranda and considered the oral argument, the court grants the Pluralsight Defendants' Motion to Dismiss.

## BACKGROUND

Pluralsight is a software company that offers a cloud-based technology skills platform and sells subscriptions to its platform to businesses and individuals. Pluralsight customers have access

**Add.1**

to a library of online technology skills courses, skill and role assessments, learning paths to help users master particular subjects, and analytic tools to help business customers track and respond to the technology skills of their employees.

The class period in this case is from January 16, 2019 through July 31, 2019 ("Class Period"). Pluralsight became a public company in May 2018. Each year from 2017 through 2019, Pluralsight reported net losses of $96.53 million, $128.58 million, and $163.57 million, respectively. Despite these net losses, Pluralsight attracted investors by touting its "billings" growth. "Billings" were comprised of revenue recognized ratably for the period that subscription services were provided, plus new subscriptions and subscription renewals in future quarterly periods. Although Pluralsight's profits did not grow from 2017 through 2019, its "billings" grew by approximately 40–50% year-over-year. Pluralsight told investors during the Class Period that this level of growth was built into its long-term business model. Pluralsight also told investors that its billings growth was dependent upon the capacity—including headcount, experience, efficiency, and productivity—of its sales force. Pluralsight's sales force was responsible for its sales to business customers, which in turn represented at least 85% of the company's billings.

Prior to the Class Period, in August 2018, Skonnard (Pluralsight's Chief Executive Officer and Chairman) and Budge (Pluralsight's Chief Financial Officer) made positive statements to investors about the growth in Pluralsight's number of sales representatives and the sales force's increasing productivity and effectiveness. Pluralsight also told investors that sales representatives required six months from hiring to become fully productive, or "seasoned," in terms of meeting sales quotas. Pluralsight tracked its number of sales representatives and when each sales representative began work. Because the productivity and effectiveness of the sales force had a

**Add.2**

substantial effect on Pluralsight's billings, and because billings were how Pluralsight attracted investors, the sales force's effectiveness was relevant to investors.

During the Class Period, Pluralsight did not disclose to investors that, by the end of 2018, Pluralsight was behind in its sales representative ramping capacity plan. Pluralsight did, however, make numerous positive statements about its sales force and infrastructure during the Class Period at a conference, on a conference call with securities analysts and investors, on its Form 10-K, on its Secondary Public Offering ("SPO") Documents, and on an earnings call with securities analysts and investors. Also during the Class Period, Defendants Skonnard and Budge sold significant quantities of their Pluralsight stock at peak prices and in a concentrated period pursuant to 10b5-1 trading plans that they had created at the end of 2018. The stock quantities that Skonnard and Budge sold were substantially greater than the amount of stock that they sold either before or after the Class Period and represented a significant percentage of each of their respective total holdings. Skonnard and Budge sold additional shares through Pluralsight's SPO in March 2019. Skonnard sold more of his shares on July 26, 2019.

On July 31, 2019, during Pluralsight's second quarter 2019 earnings call, Pluralsight, Skonnard, and Budge disclosed to securities analysts and investors that Pluralsight had been behind in its capacity of seasoned sales representatives in the first and second quarters of 2019, which manifested in a 43.8% collapse in B2B[1] billings growth from business customers in three months. On the call, Budge stated that Pluralsight had to bring on dozens of sales representatives at the end of 2018 so that they could become seasoned in the second quarter, but that Pluralsight was months behind. Skonnard confirmed the same and said that Pluralsight had fallen off its annual

---

[1] "B2B" refers to Pluralsight's billings from business customers. ECF Nos. 94 ¶ 65, 111 at 8.

sales ramp capacity plan. Following these statements, Pluralsight's shares dropped 39.52% in one day. This amounted to a one-day market capitalization loss of $1.23 billion.

Court-appointed Co-Lead Plaintiff the Indiana Public Retirement System ("INPRS") is a $34.2 billion pension fund that purchased shares of Pluralsight Class A common stock during the Class Period, including 65,200 shares of Pluralsight Class A common stock in the SPO and directly from lead underwriter Morgan Stanley & Co., LLC. Co-Lead Plaintiff the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF")[2] is a $10.4 billion defined benefit public employee retirement system that also purchased Pluralsight Class A common stock during the Class Period, including 7,900 shares of Pluralsight Class A common stock the same day as the SPO from an SPO underwriter. Plaintiffs allege that they purchased or otherwise acquired this stock at artificially inflated prices because of material misstatements and omissions made by the Exchange Act Defendants[3] and Securities Act Defendants.[4] Based upon the foregoing, Plaintiffs bring this proposed securities fraud class action "on behalf of all persons other than Defendants and their affiliates who purchased Pluralsight Class A common stock [during the Class Period] and were damaged thereby." ECF No. 94 ¶ 1.

---

[2] Co-Lead Plaintiffs INPRS and CTPF will be referred to collectively as "Plaintiffs."

[3] Based upon Plaintiffs' CAC, the Exchange Act Defendants are Pluralsight, Skonnard, and Budge. Plaintiffs also name Joe DiBartolomeo ("DiBartolomeo") as a "relevant executive officer" in their CAC, but he is not a defendant in this case.

[4] Based upon Plaintiffs' CAC, the Securities Act Defendants are Pluralsight, the "Signer Defendants" (Skonnard, Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell), and the "Underwriter Defendants" (Morgan Stanley & Co., LLC and J.P. Morgan Securities, LLC).

**Add.4**

Plaintiffs sue for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Their Exchange Act claims are as follows: violations of Section 10(b) and Securities and Exchange Commission ("SEC") Rule 10b-5 against Pluralsight, Skonnard, and Budge; Section 20(a) against Skonnard and Budge; and Section 20A against Skonnard and Budge. Plaintiffs' Security Act claims are as follows: violations of Section 11 against Pluralsight, the Signer Defendants,[5] and the Underwriter Defendants;[6] Section 12(a)(2) against Pluralsight and the Underwriter Defendants; and Section 15 against the Signer Defendants. Plaintiffs also allege violations of Items 303 and 105 of Regulation S-K as part of their Exchange Act and Securities Act claims.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

---

[5] As previously noted, the Signer Defendants are Skonnard, Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell.

[6] As previously noted, the Underwriter Defendants are Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC.

**Add.5**

556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal

conclusions and its factual allegations "must be enough to raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

The Pluralsight Defendants[7] move to dismiss Plaintiffs' CAC on three primary grounds.

First, they argue that the CAC fails to satisfy the pleading requirements of Federal Rules of Civil

Procedure 8 and 9(b). Second, they argue that the CAC fails to state an Exchange Act claim under

Section 10(b), and therefore also fails to state claims under Sections 20(a) and 20A, and that

Plaintiffs fail to plead violations of Items 303 and 105 of Regulation S-K as part of these claims.

Third, they argue that the CAC fails to state a Securities Act claim under Sections 11 and 12(a)(2),

and therefore also fails to state a claim under Section 15, and that Plaintiffs fail to plead violations

of Items 303 and 105 as part of these claims. The Pluralsight Defendants also argue that Plaintiffs

lack standing under Section 12(a)(2) to state a claim against Pluralsight. The court considers each

argument in turn.

## I.      Pleading Standard

The Pluralsight Defendants begin their Motion to Dismiss with an argument on the

pleading standard applicable to the CAC. The Pluralsight Defendants first argue that the CAC fails

under Rule 8 because of its length—148 pages and 375 paragraphs—and redundancies between

its Exchange Act and Securities Act allegations. The Pluralsight Defendants also appear to argue

---

[7] The Underwriter Defendants have joined the Pluralsight Defendants' Motion to Dismiss CAC, incorporating all arguments and authorities set forth therein and requesting that all of the claims and causes of action in the CAC against them be dismissed with prejudice. ECF No. 114. The Underwriter Defendants have also joined the Pluralsight Defendants' Reply in Support of Motion to Dismiss CAC. ECF No. 124.

**Add.6**

that Plaintiffs' Exchange Act and Securities Act claims are subject to Rule 9(b)'s heightened pleading requirements because they both sound in fraud, as the Securities Act claims repeat many of the allegations made under the fraud-based Exchange Act claims and do not omit all references to the Pluralsight Defendants' alleged knowledge.

Plaintiffs respond that their Exchange Act claims comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, and both their Exchange Act and Securities Act claims are sufficiently pleaded and put the Pluralsight Defendants on notice of the claims asserted against them. Plaintiffs further argue that their Securities Act claims do not necessarily sound in fraud simply because they contain underlying factual similarities with their Exchange Act claims. While Plaintiffs concede that their Securities Act claims "inadvertently incorporated" an allegation that "Budge and Skonnard knew that adverse facts had been concealed from the public," they maintain that "the claims are clearly based on allegations of negligence" (ECF No. 119 at 39) and thus are only subject to Rule 8's pleading requirements rather than those of Rule 9(b). Further, Plaintiffs argue that their CAC clearly separates—both physically and conceptually—their fraud-based Section 10(b) claim from their negligence- and strict liability-based Section 11 and 12(a)(2) claims.

The court will evaluate the sufficiency of Plaintiffs' pleadings with respect to each claim in their CAC below. However, at this juncture, the court will determine the appropriate pleading standard for Plaintiffs' Exchange Act and Securities Act claims.[8]

---

[8] The court also notes at this stage that the Pluralsight Defendants' thorough brief in support of their Motion to Dismiss supports that they have been put on notice of the claims that Plaintiffs have made against them, which is a central "goal[] embodied within Rule 8(a), Rule 9(b), and the [PSLRA]." *In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 310 (S.D.N.Y. 2013) ("Indeed, Defendants' briefs in support of their motions to dismiss, which forcefully and directly

7

**Add.7**

A. Pleading Standards Relevant to Exchange Act and Securities Act Claims

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 9(b) imposes a heightened pleading requirement for claims sounding in fraud: a plaintiff must "state with particularity the circumstances constituting fraud," and "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Securities fraud claims under the Exchange Act must also satisfy the PSLRA's heightened pleading requirement "with regards to . . . whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018) (citing 15 U.S.C. § 78u-4(b)(1)–(2)).[9]

The parties do not appear to dispute that Plaintiffs' securities fraud claims under the Exchange Act are subject to Rule 9(b) and the PSLRA's heightened pleading requirements. Because Plaintiffs' claims under the Exchange Act are grounded in securities fraud, the court finds that Rule 9(b) and the PSLRA's heightened pleading requirements apply to those claims. Thus, the only remaining issue is the pleading standard applicable to Plaintiffs' Securities Act claims.

---

attack Plaintiffs' allegations of wrongdoing, are themselves proof that Defendants have notice of the claims against them.").

[9] With respect to misleading statements or omissions, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). With respect to scienter, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

**Add.8**

B.  Pleading Standard Applicable to Plaintiffs' Securities Act Claims

Plaintiffs' Securities Act claims are alleged under Sections 11, 12(a)(2), and 15. Although these causes of action do not require proof of fraud, *see* 15 U.S.C. §§ 77k, 77*l*(a)(2) 77*o*(a), and are not subject to the PSLRA's heightened pleading requirements, *see id.* § 78u-4(b)(1)–(2), other circuits have found that such claims can still be subject to the heightened pleading standards of Rule 9(b) if they "sound[] in fraud." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted); *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (collecting cases); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). *Contra In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) ("[T]he particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11.").

The Tenth Circuit has not ruled on the applicability of Rule 9(b)'s heightened pleading standards to Securities Act claims that do not require proof of fraud but are still premised on fraud, having only contemplated the issue without deciding it. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("[a]ssuming without deciding" that the court adopted the Third Circuit's analysis that "Rule 9(b) scrutiny" is triggered in Securities Act claims sounding in fraud and finding that the heightened pleading requirements of Rule 9(b) did not apply to a Securities Act claim "not premised on fraud"), *superseded on other grounds by* 15 U.S.C. § 78u-4. Although Sections 11, 12(a)(2), and 15 of the Securities Act do not require proof of fraud, this court adopts the analysis of the circuits previously cited and applies the Rule 9(b) heightened pleading standard to Securities Act claims that "sound in fraud," as determined by a close examination of the CAC. *See Shapiro*, 964 F.2d at 288 ("We see no valid reason to create a special exception to Rule 9(b)

9

**Add.9**

for [§ 11 and § 12(2) claims grounded in fraud]. Accordingly, we hold that when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies.").

"To ascertain whether a complaint 'sounds in fraud,' [the court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" *Rubke*, 551 F.3d at 1161 (citation omitted). If a complaint "employs the exact same factual allegations to allege violations of [the Securities Act] as it uses to allege fraudulent conduct under . . . the Exchange Act, [the court] can assume that it sounds in fraud." *See id.* (citation omitted). "However, a complaint that neither specifically alleges fraud 'nor alleges facts that would necessarily constitute fraud' does not sound in fraud and is not governed by Rule 9(b)." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 917 (N.D. Cal. 2015) (citations omitted).

After careful review of Plaintiffs' Securities Act claims in their CAC, the court finds that they are not grounded in fraud and are thus governed by Rule 8's pleading requirements. Although there is much factual overlap between Plaintiffs' Exchange Act and Securities Act claims, Plaintiffs have formulated their Securities Act claims to sound in negligence and strict liability rather than in fraud. Plaintiffs employ several tools to differentiate their Securities Act claims from their Exchange Act claims and articulate the foundations on which each set of claims rests—the former on negligence and strict liability and the latter on fraud. *Cf. In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) (labeling mere disclaimers that a Securities Act claim did not sound in fraud as "nominal efforts" that were "unconvincing where the gravamen of the complaint [was] plainly fraud and no effort [was] made to show any other basis of the claims levied").

First, Plaintiffs clearly segregate their Exchange Act claims from their Securities Act claims. Although this provides for an admittedly lengthy complaint, the length of the CAC alone

**Add.10**

is not a sufficient basis on which to find that the CAC fails under either Rule 8 or Rule 9(b), as the Pluralsight Defendants suggest that it should. *See* ECF No. 111 at 15–16. There is significant overlap between the allegations of Plaintiffs' Exchange Act and Securities Act claims. But this appears to be a product both of setting out two different sets of claims—one set grounded in fraud, and the other in negligence and strict liability—and seeking to thoroughly state those claims. The CAC is, on the whole, well-organized. The court declines to find that Plaintiffs' claims fail by virtue of the CAC's length.

Additionally, Plaintiffs begin the Securities Act portion of their CAC with an explicit disclaimer[10] that they do not make "any allegations of fraud, scienter, or recklessness in connection with these non-fraud [Securities Act] claims." ECF No. 94 ¶ 254. But Plaintiffs do not merely rely upon this general disclaimer. *Cf. Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 155 (D. Conn. 2019) ("[A] boilerplate disclaimer is not enough to make out a claim for negligence." (citation omitted)). While Plaintiffs reference Skonnard and Budge's alleged knowledge of the falsity of their public statements regarding the growth trajectory of Pluralsight's sales force, Plaintiffs also clearly ensconce their Securities Act claims in negligence and strict liability. Plaintiffs allege that the Offering Documents at issue "were negligently

---

[10] Plaintiffs also begin the Exchange Act portion of their CAC with the following disclaimer:

> These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Sections 10(b), 20(a) and 20A of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

ECF No. 94 ¶ 235.

**Add.11**

prepared," ECF No. 94 ¶¶ 302, 315, and that "these facts were readily apparent to the Securities

Act Defendants or would have been had they done basic diligence," *id.* ¶¶ 315, 313, 318, 338, 342.

Finally, Plaintiffs' count-specific allegations clearly sound in negligence and strict liability.

These allegations again include disclaimers that they "do not allege fraud scienter, or the intent of

the [defendants] to defraud" Plaintiffs, *id.* ¶¶ 344, 357, 362, that their Section 11 claim "is

predicated upon the Securities Act Defendants' liability for negligently making false and materially

misleading statements in the Offering Documents," *id.* ¶ 344, and that "any implication of fraud

or fraudulent intent is expressly disclaimed" as part of their Section 15 claim, *id.* ¶ 363. These

allegations are also replete with references to strict liability, a failure to "make a reasonable and

diligent investigation," and a failure to exercise reasonable care and diligence, *id.* ¶¶ 346, 349,

350, 351, 359, 361, 367. *See Schwartz*, 124 F.3d at 1252 (finding that a Securities Act claim did

not sound in fraud when the complaint made numerous references to the defendants' lack of

"reasonable grounds for belief," and failure to perform a "reasonable investigation" and to exercise

"reasonable care").

After close examination of the CAC, the court finds that Plaintiffs' Securities Act

allegations are not "the exact same factual allegations" as Plaintiffs' Exchange Act allegations.

*Rubke*, 551 F.3d at 1161 (citation omitted). The Securities Act allegations focus on different alleged

failures on the part of the Pluralsight Defendants than the fraud-based conduct alleged under the

Exchange Act claims. Thus, the court cannot "assume" that Plaintiffs' Securities Act claims

"sound[] in fraud," and finds that they in fact do not. *See id.*; *In re Wachovia Equity Sec. Litig.*,

753 F. Supp. 2d 326, 374–75 (S.D.N.Y. 2011) (holding that Section 11 claim was not subject to

Rule 9(b) when plaintiffs segregated their Securities Act negligence claims from their fraud-based

claims, and that plaintiffs' allegations that defendants engaged in fraud did not preclude

12

**Add.12**

negligence-based claims against defendants as well). Plaintiffs' Securities Act claims sound in

negligence and strict liability, and so they will be evaluated under Rule 8 below.

## II.    Exchange Act Claims

Plaintiffs allege three claims under the Exchange Act: violation of Section 10(b) and

implementing Rule 10b-5 against Pluralsight, Skonnard, and Budge; violations of Sections 20(a)

and 20A against Skonnard and Budge; and violations of Items 303 and 105 of Regulation S-K. The

Pluralsight Defendants argue that Plaintiffs have failed to state a claim under Section 10(b). The

Pluralsight Defendants also argue in a footnote that Plaintiffs' failure to state a claim under Section

10(b) results in the failure of their Section 20(a) and 20A claims because such claims require a

"primary" and "predicate" Exchange Act violation, respectively. ECF No. 111 at 31 n.12. Finally,

the Pluralsight Defendants argue that Plaintiffs have failed to plead violations of Items 303 and

105 of Regulation S-K. The court considers each argument in turn.

### A.   Section 10(b) and Rule 10b-5 Claim

"Section 10(b) [of] the [Exchange] Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent acts done in connection with

securities transactions." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1094–95 (10th Cir. 2003).

Under Section 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of

any security . . . any manipulative or deceptive device or contrivance in contravention of such rules

and regulations as the Commission may prescribe as necessary or appropriate in the public interest

or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b-5 identifies certain actions that

are prohibited by the statute." *Adams*, 340 F.3d at 1095. Specifically, Rule 10b-5 prohibits any

person from making "any untrue statement of a material fact or [omitting] to state a material fact

**Add.13**

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage." *In

re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a claim under

Rule 10b-5 for securities fraud, a plaintiff must allege the following:

> (1) the defendant made an untrue or misleading statement of
> material fact, or failed to state a material fact necessary to make
> statements not misleading;
> (2) the statement complained of was made in connection with the
> purchase or sale of securities;
> (3) the defendant acted with scienter, that is, with intent to defraud
> or recklessness;
> (4) the plaintiff relied on the misleading statements; and
> (5) the plaintiff suffered damages as a result of his reliance.

*Adams*, 340 F.3d at 1095 (citation omitted). The Pluralsight Defendants argue only that Plaintiffs

failed to plead the first and third elements of a Section 10(b) claim. Accordingly, the court only

evaluates the sufficiency of the CAC with respect to each of these elements in turn.

> 1)    Whether Plaintiffs Adequately Pleaded that the Pluralsight Defendants
>
>        Made Untrue or Misleading Statements of Material Fact or Omissions

Although the sufficiency of a securities fraud claim was once evaluated under Rule 9(b),

the PSLRA set a new pleading standard. *Adams*, 340 F.3d at 1095. The PSLRA heightened the

pleading standard of the first Rule 10b-5 element listed above, regarding whether the defendant

made an untrue or misleading statement of material fact or omission. *Id.* To satisfy this element,

the PSLRA provides that every complaint alleging a violation of Section 10(b) must "specify each

statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA further states that "if an allegation regarding

14

**Add.14**

the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary to make the statements that were made not misleading." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (citing 17 C.F.R. § 240.10b-5). Under Rule 10b-5, "[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Whether information is material also depends on other information already available to the market; unless the statement 'significantly altered the "total mix" of information' available, it will not be considered material." *Id.* (citation omitted).

"Rule 10b-5 'prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1164 (10th Cir. 2018) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (quoting *Brody*, 280 F.3d at 1006). "To require that statements be 'complete' would be to impose an excessive burden since '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Id.* (quoting *Brody*, 280 F.3d at 1006). Thus, to survive a motion to dismiss under the PSLRA's heightened pleading requirements, "the plaintiffs' complaint must specify the reason or reasons why the statements made by [the company] were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d at 1006 (citations omitted).

**Add.15**

"In addition to misstatements or omissions of fact, statements of opinion or belief are also actionable under Section 10(b) and Rule 10b-5." *MF Glob.*, 982 F. Supp. 2d at 305 (citations omitted). "To plead a claim for such statements, a plaintiff 'must allege that [the] defendant's opinions were both false and not honestly believed at the time they were made.'" *Id.* (citation omitted); *accord Grossman*, 120 F.3d at 1119 n.6 ("[A] statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact." (citation omitted)). "[S]tatements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'" *Hampton*, 897 F.3d at 1299 (citation omitted).[11]

There are numerous types of statements that are not actionable in a securities fraud case. First, "[i]t is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (collecting cases); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (finding that a company's "accurate reporting of its past results did not then require the company to speculate on the effect that a contract slowdown . . . would have on its future earnings" (citation omitted)). Such statements are thus "immaterial and not actionable as a matter of law." *McDonald*, 287 F.3d at 998.

Second, statements that "are only vague statements of corporate optimism" are "not considered materially misleading" under Rule 10b-5. *Grossman*, 120 F.3d at 1119. "Statements

---

[11] The Pluralsight Defendants argue that several statements listed in their Motion to Dismiss are unactionable opinion statements. ECF No. 111 at 20–21. However, the Pluralsight Defendants' arguments regarding this exception are conclusory and fail to identify exactly which portions of the several cited statements constitute opinions. Accordingly, the court finds that the Pluralsight Defendants have failed to adequately raise this exception.

**Add.16**

classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Id.* (footnote and citation omitted). "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach*, 355 F.3d at 174 (citation omitted). "But statements are not puffery where they are 'misrepresentations of existing facts' made even though the speaker 'knew that the contrary was true.'" *MF Glob.*, 982 F. Supp. 2d at 305 (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). Thus, "'statements of optimism that are not capable of objective verification' are *not* material misstatements *unless* they inaccurately represent 'the speakers' beliefs concerning then-present factual conditions.'" *Hampton*, 897 F.3d at 1299 (citation omitted).

Third, the PSLRA's safe harbor provides that "forward-looking statement[s] . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" do not subject a "person"[12] to liability. 15 U.S.C. § 78u-5(c)(1)(A)(i).[13]

---

[12] "Persons" that come within the protection of the PSLRA safe harbor include an issuer subject to certain reporting requirements, "a person acting on behalf of such issuer," "an outside reviewer retained by such issuer making a statement on behalf of such issuer," or "an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer." 15 U.S.C. § 78u-5(a).

[13] The PSLRA's safe harbor provision is the counterpart of the "bespeaks caution" doctrine, which provides that "forward-looking representations" are immaterial "when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading

Fourth, "'silence, absent a duty to disclose' cannot serve as the basis for liability under Rule 10b-5." *Grossman*, 120 F.3d at 1125 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). The Tenth Circuit has found that "[a] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald*, 287 F.3d at 998 (citation omitted). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); they "prohibit only misleading and untrue statements, not statements that are incomplete," *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (citation omitted). However, "if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." *Grossman*, 120 F.3d at 1125 (citation omitted). Additionally, when a party "elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information." *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (quoting *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) (unpublished)); *see also Nakkhumpun v. Taylor*, 782 F.3d 1142, 1152–53 (10th Cir. 2015). "[T]he requirement is not to dump all known information with every public announcement, but the law requires 'an actor to provide complete and non-misleading information with respect to the subjects

---

effect." *Grossman*, 120 F.3d at 1120–21 (adopting the "bespeaks caution" doctrine as "a valid defense to a securities fraud claim in the Tenth Circuit"). Under the "bespeaks caution" doctrine, "a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Id.* at 1120 (footnote and citation omitted).

*on which he undertakes to speak.*'" *In re K-tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir.

2002) (citation omitted).

Plaintiffs have provided the eighteen allegedly false statements that they assert are

actionable under the Exchange Act in an exhibit attached to their Opposition to Defendants' Motion

to Dismiss. *See* ECF No. 119-2.[14] The court evaluates each statement in turn to determine whether

it is actionable under Section 10(b) and Rule 10b-5.

a)   Statements 1–4

Statements 1–4[15] were made by Budge during the Class Period on January 16, 2019 at the

Needham Growth Conference in discussing the company's past sales force investments:

> [1] [I]n 2017 through '18—well, first part of '18 and then the later
> part of '16 is when we went to a heavy investment in the enterprise,
> we actually saw that we had the product that would have—and the
> content capabilities that would appeal to that bigger enterprise. At
> the time, we had about 80 quota-bearing reps and little infrastructure
> around our sales reps, which in the world of SaaS you want to have
> a robust customer success organization, CSMs as they're
> affectionately called pre-sales, post-sales motion, all the digital

---

[14] Because Plaintiffs have limited their Exchange Act claims to the statements contained in an
exhibit attached to their Opposition to Defendants' Motion to Dismiss (*see* ECF Nos. 119 at 17,
119-2) the court will accordingly limit its analysis of the sufficiency of Plaintiffs' Exchange Act
claims to the statements contained therein. The court will cite to the statements contained therein
according to the "Statement No." listed next to them.

Additionally, in their Motion to Dismiss, the Pluralsight Defendants argue that several statements
in Plaintiffs' CAC are not actionable because they are statements from outside of the class period
or are statements by non-party securities analysts. ECF No. 111 at 22. The statements to which the
Pluralsight Defendants refer, however, are not listed in Plaintiffs' exhibit of allegedly actionable
statements (*see* ECF No. 119-2), and Plaintiffs concede that they are not actionable (ECF No. 119
at 8 n.3). Accordingly, the court does not consider them as actionable under Section 10(b) or SEC
Rule 10b-5. Plaintiffs argue that these statements "provide context for Defendants'
misstatements . . . , demonstrate falsity and materiality, and bolster an inference of scienter." ECF
No. 119 at 8 n.3. The court considers these statements for these limited purposes.

[15] Bracketed numbers are included in the quoted text below to indicate the portion of Budge's
remarks associated with each Statement.

**Add.19**

marketing to feed into that, the business development reps or inside sales reps, if you will. None of that infrastructure really existed at scale. Not to mention, we didn't have enough like quota-bearing reps on the ground. . . .

So we went from roughly 0 enterprise-class reps to today, we have about 120 of those reps. And the aggregate quota-bearing reps went from about 80 at that time to today we have about 250.

[2] We'll grow that to over 300 as we go through 2019. So while we'll continue to add a good 70 to 80 a year, it's lower as a percentage of the total growth that we have, which is a reason why you're seeing some of the efficiencies in the model.

[3] In the second quarter of this year—of last year, I should say, last year 2018, it was the first quarter in the previous 8 quarters where we actually grew our B2B billings number faster than our sales and marketing line. So we'd kind of crossed over into where we were starting to see some of the efficiencies of our models. We built out some of the infrastructure around sales to scale. We didn't have to keep growing it. . . .

[4] So it's work—it seems to be working. So we had a lot of great sales reps. They're killing it. And a lot of great infrastructure around them that has improved our retention massively and we're now at scale, we're starting to see the efficiencies around that.

    **Statement 1.** The Pluralsight Defendants argue that Statement 1 is an unactionable accurate statement of historic fact. Plaintiffs respond that Statement 1—specifically that Pluralsight had "about 250" quota-bearing sales representatives—is false. Citing Budge's January 14, 2020 statement at the Needham Growth Conference that Pluralsight "came out of 2018 going into 2019 with about 200 quota-bearing sales reps" (ECF No. 94 ¶ 136), Plaintiffs argue that Statement 1 represents a 25% inflation of the number of quota-bearing sales representatives that Pluralsight actually had on January 16, 2019. Plaintiffs state that this misrepresentation is material because of Pluralsight's repeated linking of its sales force to its billings growth and how Pluralsight's being behind in sales representatives at the beginning of 2019 "expressed itself" in the billings growth drop in the second quarter. The Pluralsight Defendants respond that Statement

20

1 was not false, as it was couched in approximating language (i.e., "*about* 250"), is not inconsistent with Budge's Needham Growth Conference statement, and was accurate when made.

Plaintiffs appear to take principal issue with the final sentence of Statement 1—that Pluralsight then had "about 250" quota-bearing sales representatives. It is evident that the remainder of Statement 1 is a report on Pluralsight's historic success, recounting the company's sales representative growth from the end of 2016 up until January 16, 2019. The only issue with respect to the rest of Statement 1 is whether its reporting of historic success was "accurate" when made. *See McDonald*, 287 F.3d at 998. But Plaintiffs do not allege that this historic reporting was inaccurate. Accordingly, all but the final sentence of Statement 1 is unactionable as an accurate statement of historic success.

With respect to the final sentence of Statement 1, the Pluralsight Defendants have cited no authority for their proposition that the use of approximating language can in effect insulate a statement from being false or misleading. And while the Pluralsight Defendants are correct that Budge's January 14, 2020 statement that Pluralsight "came out of 2018 going into 2019 with about 200 quota-bearing sales reps" does not necessarily mean that the company did not have "about 250" quota-bearing sales representatives on January 16, 2019, Plaintiffs have sufficiently alleged at this stage that this statement was not "accurate" when made. Thus, Plaintiffs' allegations that Statement 1 was both false and material in light of how central Pluralsight's sales force numbers were to its billings growth are sufficient at this stage to render the final sentence of Statement 1 actionable.

**Statement 2.** The Pluralsight Defendants argue that Statement 2 falls within the PSLRA's safe harbor as a "forward-looking statement" accompanied by "meaningful cautionary statements." The Pluralsight Defendants argue that Statement 2 is "forward-looking," as it

21

**Add.21**

expresses Pluralsight's plans for sales force growth, and contains "meaningful cautionary statements" because it was made at the Needham Growth Conference at which investors were referred to Pluralsight's "investor relations website containing links to SEC filings and an investor deck containing a Safe Harbor Statement." ECF No. 111 at 19–20. While the court agrees that Statement 2 is forward-looking, the court does not find that it was accompanied by the "meaningful cautionary statements" contemplated by the PSLRA's safe harbor provision. To satisfy the "meaningful cautionary statements" requirement, the Pluralsight Defendants cite a document from Pluralsight's presentation at the Needham Growth Conference, in which Budge stated the following:

> So this is my colleague—over here is Mark McReynolds, and if you have questions that we don't get to them in this session, you can always reach out to Mark or myself, and we're happy to dive in deeper. And Scott's obviously a great resource for reaching into questions about Pluralsight, and we have our – on our Investor Relations page of our website, you can get the full deck of a whole bunch of tidbits about the company. So encourage any and all of that.

ECF No. 112-5 at 5. This court cannot imagine, and the Pluralsight Defendants provide no authority to support, that a statement this vague could be regarded as "meaningful cautionary language" within the meaning of the PSLRA safe harbor. And the Pluralsight Defendants did not provide the court with copies of the language on Pluralsight's website or Investor Relations page, preventing the court from assessing the adequacy of the cautionary language contained therein. But regardless of the language on the website, the court is wary of concluding that referring investors to an external website to unearth cautionary statements that would clarify oral statements they were hearing live at the conference is the sort of "accompanying" contemplated by the PSLRA's safe harbor. Nevertheless, the court finds that Budge's projections about Pluralsight's future growth in quota-bearing sales representatives are unactionable statements of optimism and

puffery. *See Raab*, 4 F.3d at 289 (holding that a company's projection of "an expected annual growth rate of 10% to 30% over the next several years" and statement that it was "poised to carry the growth and success of 1991 well into the future" were "hardly material" and "soft," "puffing" statements that "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth" (citation omitted)). Moreover, even assuming that Pluralsight was behind in its sales ramping capacity and Budge knew of this, these allegations do not render his future projections incorrect or even misleading. Budge was permitted to "be confident about [his] stewardship and the prospects of the business that [he] manage[d]." *See Rombach*, 355 F.3d at 174.

Additionally, Plaintiffs appear to argue that Budge's touting of Pluralsight's efficiencies gave rise to a duty to disclose Pluralsight's alleged capacity gap at the beginning of 2019. However, Plaintiffs do not allege that the efficiencies mentioned in Statement 2, or any of the information mentioned in Statement 2, were false. Accordingly, Budge did not incur a duty to correct any allegedly misleading impression left by Statement 2. *See Grossman*, 120 F.3d at 1125. Moreover, in choosing to discuss efficiencies, Budge did not incur a duty to discuss every factor bearing upon those efficiencies. *See K-tel Int'l*, 300 F.3d at 898. Accordingly, Statement 2 is unactionable under Section 10(b) and Rule 10b-5.

**Statement 3.** The Pluralsight Defendants argue that Statement 3, which discusses Pluralsight's historic B2B billings growth, is an unactionable accurate statement of historic fact. Plaintiffs have conceded that they do not allege that Statement 3 is false. *See* ECF No. 119 at 19 n.13. The court agrees with the Pluralsight Defendants and finds that Statement 3 is not actionable under Section 10(b) and Rule 10b-5.

**Add.23**

**Statement 4.** The Pluralsight Defendants argue that Statement 4 is an unactionable statement of corporate optimism and opinion. Plaintiffs respond that Statement 4 is not immaterial puffery because of the essential role that Pluralsight's sales force plays in its billings growth. The court agrees with the Pluralsight Defendants. Statement 4 is entirely composed of "generalized statements of optimism that are not capable of objective verification," see *Grossman*, 120 F.3d at 1119, such as: "it seems to be working," "we have a lot of great sales reps," "[t]hey're killing it," "a lot of great infrastructure around them that has improved our retention massively," "we're now at scale," and "we're starting to see the efficiencies around that." Accordingly, Statement 4 is not actionable under Section 10(b) and Rule 10b-5.

b)  Statement 8

Statement 8 was made by Budge on February 13, 2019 on an earnings call with analysts and investors in response to a question about sales force hiring trends and how Pluralsight's sales force was positioned at the end of the fourth quarter of 2018:

> Total quota-bearing reps closing in at around 240, we expect that to grow to probably over 300 as we roll through 2019. . . . So more reps to come, more on quota on the Street and more goodness from them.

The Pluralsight Defendants argue that Statement 8 is an unactionable accurate statement of historic fact and expression of optimism and puffery. Plaintiffs argue that Statement 8 is actionable because, in discussing Pluralsight's headcount, hiring trends, and sales growth plans, Budge had a duty to disclose that the company was behind on its annual sales ramp capacity plan. Plaintiffs argue that this statement is material because of the importance of Pluralsight's sales ramp capacity to its billings growth.

**Add.24**

The court finds that Statement 8 is not actionable. Statement 8 contains forward-looking statements of optimism and puffery that are not capable of objective verification (e.g., "we expect that to grow to probably over 300 as we roll through 2019," "more reps to come, more on quota on the Street and more goodness from them"). Plaintiffs do not allege that any part of Statement 8 was false. And in choosing to discuss how Pluralsight's sales force was positioned at the end of 2018 and the company's hiring plans for 2019, Budge did not incur a duty to "dump all known information" related to the sales force capacity. *See K-tel Int'l*, 300 F.3d at 898. Moreover, even assuming that Pluralsight was behind in its sales ramp capacity plan at the time and Budge knew of this information, such does not alter the meaning of the positive future projections that Budge made for 2019. Accordingly, Statement 8 is not actionable under Section 10(b) and Rule 10b-5.

c)   Statement 11

Statement 11 was made in Pluralsight's February 21, 2019 Form 10-K, which was signed by Skonnard and Budge, under a section titled "Growth Strategy":

> We have a large direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective. We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform. We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship. As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase. We will continue to expand our platform capabilities to deliver additional value to our customers. Our sales force educates business customers on the strengths of our platform to help customers make informed decisions and create a customized and unified end-to-end learning experience for their businesses.

**Add.25**

The Pluralsight Defendants argue that Statement 11 is an unactionable accurate statement of historic fact and a statement of corporate optimism and puffery. Plaintiffs concede that the Pluralsight Defendants have not falsely stated the historic increases in Statement 11. *See* ECF No. 119 at 19 n.13. Plaintiffs also do not dispute the last sentence of Statement 11 regarding the function of Pluralsight's sales force or contend that this statement is false or misleading. The court therefore finds that Statement 11 is unactionable as an accurate statement of historic fact (regarding the increase in annual spending by Pluralsight customers) and as a statement of corporate optimism and puffery (regarding Pluralsight's "large direct sales force," ability "to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform," intent "to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship," and plan to "continue to expand our platform capabilities to deliver additional value to our customers").

d)  Statement 12

Statement 12 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" on February 21, 2019:

> As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and there is no guarantee that our investments will succeed and contribute to additional customer acquisition and revenue growth.

The Pluralsight Defendants argue that Statement 12 is protected under the PSLRA's safe harbor provision. The statement is forward-looking, as it expresses Pluralsight's need to "continue to increase the investments we make in sales and marketing." However, the statement is not accompanied by the requisite meaningful cautionary statements. "Cautionary words about future

26

**Add.26**

risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 (citing *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")). Plaintiffs allege that, at the time Statement 12 was made, the Pluralsight Defendants knew or recklessly disregarded that the company was behind in its sales representative ramping capacity plan and was experiencing sales execution failures. Thus, Plaintiffs argue that the risk that the company was warning against had already materialized, rendering its warning ineffectual. Plaintiffs have alleged sufficient facts at this stage to prevent the application of the PSLRA safe harbor provision, and so the cautionary words in Statement 12 do not insulate the Pluralsight Defendants from liability.

However, apart from its inability to insulate the Pluralsight Defendants from liability, Statement 12 is still not independently actionable as a false or misleading statement or omission. Plaintiffs do not argue that any part of Statement 12 is false. Rather, Plaintiffs contend that Statement 12 is an actionable omission because, in discussing its efforts to expand and invest in its sales and marketing and warning that there is no guarantee that these investments will succeed, Pluralsight incurred a duty to disclose that it was then behind in its sales ramp capacity plan and that this could negatively impact the company's billings growth. The court disagrees. Statement 12 does not explicitly discuss Pluralsight's sales force hiring or capacity plan. In making a high-level statement about Pluralsight's expansion of and investments in its sales and marketing, the company did not incur a duty to "disclose any and all material information" related to these general subjects. *See Matrixx Initiatives*, 563 U.S. at 44. While an actor must provide "complete and non-misleading information with respect to the subjects *on which he undertakes to speak*," *K-tel Int'l*,

27

**Add.27**

300 F.3d at 898 (citation omitted), Pluralsight was not discussing its sales ramp capacity plan in this statement. To construe this full and complete disclosure requirement so broadly as to require an actor to disclose any and all material information when the actor so much as vaguely or generally references subject matter related to the material information would impose an impossible burden. The court declines to impose that burden here.

Even when a generic risk factor cannot protect a company "from liability for other misstatements or omissions," such does not mean that the generic risk factor can "be the basis for liability." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 480 F. Supp. 3d 1050, 1061 (N.D. Cal. 2020). Statement 12 was labeled a "Risk Factor" on Pluralsight's Form 10-K, and several courts have found that risk disclosures are not independently actionable under Section 10(b) and Rule 10b-5. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008) ("Though ubiquitous in securities filings, cautionary statements of potential risk have only rarely been found to be actionable by themselves." (citations omitted)). For example, in *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (unpublished), plaintiffs contended that a company's risk disclosures in its Form 10-K were actionable under Section 10(b) because the disclosures communicated that the risks were "only *possible*" when, "in fact, [the risks] had already come to pass and were presently harming investment in [the company]." The Sixth Circuit held that the company's risk disclosures were not actionable under Section 10(b):

> Risk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently *prospective* in nature. They warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company. This is apparent from any dictionary definition of "risk." For example, Webster's Third New International Dictionary lists the primary definition of "risk" as a "*possibility* of loss, injury, disadvantage, or destruction." *Webster's Third New International Dictionary* 1961 (1986) (emphasis added). For these reasons, a

**Add.28**

> reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms.

*Id.* at 491. Other courts have agreed. *See, e.g.*, *Volkswagen*, 480 F. Supp. 3d at 1061–62 (finding that "generic warnings" in Risk Factor statements couched in hypothetical language were not independently actionable even though plaintiffs alleged that those risks had already "begun to materialize"); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) ("[Risk Factors in SEC filings] constitute defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results." (citations omitted)); *FBR Inc.*, 544 F. Supp. 2d at 360, 362 (finding a company's "boilerplate description of its regulatory risks" in its SEC filings was not actionable in part because the description "said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance," and "significantly" because the company never claimed to be "in 'full compliance with all regulations, or that it had no outstanding regulatory issues'" (citations omitted)).

Still, "there may be circumstances under which a risk disclosure might support Section 10(b) liability." *Bondali*, 620 F. App'x at 491. This is not one of those circumstances. The court finds that Statement 12—a generic Risk Factor in Pluralsight's Form 10-K—"could not have been misleading to a reasonable investor." *FBR Inc.*, 544 F. Supp. 2d at 362. A reasonable investor would be unlikely to read Statement 12's generic language about Pluralsight expanding its sales efforts and investing in sales and marketing and be misled into thinking that Pluralsight either was or was not behind in its sales force ramping capacity. Accordingly, Statement 12 is not independently actionable under Section 10(b) and Rule 10b-5.

e) Statement 13

Statement 13 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "Failure to effectively expand our sales and marketing capabilities could harm our ability to increase our customer base and achieve broader market acceptance of our platform." It further stated:

> If we are unable to hire, develop, and retain talented sales or marketing personnel, if our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time, or if our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

The court incorporates its analysis of Statement 12 here. Additionally, although Statement 13 addresses Pluralsight's sales force more directly than Statement 12, the court still does not find Statement 13 actionable under Section 10(b) and Rule 10b-5. While Plaintiffs argue that the risk that Pluralsight's sales capacity gap posed to the company's billings growth had already materialized, it is not evident that this is true. *See Bondali*, 620 F. App'x at 491 (declining to find risk disclosures actionable when plaintiffs failed to "allege[] facts showing any investment risk had already materialized"); *FBR Inc.*, 544 F. Supp. 2d at 362 (finding risk factors unactionable when, "[a]t the time that the cautionary statements were made, the risk that [the company's] noncompliance with securities regulations would actually cause a loss to the company or its shareholders had neither 'transpired' nor become a 'near certainty'" (quoting *Rombach*, 355 F.3d at 173)). Pluralsight made Statement 13 in its 2018 Form 10-K, which was filed on February 21, 2019. As the Pluralsight Defendants underscore, however, Pluralsight reported the following results for the first quarter of 2019 on May 1, 2019: a "total billings growth of 41% compared to 1Q18 and B2B billings growth of 48%." ECF No. 111 at 13. The effect of the company's sales

30

**Add.30**

capacity gap did not materialize until the second quarter of 2019, when Pluralsight reported only "23% year-over-year growth in total billings and 27% growth in B2B billings" on July 31, 2019. *Id.* at 14. Thus, it is not apparent that the risk entailed by Pluralsight being behind in its sales ramp capacity plan had manifested at the time that the company filed its 2018 Form 10-K. At oral argument, the Pluralsight Defendants argued that billings were fueled by two factors: first, the number of sales representatives, and second, by the productivity of those sales representatives. As a result, even though the company was behind in its sales ramp capacity plan going into 2019, the smaller number of sales representatives were still being productive, thereby obscuring the risk that the smaller numbers created.

Thus, the court finds that Plaintiffs have not sufficiently alleged that the risk created by Pluralsight's sales capacity gap had materialized at the time that Statement 13 was made, and Statement 13 is therefore unactionable.

### f) Statement 14

Statement 14 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "If we fail to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed." It further stated:

> As we expand our business, our continued success will also depend, in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base.

For the same reasons set out in its analysis of Statements 12 and 13, the court finds Statement 14 unactionable.

**Add.31**

g)  Statement 15

Statement 15 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "If we fail to effectively manage our growth, our business and results of operations could be harmed." It further stated:

> We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . If we do not achieve the benefits anticipated from these investments, or if the achievement of these benefits is delayed, our results of operations may be adversely affected.

For the same reasons set out in its analysis of Statements 12 and 13, the court finds Statement 15 unactionable.

h)  Statement 17

Statement 17 was made in Pluralsight's Registration Statement filed on March 4, 2019 and the Prospectus filed on March 7, 2019 as part of the company's SPO Offering Documents:

> We have significantly expanded our direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective.

The Pluralsight Defendants argue that Statement 17 is an unactionable accurate statement of historic fact. Plaintiffs argue that Statement 17, "is an actionable half-truth and omission" because Pluralsight was then contending with significant hiring and on-boarding delays with its sales force. ECF No. 119 at 20. The Pluralsight Defendants argue that Statement 17 was true based on the information contained in Statements 1 and 2 about Pluralsight's sales force growth since 2017. The court finds that Statement 17 is not actionable. To the extent that Statement 17 is a statement of Pluralsight's historic success in significantly growing its sales force, Plaintiffs do not dispute that Pluralsight's sales force had grown overall—only that it had not grown sufficiently. Thus, Plaintiffs fail to allege that Statement 17 is historically inaccurate. *See McDonald*, 287 F.3d

**Add.32**

at 998. Additionally, in speaking generally about how it had structured its business model with respect to its sales force, Pluralsight did not incur a duty to "dump all known information" about the state of its sales force. *See K-tel Int'l*, 300 F.3d at 898. The court also finds that Statement 17 contains a "generalized statement[] of optimism that [is] not capable of objective verification," *Grossman*, 120 F.3d at 1119, as it communicates that Pluralsight has "significantly" expanded its direct sales force and "aligned" its sales team's compensation. Accordingly, Statement 17 does not support liability under Section 10(b) and Rule 10b-5.

i)   Statement 18

Statement 18 was contained in Pluralsight's Offering Documents as well, and it repeats Statement 11 from the company's Form 10-K. The court incorporates its analysis with respect to Statement 11 here and accordingly finds Statement 18 unactionable for the same reasons.

j)   Statements 19 and 25

Statements 19 and 25 were contained in Pluralsight's Offering Documents as well and are composed of the same Risk Factors from the company's Form 10-K, as reflected in Statements 12, 13, 14, and 15. The court incorporates its analyses with respect to Statements 12, 13, 14, and 15 here and accordingly finds Statements 19 and 25 unactionable for the same reasons. That Statements 19 and 25 were made on March 4 and 7, 2019, as compared to Statements 12, 13, 14, and 15, which were made on February 21, 2019, does not alter the court's analysis because Pluralsight was still reporting strong billings growth and productivity on May 1, 2019, and the sales capacity gap did not express itself in billings growth until months later.

**Add.33**

k) Statement 27

Statement 27 was made by Budge during Pluralsight's first-quarter 2019 conference call on May 1, 2019 in response to a question from a securities analyst about Pluralsight's progress in hiring sales representatives by the end of the year:

> Look, we like where we are with our sales reps. We're committed to continue to grow the sales force. We have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019 which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force from 80 quota bearing reps two years ago to—at this point over—at the end of this year over 300. So love our growth there. Our retention is excellent. I think compared to industry average, we'd always like it to be higher and the churn to be lower, particularly with our sales reps. But it's a function when there is a little bit more turnover in sales, often in the first quarter or so. We've experienced some of that. It's normal. We planned for that and that's—we're still committed, and we see a clear path to having 300-plus reps by the time we exit the year. So the short answer is we're on pace.

The Pluralsight Defendants argue that this is an unactionable statement of accurate historic fact, is an expression of optimism and puffery, and falls within the PSLRA's safe harbor provision. Plaintiffs argue that Statement 27 is actionable because Budge had a duty to disclose that the company was behind on its annual sales ramp capacity plan. Plaintiffs argue that this statement is material because of the importance of Pluralsight's sales ramp capacity to its billings growth.

The court finds that Statement 27 is not actionable. Statement 27 does not fall within the PSLRA safe harbor provision. Although Statement 27 contains forward-looking remarks (e.g., "[w]e have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019;" "we're still committed, and we see a clear path to having 300-plus reps by the time we exit

34

**Add.34**

the year") it was not accompanied by meaningful cautionary language.[16] Nevertheless, a portion

of Statement 27 is an unactionable statement of accurate historic fact. Statement 27 references

Pluralsight's growth from "80 quota bearing reps" from two years prior, and Plaintiffs do not allege

that this figure is inaccurate. Additionally, Statement 27 is replete with unactionable optimism and

puffery: "we like where we are with our sales reps;" "[w]e have a plan to grow into the high 200s,

even cross over 300s in quota bearing reps this year 2019;" "[s]o love our growth there;" "we're

still committed, and we see a clear path to having 300-plus reps by the time we exit the year;"

"we're on pace." Although some statements that are "particularly concrete" can "cross the line

from corporate optimism and puffery to objectively verifiable matters of fact," *Level 3*, 667 F.3d

at 1340, Statement 27 does not cross that line. The most specific statement of optimism and puffery

---

[16] Statement 27 was made on an earnings call that began with the following cautionary language
by Mark McReynolds:

> Some of our remarks will include forward-looking statements within
> the meaning of the federal securities laws. Actual results may differ
> materially from those contemplated by these forward-looking
> statements. Factors that could cause these results to differ materially
> are set forth in today's press release and in our SEC filings. Any
> forward-looking statements that we make on this call are based on
> information and assumptions as of today, and we assume no
> obligation to update these statements.

ECF No. 112-6 at 5. These cautionary remarks are insufficient for the same reasons set forth in the
court's analysis of Statement 12's cautionary statements. This cautionary language is insufficient
because Plaintiffs have alleged that the risk that the language cautions against had already
materialized, rendering the warning ineffectual for purposes of the PSLRA safe harbor provision.
*See Rombach*, 355 F.3d at 173.

**Add.35**

is "[w]e have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019," but this statement is unactionable puffery. *See Raab*, 4 F.3d at 289.[17]

l)   Statement 28

Statement 28 was also made by Budge during Pluralsight's first-quarter 2019 conference call on May 1, 2019 in response to a question from a securities analyst about the "limiting factor on the pace of sales headcount growth" (ECF No. 94 ¶ 208):

> Yes. Look, it's probably a combination of both of those. Not probably, it is a combination of both of those. We—there's probably only so many reps we could hire in any given year. We do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization. And we like the direction we're going on both a top and bottom line. We like the fact that we've been cash flow profitable for three straight quarters now. We would like to continue that. As long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time. And we think that will grow a long and sustainable business model for us.

The Pluralsight Defendants argue that Statement 28 is not actionable because it is an expression of optimism and puffery (e.g., "[w]e do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization," "we like the direction we're going on both a top and bottom line," "[a]s long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time," "we think that will grow a long and sustainable business model for us") and that the PSLRA safe harbor applies. The court finds that Statement 28

---

[17] Budge also appears to acknowledge a "turnover in sales" in the first quarter of 2019. Plaintiffs do not allege that this statement was false or misleading and do not make any specific arguments related to this statement. The court finds that this portion of Statement 27 is also unactionable.

**Add.36**

is unactionable for the same reasons set forth in its analysis of Statement 27. Plaintiffs argue that, in answering a question referencing "sales headcount growth" and "sales management's capacity," Budge incurred a duty in Statement 28 to disclose Pluralsight's sales ramp capacity issue. The court disagrees. Although Plaintiffs characterize Budge as "respond[ing] in detail" to this question, Budge's statements in Statement 28 only discuss hiring sales representatives at a high level of generality and are otherwise vague statements of optimism and puffery. *See Raab*, 4 F.3d at 289. Accordingly, Statement 28 is unactionable.

m)  Statements 29–30

Statements 29 and 30[18] were made by Skonnard in Pluralsight's May 1, 2019 press release regarding the company's first quarter results and on an earnings call with analysts:

> [29] Our Q1 financial results marked a great start to 2019. Revenue and billings growth continue to be strong with both up over 40% year over year. We continue to demonstrate the efficiency in our model with our third consecutive quarter of positive cash flow.

> [30] And our teams continue to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate of 128%.

**Statement 29.** The Pluralsight Defendants argue that Statement 29 is an unactionable accurate statement of historic fact. Plaintiffs argue that Statement 29 is actionable because of the misleading impression that Skonnard created with his May 1, 2019 statements, as they communicate that Pluralsight was then doing well when that was not the case. Plaintiffs allege that at the time these statements were made, Pluralsight was behind in its sales representative capacity, and this ultimately resulted in a 40% decline in billings growth. However, Statement 29 does not

---

[18] Bracketed numbers are included in the quoted text below to indicate the portion of Skonnard's remarks associated with each Statement.

**Add.37**

address Pluralsight's sales representative capacity. And, as the Pluralsight Defendants underscore in their Reply Brief, Plaintiffs have not alleged that any of the information in Statement 29 is false. *See* ECF No. 120 at 8. Accordingly, court finds that Statement 29 is unactionable as an accurate statement of historic fact regarding Pluralsight's revenue and billings growth (i.e., "Revenue and billings growth continue to be strong with both up over 40% year over year."). The court also finds Statement 29 unactionable as an expression of corporate optimism and puffery (i.e., "[o]ur Q1 financial results marked a great start to 2019," "[w]e continue to demonstrate the efficiency in our model").

**Statement 30.** The Pluralsight Defendants argue that Statement 30 is an unactionable accurate statement of historic fact because it communicates Pluralsight's dollar-based net retention rate, and an unactionable expression of optimism and puffery. The court agrees. Statement 30 is unactionable as an accurate statement of historic fact (i.e., Pluralsight's "dollar-based net retention rate of 128%") and as an expression of corporate optimism and puffery (i.e., "our teams continue to execute with strong focus and commitment to customer success").

In sum, the court finds that Plaintiffs have only adequately alleged that the last sentence in Statement 1 is actionable under Section 10(b) and Rule 10b-5. In order to survive the Motion to Dismiss, however, Plaintiffs also must adequately plead scienter.

    2)    **Whether Plaintiffs Adequately Pleaded that the Pluralsight Defendants Acted with the Requisite Scienter**

The PSLRA also heightened the pleading standard for the third element of a 10b-5 claim regarding the defendant's requisite scienter. *Adams*, 340 F.3d at 1095–96. Under the PSLRA, the plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u-4(b)(2)(A). "In a securities fraud case, the appropriate level of scienter is 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Adams*, 340 F.3d at 1105 (citation omitted). "Recklessness in the context of securities fraud is a high bar. It is 'defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (citation omitted). "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113 (10th Cir. 2015) (citation omitted).

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Still, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted). To determine whether scienter is present, the court must "engage in a comparative evaluation," considering the plaintiff's inferences as well as "competing inferences rationally drawn from the facts alleged." *Id.* at 314. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (citation omitted). As part of this evaluation, "omissions and ambiguities count against inferring scienter." *Id.* at 326.

In the Tenth Circuit, a plaintiff claiming securities fraud based on nondisclosure of potentially material facts must allege the following to establish scienter:

**Add.39**

> (1) the defendant knew of the potentially material fact, and (2) the
> defendant knew that failure to reveal the potentially material fact
> would likely mislead investors. The requirement of knowledge in
> this context may be satisfied under a recklessness standard by the
> defendant's knowledge of a fact that was so obviously material that
> the defendant must have been aware both of its materiality and that
> its non-disclosure would likely mislead investors.

*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). In alleging

scienter, "[a]llegations of motive and opportunity may be important," but they are "typically not

sufficient in themselves to establish a 'strong inference' of scienter." *Id.* at 1262. Nevertheless,

evidence of motive and opportunity "may be considered as part of the mix of information that can

come together to create the 'strong inference' of scienter required by the PSLRA." *Id.* at 1263.

Plaintiffs allege that the Defendants acted with the requisite scienter when they "knowingly

or recklessly misrepresented and omitted material facts about the capacity of [Pluralsight's] sales

program." ECF No. 94 ¶ 138. As evidence for this allegation, Plaintiffs cite the statements set forth

above regarding Pluralsight's sales capacity, Skonnard and Budge's alleged admissions regarding

Pluralsight having been behind in its sales ramping capacity at the beginning of 2019, Skonnard

and Budge's trading during the Class Period,[19] the Pluralsight Defendants' alleged personal and

detailed knowledge of Pluralsight's ramping of sales representatives and deal pipeline, and the

Pluralsight Defendants' prior statements that the generation of billings from Pluralsight's sales

force was central to the company's business model. The Pluralsight Defendants argue that

Plaintiffs have failed to plead scienter because none of their allegations relies upon internal reports

---

[19] As part of these allegations, Plaintiffs also cite DiBartolomeo's concurrent trading activities.
However, DiBartolomeo is not a party to this litigation, his conduct is not imputed to Skonnard
and Budge, and Plaintiffs concede that their allegations related to DiBartolomeo only provide
"context" for Skonnard and Budge's trading. ECF No. 119 at 34 n.29.

**Add.40**

or witnesses demonstrating the Pluralsight Defendants' state of mind or gives rise to a strong inference of scienter.

As a preliminary matter, the Pluralsight Defendants have not provided any authority that Plaintiffs must provide internal reports or witnesses to sufficiently plead scienter and survive a motion to dismiss, and the court does not find that such is required of Plaintiffs. Turning to Plaintiffs allegations of scienter, the court will consider each allegation in turn and determine whether all of the scienter allegations, taken together, "give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23.

### a)  Skonnard and Budge's July 31, 2019 Statements

In support of their scienter allegations, Plaintiffs first cite Skonnard and Budge's July 31, 2019 statements during an earnings call. On the call, Skonnard told investors that there "was not enough capacity in the system to sustain our high-growth expectations as we entered the year." ECF No. 94 ¶ 139(a). Budge added that "we just didn't have enough ramped capacity in our system in really the first and second quarter," that "there were dozens of reps that we needed to bring on board at the end of last year . . . [a]nd there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter." *Id.* ¶ 139(b). Budge further explained that the lack of ramped sales capacity in the first and second quarter "expressed itself with the outcome you saw in the second quarter"—the drop in billings. *Id.* In response to a question about why Skonnard and Budge did not disclose this information earlier, Budge explained that Pluralsight was "still hitting" its numbers in the first quarter. *Id.* ¶ 139(c). Budge also stated that Pluralsight "didn't come into the year early enough in the year" and that the company was "a few months behind there, that's been the big impact." *Id.* ¶ 139(d).

**Add.41**

Plaintiffs argue that Budge's response about the company "still hitting" its numbers in the first quarter is not a denial of knowledge of the problem at the time that it was occurring and therefore supports that Skonnard and Budge "actually knew of the problem and deliberately chose not to tell investors." *Id.* ¶ 139. The Pluralsight Defendants respond that Budge did not admit on July 31, 2019 that he knew prior to June 2019 that Pluralsight's sales challenges would result in lower billings growth in the second quarter of 2019, and his statement "we were still hitting our numbers" cannot be construed as an admission. Rather, the Pluralsight Defendants argue that this statement supports that there was no reason to believe that they lacked sufficient sales capacity and productivity to achieve their billings growth in the second quarter of 2019.

Although Plaintiffs contend that Skonnard and Budge's July 31, 2019 statements are "admissions" of their knowledge of Pluralsight's sales ramp capacity gap from the beginning of 2019, these statements could just as well be cast as—and appear to this court to more accurately be—nonculpable, hindsight expressions of what caused the company's second quarter billings to drop. Hindsight expressions do not support an inference of scienter. *See Fleming*, 264 F.3d at 1260 ("Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight,' . . . because corporate officials should be liable for failing to reveal only 'those material facts reasonably available to them.'" (citation omitted)). The most compelling statement in support of a scienter inference is Budge's response to the question of why they did not disclose the sales ramping issues earlier: "we were still hitting our numbers." But even this statement is ambiguous as to whether it indicates knowledge of the sales capacity gap at the beginning of 2019 or is a hindsight conclusion formed upon investigation of what caused the second quarter drop in billings. And ambiguities do not support an inference of scienter. *Tellabs*, 551 U.S. at 326.

**Add.42**

As the Pluralsight Defendants stated at oral argument, regardless of whether these statements support that Budge and Skonnard knew or were reckless as to Pluralsight being behind in its sales ramping capacity plan at the beginning of 2019, Plaintiffs have failed to adequately allege that Skonnard and Budge knew or were reckless to the materiality of this information or that failing to reveal it to investors would likely mislead them. Budge's response that the company was "still hitting [its] numbers," coupled with Pluralsight's strong billings and B2B billings growth in the first quarter of 2019 despite the alleged sales capacity gap supports that the company did not have reason to believe that the gap would have a material impact on billings. Without indication that the sales capacity gap would negatively impact billings growth, the Pluralsight Defendants argue that Budge and Skonnard did not know that a failure to disclose the gap would mislead investors. The court agrees. Here, the culpable inference is not "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Accordingly, the court finds that these statements provide marginal, if any, support for a scienter inference.

b) Budge's January 14, 2020 Statements

Plaintiffs also cite Budge's statements at the Needham Conference on January 14, 2020, where he acknowledged that it was "somewhat well documented [Pluralsight] had a capacity gap in the first half of 2019" and that the company "came into the year with fewer sales reps than we had planned—than we had hoped for" and did not "decide where they should go early enough in 2018 leading into 2019." ECF No. 94 ¶ 140. Budge also stated that "we feel much better focused from our sales leaders going into 2020 than we had going into 2019." *Id.*

Plaintiffs allege that these statements support that the Pluralsight Defendants were aware of their sales force deficiencies at the beginning of 2019 and that sales leaders "had not engaged in the process of hiring high-quality sales representatives ['going into 2019']." *Id.* The Pluralsight

43

**Add.43**

Defendants respond that Budge did not admit that he knew prior to June 2019 that Pluralsight's second quarter 2019 billings disappointment would occur, and that this statement is merely a "hindsight review . . . [which] contributes nothing to an inference of scienter." *Level 3*, 667 F.3d at 1347. The court agrees with the Pluralsight Defendants. These January 14, 2020 statements could be stretched to indicate culpability, but the court finds the nonculpable inference far more compelling for the same reasons the court set forth in its analysis of Skonnard and Budge's July 31, 2019 statements. In short, these post-class period statements are more likely hindsight statements, and even if they are interpreted as supporting prior knowledge of the sales capacity gap, Plaintiffs have failed to adequately allege that Budge knew or was reckless to the materiality of these statements and that failing to disclose this information would likely mislead investors given Pluralsight's 2019 quarter one billings growth even with the alleged sales capacity gap. Accordingly, Budge's January 14, 2020 statements provide minimal, if any, support for an inference of scienter. *See Level 3*, 667 F.3d at 1347 ("Plaintiff also alleges that defendants' disclosures after the class period revealed their knowledge of integration issues during the class period. . . . But the disclosures do not suggest that defendants knew or recklessly disregarded information contrary to their public statements.").

c) Skonnard and Budge's Stock Trading During the Class Period

Plaintiffs also cite Skonnard and Budge's stock trading during the class period as support for an inference of scienter. Plaintiffs allege that Skonnard and Budge's trading evinces "a motive to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making false and misleading statements and withholding material adverse facts from the market." ECF No. 94 ¶ 141. Plaintiffs aver that Skonnard and Budge sold substantially more stock during the Class Period than they did before or after the Class Period, and this resulted in sales at higher

44

**Add.44**

prices than prior or subsequent stock sales that far exceeded their total compensations. Plaintiffs argue that Skonnard and Budge had a motive to make positive statements that would artificially inflate share prices so that they could personally profit.

The Pluralsight Defendants argue that Skonnard and Budge's stock sales do not support an inference of scienter. The Pluralsight Defendants aver that many of Skonnard and Budge's sales were triggered automatically pursuant to a Rule 10b5-1 plan and thus are not evidence of scienter. The Pluralsight Defendants also state that still more sales were made automatically by Pluralsight as part of an agreement to satisfy its tax liability. Further, the Pluralsight Defendants point out that it is not suspicious that Skonnard and Budge earned more from their stock sale proceeds than from their annual compensation because neither one received a base salary in 2018 or 2019. The Pluralsight Defendants also argue that the timing of the sales was not suspicious—Skonnard and Budge sold more during the Class Period than before because Pluralsight had been in a "customary 180-day post-IPO lock-up period" up until two months prior to the Class Period. ECF No. 111 at 27. Finally, with respect to the number of shares sold, the Pluralsight Defendants argue that Skonnard sold less than 5% of his total holdings, and Plaintiffs' statement that Budge sold 39.9% of his holdings is an oversimplification. The Pluralsight Defendants point out that Budge also vested into additional shares, and the majority of his sales were pursuant to his Rule 10b5-1 plan and for taxes, leaving only the 11.8% of the shares that Budge sold in the SPO.

"[M]otive can be a relevant consideration" in making the scienter determination, and "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. However, defendants engaging in stock sales but "retain[ing] a substantial percentage of their . . . holdings" and in stock sales "made pursuant to 'automatic transactions' set up prior to the class period to pay withholding taxes that became due . . . rebut any inference of scienter we might

45

**Add.45**

otherwise draw regarding these sales." *Level 3*, 667 F.3d at 1346–47 (citations omitted). Because the Pluralsight Defendants argue that Skonnard and Budge retained substantial portions of their Pluralsight stock holdings and that their stock trading was primarily made pursuant to Rule 10b5-1 plans and "automatic transactions" to pay withholding taxes, this "rebut[s] any inference of scienter." *See id.* Plaintiffs' inference that these stock sales demonstrate scienter is thus not "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Accordingly, the court finds that Skonnard and Budge's stock sales only provide minimal support for an inference of scienter.

d) Skonnard and Budge's Knowledge of Sales Representative

Ramping and Deal Pipeline

Plaintiffs cite several statements made by Skonnard and Budge before and during the class period regarding Pluralsight's sales force ramping process and progress and the company's deal pipeline as support that Skonnard and Budge knew that Pluralsight was behind in its sales ramping capacity and did not disclose this information to investors. According to Plaintiffs, because Skonnard and Budge spoke in detail and positively about Pluralsight's process of recruiting and ramping sales representatives, this supports an inference that they were therefore aware of the company's sales force issues at the beginning of 2019 but made no effort to correct their allegedly misleading public statements that the company was "on pace." Plaintiffs also argue that Skonnard and Budge made several statements indicating that they were aware of the company's deals, and this in turn supports that the two knew how many deals Pluralsight were likely to close in the second quarter of 2019 and that the company was behind.

The Pluralsight Defendants argue that Plaintiffs only cite "statements of optimism and forecasting" as evidence of Skonnard and Budge's allegedly "detailed knowledge" of Pluralsight's

46

**Add.46**

hiring process and sales pipeline, and that knowledge cannot be imputed to Skonnard and Budge based solely on their positions in Pluralsight. ECF No. 111 at 24. *Anderson v. Spirit Aerosystems Holdings, Inc.*, establishes that scienter cannot be inferred "based only on a defendant's position in a company or involvement with a particular project. . . . [A]dditional particularized facts are necessary for an inference of scienter." 827 F.3d 1229, 1245 (10th Cir. 2016) (citations omitted). Plaintiffs allege more here. Plaintiffs argue that Skonnard and Budge had detailed knowledge of Pluralsight's sales force ramping and billing based on several specific statements that the two made on earnings calls and at conferences and presentations. In those statements, Skonnard and Budge discussed details and metrics associated with these subjects: *see, e.g.*, ECF No. 94 ¶ 164(a) (discussing the fifteen- and eighteen-month and two-year benchmarks of Pluralsight sales representatives); 164(e)–(g) (discussing Pluralsight's number of quota-bearing sales representatives; 164(h) (discussing Pluralsight's B2B billings growth). Additionally, while "mere attendance at meetings does not contribute to an inference of scienter," *Anderson*, 827 F.3d at 1246, Plaintiffs allege that Skonnard and Budge did far more than attend meetings. Plaintiffs provide undisputed evidence that Skonnard and Budge spoke at length during various meetings about Pluralsight's sales force ramping and productivity.

The Pluralsight Defendants also argue that Plaintiffs failed to allege that Skonnard and Budge had access to particular documents with "red flags." ECF No. 111 at 24. While the Tenth Circuit acknowledged in *Anderson* that the plaintiffs did not allege that the executives "actually reviewed" relevant data, the court stopped short of making the review of data a requirement to allege scienter and only cited the absence of this allegation as further support that the plaintiffs' otherwise already sparse scienter allegations were insufficient. *See* 827 F.3d at 1246. Accordingly,

**Add.47**

Plaintiffs' allegations do not fail simply because they have not alleged that Skonnard and Budge had access to particular reports.

Nevertheless, even if Skonnard and Budge had access to and knowledge of Pluralsight's sales representative ramping and deal pipeline, and even if this indicates that Skonnard and Budge knew of the company's sales capacity gap at the beginning of 2019, as the court reasoned above, such does not necessarily mean that the two knew of or were reckless to the materiality of the information and the likelihood that they would mislead investors by not disclosing it. Thus, on balance, the court finds that Plaintiffs' allegations regarding Skonnard and Budge's knowledge of and access to Pluralsight's information related to its sales force ramping and deal pipeline provides tangential support at best for an inference of scienter.

e)  Skonnard and Budge's Statements Regarding the Central Nature of Sales Force to Pluralsight's Investors, Stock Price, and Business Model

Plaintiffs allege that the high frequency with which Pluralsight's sales capacity and sales representative growth were discussed during earnings calls, investor meetings and presentations, and conferences supports an inference of scienter. This topic was often discussed and touted by Skonnard and Budge, Plaintiffs argue, because it was closely linked to billings growth and therefore revenue growth. Accordingly, Plaintiffs argue that it was at least reckless for Skonnard and Budge not to disclose Pluralsight's sales capacity issues occurring at the beginning of 2019 at the time that they were occurring. Plaintiffs argue that this is true especially because billings were the company's "key business metric," and billings were in turn dependent upon the company's sales force capacity. The court finds that these allegations do not support a strong inference of

scienter for the same reasons stated above in its analysis of Plaintiffs' preceding scienter allegations.

In "assess[ing] all the allegations holistically," Plaintiffs have not alleged facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 326, 324. Instead, Plaintiffs' allegations require the court to "stack inference upon inference to even conclude . . . that defendants knew or were reckless in not knowing," *Level 3*, 667 F.3d at 1345, that Pluralsight was behind in its sales force ramping capacity plan, that this alleged sales capacity gap would materially impact billings, and that a failure to reveal this information was likely to mislead investors. Plaintiffs' allegations do not support a strong, cogent inference of scienter. Accordingly, Plaintiffs have failed to adequately plead scienter. Although the court found above that a portion of Statement 1 was actionable under Section 10(b) and Rule 10b-5, because Plaintiffs have failed to adequately plead scienter, Plaintiffs' Section 10(b) and Rule 10b-5 claim fails and is dismissed.

B. Items 303 and 105 Claims

"Regulation S-K is a set of rules that sets forth reporting requirements applicable to various filings . . . including registration statements." *In re HEXO Corp. Sec. Litig.*, No. 19 Civ. 10965, 2021 WL 878589, at *10 (S.D.N.Y. Mar. 8, 2021) (unpublished). Plaintiffs allege that the Pluralsight Defendants violated Items 303 and 105 of Regulation S-K because they failed to disclose that Pluralsight was behind in its sales ramp capacity plan at the beginning of 2019, knowing how closely the company's billings growth rate was tied to its sales representative capacity and the negative impact that this was having on the company's deal pipeline.

**Add.49**

1) Item 303

Item 303 requires a public company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii); *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). Additionally, if the company "knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." 17 C.F.R. § 229.303(b)(2)(ii). This "duty to disclose arises 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Slater*, 719 F.3d at 1197 (citation omitted). "Item 303 require[s] more than the mere identification of trends that were occurring in the defendant's business"; "the relevant question under Item 303 is whether [the company] reasonably expects the impact to be material." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 509 (S.D.N.Y. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011)).

Plaintiffs allege that the Pluralsight Defendants violated Item 303 when they knew that Pluralsight was behind in its sales ramp capacity in the first quarter of 2019 and that this would negatively impact the company's billings growth rate and sales cycle, but failed to disclose this information in their 2018 Annual Report on Form 10-K, Offering Documents, and Form 10-Q from the first quarter of 2019. The Pluralsight Defendants argue that Plaintiffs have failed to plead a violation of Item 303 because they have failed to allege facts showing that Pluralsight's sales capacity gap was a "known trend" to the Pluralsight Defendants in the first quarter of 2019 that

50

**Add.50**

they knew would "reasonably likely" have a material unfavorable impact on the company's billings growth. The Pluralsight Defendants underscore that Pluralsight still "posted 41% total billings growth and 48% B2B growth" in the first quarter of 2019 even with the alleged sales capacity gap. ECF No. 111 at 30. The Pluralsight Defendants also argue the two months during which they allegedly knew of this sales capacity gap is insufficient to establish a "trend" within the meaning of Item 303.

The court finds that Plaintiffs have failed to adequately plead an Item 303 violation. That Pluralsight still "posted 41% total billings growth and 48% B2B growth" in the first quarter of 2019 during the alleged sales capacity gap strongly cuts against Plaintiffs' allegation that the Pluralsight Defendants knew that the alleged gap would materially impact billings growth. Regardless of whether two months is a sufficient amount of time to constitute a "trend" within the meaning of Item 303 or whether the alleged sales capacity gap is regarded as an "uncertainty," Pluralsight's strong billings growth in the first quarter of 2019 despite the alleged sales capacity gap did not render it reasonably likely that the sales capacity gap would materially impact billings growth—in fact, it provided evidentiary support for the opposite result.

2)      Item 105

Plaintiffs also allege that the Pluralsight Defendants violated Item 105 of Regulation S-K because their Offering Documents did not mention "the substantial, materialized risks posed by the sales capacity gap to Pluralsight's billings growth, much less provide[] an adequate description of those risks," even though the Pluralsight Defendants knew of these risks. ECF No. 94 ¶ 222. Item 105 requires that offering documents contain, "under the caption 'Risk Factors[,]' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

**Add.51**

The Pluralsight Defendants argue that Plaintiffs' Item 105 claim fails because the Offering Documents at issue contained a "Risk Factors" section with warnings that "[f]ailure to effectively expand our sales and marketing capabilities could harm our ability to increase our customer base," that customer growth would be affected "[i]f we are unable to hire, develop, and retain talented sales or marketing personnel," and that the time necessary to train sales representatives made it "difficult to determine in a timely manner if we are efficiently allocating our resources in these areas." ECF No. 111 at 31. These "Risk Factor" warnings, the Pluralsight Defendants argue, do not provide for liability under Item 105, as they precisely warn of the risk that a sales capacity gap posed to billings growth. The court agrees. These warnings are sufficient under Item 105, and they need not have been more specific because the Pluralsight Defendants did not have reason to believe that those risks had in fact materialized and would negatively impact billings growth.

C.   Section 20(a) and Section 20A Claims

To state a claim under Section 20(a) of the Exchange Act for control person liability, 15 U.S.C. § 78t(a), a plaintiff "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Fleming*, 264 F.3d at 1270–71 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)). Similarly, courts have interpreted a claim under Section 20A of the Exchange Act for insider trading liability, 15 U.S.C. 78t-1(a), "as requiring the plaintiff to plead a predicate violation of the [Exchange] Act or its rules and regulations." *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1244 (D. Utah 1999) (quoting *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998)). Although the Tenth Circuit has not formally adopted this "predicate violation" standard for a Section 20A claim, this

**Add.52**

court will adopt it when, as here,[20] "both sides agree that a Section 20A claim is dependent on a violation of the [Exchange] Act." *Id.* at 1245.

In a footnote, the Pluralsight Defendants argue that Plaintiffs' Section 20(a) and Section 20A claims should be dismissed because they have failed to state a "primary violation" and a "predicate violation," respectively, under the Exchange Act. ECF No. 111 at 31 n.12. As detailed above, the court finds that Plaintiffs have not sufficiently alleged Exchange Act claims. Accordingly, Plaintiffs' Section 20(a) and Section 20A claims are dismissed.

## III.    Securities Act Claims

Plaintiffs allege three claims under the Securities Act: violation of Section 11 against Pluralsight, the Signer Defendants, and the Underwriter Defendants; violation of Section 12(a)(2) against Pluralsight and the Underwriter Defendants; and violation of Section 15 against the Signer Defendants. As part of their Securities Act claims, Plaintiffs also allege violations of Items 303 and 105 of Regulation S-K. The Pluralsight Defendants argue that Plaintiffs' Section 11 and Section 12(a)(2) claims fail because Plaintiffs have failed to plead any material misstatement or omission. The Pluralsight Defendants also argue that Plaintiffs' Items 303 and 105 claims fail for the same reasons stated under the Exchange Act analysis and that Plaintiffs' Section 12(a)(2) claim should also fail because Plaintiffs lack standing to assert such a claim. Finally, the Pluralsight

---

[20] In their Opposition Brief, Plaintiffs do not refute the Pluralsight Defendants' argument that a "predicate violation" under the Exchange Act is required for their Section 20A claim to survive a motion to dismiss. *See* ECF No. 119 at 40 n.39. Rather, Plaintiffs argue that their Section 20A claim should not be dismissed because they have adequately alleged an "underlying violation[]" of Section 10(b). *Id.* Accordingly, the court finds that the parties agree on the "predicate violation" standard and apply it here to Plaintiffs' Section 20A claim. *See Karacand*, 53 F. Supp. 2d at 1245.

**Add.53**

Defendants argue in a footnote that Plaintiffs' Section 15 claim should be dismissed because Plaintiffs have failed to plead a predicate Securities Act violation. ECF No. 111 at 34 n.13.

As stated above, the court finds that Plaintiffs' Securities Act claims are only subject to Rule 8's pleading requirements instead of those of Rule 9(b). However, even under this lesser pleading standard, the court still finds that Plaintiffs' Securities Act claims fail and are accordingly dismissed.

A.  Sections 11 and 12(a)(2) Claims

"The Securities Act of 1933, 48 Stat. 74, 15 U.S.C. § 77a *et seq.,* protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 178 (2015) (citation omitted). Section 11 of the Securities Act "imposes liability on issuers, directors of issuers, and other signers of a registration statement that contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted). In relevant part, Section 11 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may . . .  sue.

15 U.S.C. § 77k(a). Section 11 accordingly provides for two types of liability: "one focusing on what the statement says and the other on what it leaves out." *Omnicare*, 575 U.S. at 179. Section 12(a)(2) of the Securities Act imposes liability upon someone who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). As with Section 11, a Section 12(a)(2) claim can be satisfied by showing that "the relevant communication either misstated or omitted a material fact." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements[.]"). Because of the parallels between a Section 11 and a Section 12(a)(2) claim, "[a] plaintiff who fails to plead a [Section] 11 claim necessarily fails to plead a [Section] 12(a)(2) claim as well." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted). Further, the same analysis of alleged misstatements or omissions under the Exchange Act "applies equally to Securities Act claims," although Securities Act claims do not require proof of scienter, reliance, or loss causation, nor do they require pleading with particularity unless they sound in fraud. *Id.* As previously discussed, because Plaintiffs' Securities Act claims do not sound in fraud, but rather in negligence and strict liability, they are subject to the pleading requirements of Federal Rule of Civil Procedure 8(a). *See* Section I.B.

The Pluralsight Defendants argue that Plaintiffs' Sections 11 and 12(a)(2) claims fail because the statements in Pluralsight's Offering Documents that Plaintiffs cite as the basis of their claims[21] are not actionable under Sections 11 and 12(a)(2) for the same reasons that the Pluralsight

---

[21] In their Motion to Dismiss, the Pluralsight Defendants identify seven statements contained in Pluralsight's Offering Documents as the basis of Plaintiffs' Securities Act claims. ECF No. 111 at 33. However, in their Opposition to Defendants' Motion to Dismiss, Plaintiffs provide a chart identifying the allegedly actionable Securities Act Allegations and reducing the number of actionable statements to six: Statements 17, 18, 20, 21, 22, and 23. ECF No. 119-3. Accordingly, the court will consider these six statements in evaluating the sufficiency of Plaintiffs' Securities Act claims.

**Add.55**

Defendants argued that they were not actionable under Section 10(b) of the Exchange Act. The court agrees with the Pluralsight Defendants. Accordingly, the Pluralsight Defendants' Motion to Dismiss on this ground is granted.[22]

### B.  Section 15 Claim

Under Section 15 of the Securities Act, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher*, 144 F.3d at 1304–05; *see also* 15 U.S.C. § 77o. "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305 (citations omitted). The Pluralsight Defendants argue in a footnote that Plaintiffs' failure to plead a primary Securities Act claim precludes a Section 15 claim. ECF No. 111 at 34 n.13. The court agrees. Accordingly, the Motion to Dismiss on this ground is granted.

### C.  Items 303 and 105 Claims

The Pluralsight Defendants also argue that Plaintiffs' claims under Regulation S-K Items 303 and 105 related to their Securities Act claims should fail for the same reasons that their Items 303 and 105 claims related to their Exchange Act claims should fail. The court agrees, and the Motion to Dismiss with respect to these claims is granted.

---

[22] Because the court finds that Plaintiffs have failed to allege actionable statements under Section 12(a)(2), the court does not reach the Pluralsight Defendant's argument that Plaintiffs lack standing to sue them under Section 12(a)(2).

**Add.56**

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

1. The Pluralsight Defendants' Motion to Dismiss Corrected Amended Complaint (ECF No. 111) is GRANTED. All claims are DISMISSED without prejudice.

2. The Underwriter Defendants' Joinder in the Pluralsight Defendants' Motion to Dismiss Corrected Amended Complaint (ECF No. 114) is GRANTED. All claims are DISMISSED without prejudice.

DATED March 31, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

57

**Add.57**

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify the foregoing:

1. All required privacy redactions have been made per 10th Cir. R. 25.5;

2. All hard copies of any pleading required to be submitted to the Court will be an exact copy of the version submitted electronically (the ECF digital submission);

3. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, (Vipre software version 12.0.7874; Definitions version 95228 – 7.89603 [Vipre engine version 3.9.2671.2 – 3.0] last updated on September 3, 2021, and according to the program, the submission is virus-free

s/ *Carol V. Gilden*
Carol V. Gilden

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021, I caused to be filed a true and correct copy of the Appellant's Opening Brief and the Appellant's Appendix (Volumes I through III) with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

s/ *Carol V. Gilden*
Carol V. Gilden